# EXHIBIT 3

Page 94

1  have been this most recent year you filed your taxes
2  for.
3  A. Yeah.
4  Q. So let's go back. Let's not go to -- let's go to this
5     year, 2024. You haven't filed taxes yet, but we're
6     coming to the yearend. How much have you -- has each
7     corporate entity been able to bring in this year?
8  A. I think -- profit wise?
9  Q. Yes.
10 A. Around $2 million for me.
11 Q. So you've had a good year this year?
12 A. Yeah, I worked very hard. I did.
13 Q. I'm sure you do. And your husband?
14 A. He did like, I think, $500,000.
15 Q. Okay. So obviously a definite portion of this comes
16    from government payments to you, correct?
17 A. Um-hmm.
18 Q. That's a yes?
19 A. Yes.
20 Q. Isn't it important for you to know how to bill properly
21    so that you're only being paid for what the government
22    legally allows you to be paid for?
23 A. Yes.
24 Q. Or do you not care?
25 A. No, of course I care. And the idea that everything is

Page 95

1  done correctly. That's why the biller oversees it. She
2  understands it better than I do. So I just try to help
3  save her some time as far as just putting in codes of
4  things that were done. But as far as servicing and
5  that, they manage that. They have a list of when I am
6  or am not in the building, which PA sees the patient,
7  and they put that in.
8  Q. So you don't know if fraud is occurring in your office?
9  A. No, there is no fraud occurring.
10 Q. Well, how do you know that? Because you don't know
11    what they're doing, and you don't know what the rules
12    are. How do you know that? You just turn it over to
13    the biller, and you don't know what the biller puts in.
14    That's what you've just told me.
15 A. No, I don't. You're asking me for like nuance things.
16    I'm giving you --
17 Q. I'm not asking you for nuance things.
18 A. Yeah, you are.
19 Q. I'm asking you whether you are aware of whether fraud
20    has occurred in your office with regard to how things
21    are billed to the government?
22 A. No, we bill correctly.
23 Q. Well, how do you know that?
24 A. Because I've spoke to the biller about it.
25 Q. When did you last speak to the biller?

Page 96

1  A. I spoke to the biller two months ago. We talk to each
2     other.
3  Q. Do you know what the nature of our lawsuit is here?
4  A. Yes.
5  Q. What do you understand we're claiming you did wrong?
6  A. No. You're claiming I fired her because I thought that
7     she thought we were doing something wrong.
8  Q. Okay.
9  A. Instead of firing her for poor performance.
10 Q. With regard to whether or not my client's complaints
11    about what you were doing wrong are accurate, do you
12    know sitting here today if she's correct?
13 A. She's inaccurate.
14 Q. Well, have you done an investigation?
15 A. Yes.
16 Q. What did you investigate?
17 A. How things were being billed.
18 Q. Okay. What did you do? Who did the investigation, you
19    personally?
20 A. I did it with the biller. We reviewed stuff.
21 Q. Okay. And who's the biller you're referring to here?
22 A. Simrath.
23 Q. Okay. And is there a written investigation result or
24    report?
25 A. No.

Page 97

1  Q. Okay. What did you do to investigate my client's
2     claims?
3  A. We reviewed the processes of how things are billed, and
4     what was being put down.
5  Q. So then you do know how they were billed, and what was
6     being put down?
7  A. Yes.
8  Q. So you told me a few minutes ago you didn't know. It
9     was completely up to the biller.
10 A. No, you're asking me for servicing provider and billing
11    provider, and they mean different things in different
12    instances.
13 Q. Right. So why don't you explain that to me.
14 A. I don't know that, because she fills it out.
15 Q. Okay.
16 A. I'm not a biller. That's why I hired her.
17 Q. Have you ever had a physician assistant who has been
18    the billing -- who's had her name on the billing as the
19    provider?
20 A. Yes.
21 Q. For services?
22 A. Absolutely.
23 Q. And how many times has that happened?
24 A. It happens when I'm not there.
25 Q. Okay. So when did that begin?

25 (Pages 94 - 97)

www.veritext.com          Carroll Reporting & Video
                          A Veritext Company                586-468-2411
                                                            www.veritext.com

Page 98

```
 1  A.  After COVID rules ended.
 2  Q.  Okay. And what do you understand the COVID rules were?
 3  A.  That the physician did not have to be present.
 4  Q.  Under what circumstances?
 5  A.  There was the circumstance as long as they could be
 6      gotten ahold of.
 7  Q.  Where'd you get that information from?
 8  A.  From the CMS.
 9  Q.  I'm sorry?
10  A.  CMS.
11  Q.  What have you read from CMS that makes you say to me
12      here today that you didn't -- as long as you could be
13      gotten ahold of, I think was how you put it, what are
14      you relying on for that? Is that for anybody that
15      comes into your office so long as you could have been
16      gotten ahold of it's legal?
17  A.  Yes.
18  Q.  Okay. And where do you get that information from?
19  A.  From, I just told you, CMS.
20  Q.  I'm sorry?
21  A.  CMS.
22  Q.  Okay. And what did you read from CMS about COVID?
23  A.  That because of the situation with COVID, that as long
24      as the physician could be gotten ahold of that they
25      could bill.
```

Page 99

```
 1  Q.  Okay. And do you think that what you just told me is
 2      accurate?
 3  A.  Yes.
 4  Q.  Hang on a second, please. Sorry. Okay. In order for you
 5      to be out of the office, and be able to bill as a
 6      physician, based on COVID, did you have to do a case by
 7      case analysis of that particular patient coming into
 8      the office to see you personally?
 9  A.  No.
10  Q.  You're not aware that in order to be able to render
11      services and bill, excuse me, to be able to bill for
12      services when you're not in the office during COVID, it
13      had to be -- there had to be a medically indicated
14      reason on a case-by-case basis? You're not aware of
15      that?
16  A.  Medically indicated? What do you mean?
17  Q.  Yeah, because you had COVID or something, and couldn't
18      see the patient in person.
19  A.  I don't think that's what that meant.
20  Q.  What what meant? What are you saying when you said
21      that meant? What are you referring to? Go ahead.
22  A.  My understanding of it was that because of the
23      stressful nature of the COVID situation where
24      physicians were placed in hospitals, and couldn't get
25      to places, that they loosened the rule. They also
```

Page 100

```
 1      loosened the rule for telehealth too.
 2  Q.  Okay. Where do I find that what you're referring to as
 3      a physician who was responsible for these practices?
 4      Where do I find that?
 5  A.  CMS. I'd have to get it to you.
 6  Q.  Do you have something that says that?
 7  A.  I believe I do. I don't have it on me.
 8  Q.  And did you have any training on that?
 9  A.  No.
10  Q.  What format did you become aware of that in?
11  A.  Piece of paper.
12  Q.  I mean, did you get something online? How did you
13      become aware of this new policy?
14  A.  Online.
15  Q.  And are you guessing? Sounds like you're not sure.
16  A.  It was a while ago. I can't remember exactly.
17  Q.  So you can't tell me anything here today that you
18      recall specifically reading about the COVID protocols;
19      is that correct?
20  A.  No. I just told you I did read it, but I can't
21      remember exactly where I found it.
22  Q.  So during COVID, you were billing for procedures for
23      servicing a patient when you did not actually see the
24      patient, correct?
25  A.  They were all my patients, so I knew everything about
```

Page 101

```
 1      them.
 2  Q.  I didn't ask you that.
 3  A.  Well, you're acting like I don't know the patient. I
 4      knew the patients.
 5  Q.  You know what, I didn't act like that. What I said was
 6      you were billing for servicing a patient when you did
 7      not service a patient in the office, correct?
 8  A.  Me personally, no.
 9  Q.  Okay. And during COVID, did you use telehealth where
10      you were on a video with a patient?
11  A.  In certain circumstances.
12  Q.  Okay. And how many circumstances were those? Is that
13      on the calendar?
14  A.  Sometimes they put it in. My patients have to be seen
15      in person mostly. But if it was a wound check or
16      something, you could do it.
17  Q.  So then who saw the patient during COVID?
18  A.  You mean the telehealth?
19  Q.  The physician.
20  A.  I would always do the telehealth.
21  Q.  Hang on a second. So let's stick with the COVID
22      protocol. So do I have it right that what was happening
23      was the physician's assistant was seeing the patient in
24      the office, but you were remote somewhere else and
25      could be reached by phone?
```

26 (Pages 98 - 101)

Page 102

1  A. In certain circumstances, yes.
2  Q. And you think that was protected, and gave you the
3     ability to -- even if you never saw the patient, to
4     bill as the servicer, correct?
5  A. Yes.
6  Q. So wasn't the purpose of the law to not expose a doctor
7     and a patient?
8     MR. BREAUGH: Object for speculation.
9  A. I don't know.
10 BY MS. GORDON:
11 Q. I didn't get my question out yet.
12 A. No.
13 Q. Okay. That wasn't the purpose of the law?
14 A. No.
15    MR. BREAUGH: Objection to speculation.
16 BY MS. GORDON:
17 Q. And during COVID, did you see any patients that you
18    would not ordinarily have seen?
19 A. I don't understand.
20 Q. Were you treating people for COVID? Were you rushing
21    to the hospital to treat a COVID patient? I assume
22    not?
23 A. No, I treated COVID patients. I had to cut off legs,
24    and try to save people's arms. Yeah, I was grossly
25    involved in that as well.

Page 103

1  Q. Were you more busy during COVID?
2  A. Well, I didn't see new patients, so it was a different
3     busy. I was in the hospital more.
4  Q. What was your billing like in, let's call it, 2022?
5  A. 2022?
6  Q. Was it up or not?
7  A. Well, that was separate. I'm talking about COVID, like
8     the 2019 COVID.
9  Q. Okay. Well, when did the protocols come into effect,
10    the new COVID protocols?
11 A. During COVID?
12 Q. That we knew?
13 A. I didn't have a PA then, so it didn't matter. I saw all
14    my own patients.
15 Q. I'm just trying to find out what the COVID protocols
16    came in that you're relying on in this case?
17 A. I'm relying on...
18 Q. What are you relying on in this case, what time period?
19 A. From what I remember, and what I read.
20 Q. Okay. But what was the time period where you were --
21    where you had PAs, and you were relying on the COVID
22    protocols? What time period are we talking about here?
23 A. 2020 until 2023.
24 Q. Did you have a PA in 2020?
25 A. I did have a PA, but the PA didn't always see -- I

Page 104

1     mean, I was in the office. They didn't necessarily see
2     patients by themselves all the time.
3  Q. Were your PAs seeing patients virtually?
4  A. No.
5  Q. When I get your patient billing records am I going to
6     see any patients for the year 2022 where a PA used her
7     name for the billing, billing of services as compared
8     to your name?
9  A. Yes.
10 Q. Okay. How many times is that going to occur?
11 A. A few hundred.
12 Q. A few hundred?
13 A. Yeah.
14 Q. Where the PA would have been the person who's getting
15    the rate under which you were billing for?
16 A. Yeah.
17 Q. Was that 85 percent of what you would bill for?
18 A. Yes. Whatever the rate's supposed to be.
19 Q. So there was a financial advantage, obviously, for the
20    doctors to bill at their rate, correct?
21 A. Yes.
22 Q. And you said there were several hundred times during
23    2022?
24 A. Yeah. Probably 200, several hundred over the top. I
25    didn't see that many patients.

Page 105

1  Q. And under what circumstance would that occur?
2  A. If I wasn't able to be available.
3  Q. Because why?
4  A. If I was on a plane or in surgery.
5  Q. Has any PA other than my client ever billed under her
6     own provider number and not yours?
7  A. Yes.
8  Q. Okay. Who other than my client?
9  A. Well, Kendall, Kyle.
10 Q. Are you sure, or are you guessing?
11 A. No, I know they billed under them.
12 Q. Okay. Did you maintain a hard copy of my client's file
13    throughout the course of her employment with you?
14 A. We had one hard copy, and it was in the Med Spa, and
15    it's gone now, so I don't know what happened to it.
16 Q. I just asked you if you maintained a hard copy of her
17    file.
18 A. We did, but I don't have it.
19 Q. So where are hard copies of the files kept?
20 A. In the manager's office.
21 Q. I don't know what you mean by that. Give me a name.
22 A. In Madison and Rachel's office.
23 Q. Okay. And those are the medical assistants?
24 A. No. Those are the practice managers.
25 Q. I'm sorry. Okay. So where are their offices located?

27 (Pages 102 - 105)

Page 114

1  A. Yes.
2  Q. Okay. But you know there were new procedures?
3  A. Yes.
4  Q. And you've referenced them here today a bit?
5  A. Yes.
6  Q. Something about you could be remote --
7  A. The telehealth.
8  Q. -- or available by, I think you said, text or
9     something?
10 A. Yes.
11 Q. Right?
12 A. Um-hmm.
13 Q. Okay. So my question was very straightforward. You've
14    already said there was nothing in writing that was
15    distributed to your staff or employees about this, the
16    change. You said that. So then I went on and I said
17    was any training given about the new COVID procedures
18    about doctors not necessarily having to be on-site.
19 A. There was no training.
20 Q. For billing?
21 A. There was no training.
22 Q. There was no training, okay.
23 A. No training.
24 Q. Hang on one second. Okay. After my client became
25    employed at your practice, she raised some questions

Page 115

1     about how billing was being done, correct?
2  A. I guess midway through her employment.
3  Q. Okay. And what did you understand her questions were,
4     or her concerns were?
5  A. About when we bill the servicing provider, billing
6     provider who we were billing under if I wasn't there.
7  Q. Okay. And how did you learn about this? I know that
8     Julia raised some issues with you directly, correct?
9  A. Emailed. She emailed.
10 Q. But she raised them with you directly, correct?
11 A. I don't remember. I just remember I see the emails.
12 Q. And you're on some of the emails, correct?
13 A. Yes.
14 Q. And didn't you talk to her directly about this?
15 A. Afterward, yes, I did.
16 Q. After what, after the complaint?
17 A. She emailed, yeah, after she said something.
18 Q. But you definitely sat down with her on several
19    occasions because she was raising questions, correct?
20 A. I don't recall those occasions. I just know there were
21    a couple meetings we had.
22 Q. And who was in those meetings?
23 A. It would be me and Pavlina.
24 Q. Okay. And anybody else?
25 A. No.

Page 116

1  Q. And what was the purpose of the meetings?
2  A. To try to go over what her issues were, and try to
3     figure out how to correct them.
4  Q. Okay. And what did you figure out about how to correct
5     them?
6  A. We tried to explain to her that private insurers don't
7     follow incident to billing, and that there were the
8     COVID rules were different than she referenced
9     something from I think was like 2007 or something, a
10    very old reference, and that wasn't relevant.
11 Q. Didn't she email everybody some information about the
12    COVID rules?
13 A. No.
14 Q. Are you sure about that?
15 A. I never got an email about COVID rules.
16 Q. Did you give her anything about the COVID rules?
17 A. No.
18 Q. Okay. Did you put anything in writing to her
19    explaining to her why she was allegedly incorrect, and
20    you were correct?
21 A. No.
22 Q. So there's nothing at all that exists in writing where
23    you are telling Julia Zimmerman here's why what we're
24    doing is correct. You don't have anything to worry
25    about. Something like that; is that correct?

Page 117

1  A. No. I don't have anything.
2  Q. Okay.
3  A. That I wrote to her.
4  Q. And Julia emailed you, and she also emailed Simrath; is
5     that correct?
6  A. Which email are you referring to?
7  Q. I just am not referring to a specific one right now.
8     I'm saying that she emailed with you and Simrath.
9  A. Yes.
10 Q. About many of her concerns; is that true?
11 A. Yes.
12 Q. Okay. And you remember that one of her concerns was
13    the chart shouldn't contain billing diagnoses that
14    weren't actually existent as a diagnosis from the
15    finding. She was concerned about the diagnoses that
16    were being listed. Do you remember that?
17 A. Vaguely.
18 Q. Okay. And the concern was that there was improper
19    logging of diagnoses in charts which would open up
20    issues in case you should get audited, correct?
21 A. She never said that to me.
22 Q. She never said what?
23 A. Any of the words audited. She just said that she
24    thought that it was more accurate. My understanding of
25    billing diagnosis was something we were treating, and

30 (Pages 114 - 117)

Carroll Reporting & Video
A Veritext Company

www.veritext.com
586-468-2411
www.veritext.com