# EXHIBIT 5

Page 118

1  calendars, it has our visit information.  It's got all
2  the patient information, insurance information.
3  Q.  So post-April 2020, you're dealing with MBR, and they
4  get information, they see that a patient came into the
5  office and met with a physician assistant and that
6  it's being billed under your number.  Did you discuss
7  with MBR the circumstances under which that could be
8  done and not be done?
9  A.  I did not, no.
10 Q.  Okay.  And how would MBR know whether you were
11 available by phone or teleconference post-April 2020
12 or whether you were just not available?
13 A.  Because I can't think of a single time when I wasn't
14 available during a clinic.
15 Q.  But that's not the question.  The question is how did
16 MBR know if you were available?
17 A.  I didn't tell them I wasn't ever available [sic].
18 Q.  So the assumption on their end would just be you're
19 available?
20 A.  Correct.
21 Q.  Okay.  So Epic is an electronic medical record system,
22 correct?
23 A.  Yes.
24 Q.  Okay.  And does Epic include your office calendar?
25 A.  It includes -- what do you mean?

Page 119

1  Q.  I didn't understand that Epic is just the medical
2  records side, correct?
3  A.  Yeah, the entire patient care database --
4  Q.  Okay.
5  A.  -- of calendars and --
6  Q.  Okay.
7  A.  -- patient visit, and billing, and everything.
8  Q.  And what's your office calendar?  What do you use to
9  calendar vacations, other things that are going on
10 with you, when you're in, when you're out?
11 A.  The office managers keep an office calendar on
12 Microsoft Office or Outlook or whatever it is.
13 Q.  Okay.  And is that where you would document your time
14 out of the office for vacation or professional
15 activities you have to attend to, things like that?
16 Would that be --
17 A.  We can tell them when we're gone.
18 Q.  Okay.  You decide to tell, you decide to do the
19 telling.  I'm looking for some way they could document
20 when you were in the office and out and plan for your
21 schedule, like, okay, we're gone for two weeks here.
22 I assume that was on the calendar?
23 A.  If we were on vacation, the office managers were aware
24 that we were on vacation.
25 Q.  I know, I didn't ask you that, but were they -- was it

Page 120

1  on the calendar?
2  A.  I'm assuming they put it on the calendar.
3  Q.  You would have expected them to do that, I assume?
4  A.  Yes.
5  Q.  And so I assume Epic did not have access to your
6  office calendar, your Microsoft -- is it a Microsoft
7  calendar?
8  A.  Yeah.
9  Q.  Okay.  They didn't have access to that, did they?
10 A.  I'm not sure.
11 Q.  Okay.  So after the COVID regulations changed, did you
12 issue any written statements to your office?
13 A.  Regarding what?
14         MR. BREAUGH:  Can I just object to form?
15 When you say COVID changing, from pre-COVID --
16         MS. GORDON:  These regs --
17         MR. BREAUGH:  -- to COVID or --
18         MS. GORDON:  -- these regs.
19         MR. BREAUGH:  -- COVID to post?
20         MS. GORDON:  Yeah.
21         MR. BREAUGH:  Okay.
22         MS. GORDON:  COVID's now over --
23         MR. BREAUGH:  Okay.
24         MS. GORDON:  -- as to the regs, we're going
25 back to our normal.

Page 121

1 BY MS. GORDON:
2 Q.  Did you issue anything to your office?
3 A.  Did I issue anything to my office?  Such as?
4 Q.  Okay.  We now have to be back to the old way, we now
5  have to be back where I have to be on premises?
6 A.  There were discussions with Simrath.  Simrath was
7  preparing for this for a year in advance, like
8  contacting Epic, trying to get these physician
9  assistant numbers or billing capabilities.  There were
10 many, many, many emails back and forth of us trying to
11 make this ready for COVID regulations to end.
12 Q.  Well, what was so necessary that COVID -- how would --
13 what was changing from your world?  It sounds like you
14 didn't have much to change.
15 A.  I don't know what you mean by what was changing in my
16 world.
17 Q.  Well, what were all the emails between Simrath and the
18 billers to get ready for this?  What were you
19 referring to there?
20 A.  The -- that the regulations were going to change in
21 terms of how billing must be handled from the four
22 years of COVID regulations, 2020, 2021, 2022, and
23 2023, for four years, we had these COVID regulations
24 where we were going to have to go back to billing
25 incident-to at the start of 2024.  Or 2023?  At the

Page 122

1  start of 2024, and so we had to be prepared for this
2  change in our billing changes.
3  Q. Well, what was the change in your billing practices
4  that had to occur? What was going to be different?
5  A. That I had to be in the building in order for the
6  incident-to criteria to be met.
7  Q. And, therefore, what? How did that affect billing?
8  Did they have to have some notation that you were in
9  the building?
10 A. That Simrath, if we weren't in the building, would
11 bill for the physician assistant, and if we were in
12 the building, we could bill for incident-to.
13 Q. Okay. So then during that four-year period, Simrath
14 had been directed that whether you're in the building
15 or not in the building, it should be billed under your
16 name, the visit should be billed under your name?
17 A. If we were available by phone or some kind of
18 telecommunication.
19 Q. Well, was that in writing to Simrath, or was it just
20 whether you're in the building or not?
21 A. It was not in writing to Simrath.
22 Q. Okay. So I mean you're saying there's a lot of
23 communications back and forth to straighten this out,
24 I'm paraphrasing you, but it sounds like it was pretty
25 simple once the COVID regulations ended, you just told

Page 123

1  Simrath go back to the old way?
2  A. No, because Epic was new to us as our billing
3  software, and so it was not back to the same old way.
4  We used Medical Billing Resources prior to COVID,
5  which had a whole separate set of software, and we had
6  to figure out how to bill through Epic because we had
7  never done that before, and that included setting up
8  billing for a nonphysician provider.
9  Q. Okay. Prior to March of 2020, were there times when
10 you would have billed on the basis of incident-to when
11 you were not on premises?
12 A. There was no physician assistant who saw patients
13 without me being on premises prior to COVID.
14 Q. I didn't ask that. I asked if there was any billing
15 that was done when you were not on premises under your
16 name?
17 A. I guess I answered that because it wouldn't be
18 possible to bill if I wasn't there and didn't see a
19 patient.
20 Q. Oh, it would -- it would be possible, you could
21 definitely put a bill in, obviously, just calling it
22 incident-to but you weren't in the building.
23 A. I don't know what you're asking.
24 Q. I'm asking because I -- if need be, we will get the
25 records, but prior to 20 -- the COVID change, am I

Page 124

1  correct that there were times when there were
2  incident-to billings when you were not on premises?
3  A. No.
4  Q. You're a hundred percent sure of that? You're not,
5  are you?
6  A. I'm a hundred percent sure. There was no physician
7  assistant in the building seeing patients when I
8  wasn't there, and so incident-to would be billed in
9  every instance --
10 Q. Okay. How about on your wife's side?
11 A. She never used a physician assistant before COVID.
12 Q. Okay.
13 A. My physician assistant, Alyssa Zarski, was only with
14 me because when I was in the operating room, she came
15 with me, and that's the days when Dr. Pensler would be
16 in the office.
17 Q. So -- okay, all right. Were there ever instructions
18 to billers, MBR or Simrath, to bill for anything other
19 than incident-to?
20 A. Such as?
21 Q. Such as anything different than that where you gave
22 instructions? We've talked about you giving
23 instructions to billers to bill for something other
24 than incident-to.
25 A. Not during COVID.

Page 125

1  Q. Okay. Did anyone in your office ever monitor the
2  general -- the amount of billing being done by the
3  doctor versus the PA? You must have looked at that at
4  some point.
5  A. I don't think so.
6  Q. Well, you were concerned about maximizing your
7  reimbursement, and I know this came up later because
8  you made some comments to my client about you couldn't
9  afford to bill at the PA rate. Correct?
10 A. I think that statement -- are you asking me what I
11 meant by that statement?
12 Q. No.
13 A. Okay.
14 Q. I'm saying that was there ever any -- it sounds like
15 there was analysis that you had some feel for the
16 diminution in your net profit for the year based on
17 how many PA billings under your numbers there were or
18 under your number with a full reimbursement.
19 A. I don't think that, according to the COVID rules, that
20 we were mandated to take a physician assistant level
21 of repayment or reimbursement rather than a physician
22 level.
23 Q. So during COVID, you just always took the physician
24 level?
25 A. From what we understood about the COVID rules, we were