# EXHIBIT 6

Page 34
1  Q.  Okay. Are there other criteria for incident-to
2      services?
3  A.  That's the most basic criteria.
4  Q.  Any others that you're aware of?
5  A.  No.
6  Q.  Can a PA render incident-to services on a patient's
7      first visit?
8  A.  No.
9  Q.  Okay. Why not?
10 A.  It's a brand new patient. They should be seen by the
11     physician.
12 Q.  Okay. So if a brand new patient is not seen by the
13     physician, you can't bill incident-to; is that right?
14 A.  Correct.
15 Q.  And what about if a change to the plan of care occurs?
16 A.  If a plan of care occurs, then I believe it should be
17     reviewed by the physician. I don't believe the PA can
18     make that change.
19 Q.  Okay. What is the term direct supervision with regard
20     to incident-to? Is that a term that you're familiar
21     with?
22 A.  Direct supervision is pretty much if the physician is
23     like right there in the office with the PA.
24 Q.  When you say right there in the office, what are you
25     referring to?

Page 35
1  A.  Like inside the patient room.
2  Q.  Okay. So it's your understanding that if the
3      physician isn't in the patient room, then direct
4      supervision has not occurred?
5  A.  To my understanding.
6  Q.  Okay. So do you bill incident-to for Drs. Pensler and
7      Dr. Hill?
8  A.  Yes.
9  Q.  Have you in 2022 and 2023?
10 A.  No.
11 Q.  So you didn't -- you don't recall ever billing
12     incident-to for Pensler or Hill in 2022 or 2023?
13 A.  Dr. Hill was not being seen, or I was not billing for
14     Dr. Hill at that time.
15 Q.  Okay. So leaving him aside then, so with regard to
16     Dr. Pensler, you don't recall billing incident-to for
17     Dr. Pensler in '22 and '23?
18 A.  No.
19 Q.  Okay. When did you start -- when did you first bill
20     incident-to for Dr. Pensler?
21 A.  Beginning of 2024. That's when COVID regulations had
22     lifted.
23 Q.  So what's the connection between COVID regulations
24     lifting, and being able to bill incident-to?
25 A.  COVID regulations pretty much stated that if the

Page 36
1      physician was reachable through telecommunications,
2      say a text, or phone call, or anything like that, then
3      we would still be able to bill under the physician.
4  Q.  So you wouldn't be billing incident-to, you would just
5      be billing as if the physician was both the billing
6      and servicing provider?
7  A.  Correct.
8  Q.  Okay. Versus my understanding is incident-to would be
9      that servicing provider would be a PA, for example,
10     and then billing provider would be the doctor, that's
11     incident-to; is that right?
12 A.  Correct.
13 Q.  Okay. So under COVID, you're saying that -- so when
14     did COVID start? You referenced a COVID regulation.
15 A.  Um-hmm.
16 Q.  When did that come into place, as you understood it?
17 A.  I'm honestly not sure when it came into place. It was
18     just an article that I had read, and all I can recall
19     from that is that it was supposed to be lifted at the
20     beginning of 2024.
21 Q.  Okay. So I understand you don't know when the COVID
22     regulation came into place, but when did you first
23     start implementing that at the practice?
24 A.  Incident-to?
25 Q.  The COVID regulation that you're referring to.

Page 37
1  A.  As far as I knew, it was always taking place that way,
2      because I never billed incident-to at that point.
3      First off, I wasn't even familiar with incident-to.
4      With my previous employments, that never came into
5      play. When I first started my billing career, it was
6      with pediatric neurosurgery, and it was a group of
7      three physicians. And they were always there in the
8      office no matter what. At least one was. And then I
9      moved on to St. John with internal medicine.
10 Q.  Okay. I'm going to go back and ask you about your
11     prior work history in a second, but I just want to
12     stick with this follow up on something that you had
13     said earlier. So you said that under the COVID
14     regulations, you do not bill any incident-to?
15 A.  No.
16 Q.  Okay. So under the COVID regulations that you're
17     referring to, you billed as if the doctor was both the
18     billing provider and the servicing provider for all
19     services?
20 A.  Correct.
21 Q.  Regardless of whether the doctor actually performed
22     the services?
23 A.  Correct.
24 Q.  Okay. When did you start doing that?
25 A.  Since my time of employment.

Page 38

1  Q.  So since you started there in February of 2022?
2  A.  Yes.
3  Q.  Okay.  Who told you to do that?
4  A.  That was just how -- nobody told me. It was just
5      how -- I didn't know incident-to was a thing, so I
6      always billed it as servicing and billing under the
7      actual physician.
8  Q.  Okay.  So what's the COVID regulation that you are
9      referring to?
10 A.  Say again?
11 Q.  So you referred to a COVID regulation. What is that?
12     What are you referring to?
13 A.  It's the regulation.  I just explained that.
14 Q.  I know. I understand your understanding of the
15     regulation. I want to know like what source you are
16     referring to when you say there's a COVID regulation.
17     What is that?
18 A.  It was an article that was emailed to me.
19 Q.  Who emailed the article to you?
20 A.  Dr. Hill.
21 Q.  Okay.  And was that to your work email?
22 A.  Yes.
23 Q.  Okay. And, approximately, when was that?
24 A.  I think it was around July.
25 Q.  Of what year?

Page 39

1  A.  2023.
2  Q.  Okay. And what was the article about?
3  A.  That incident-to billings has been like paused until
4      COVID regulations that are supposed to be lifted in
5      2024.  And that telecommunications, as long as the
6      physician was reachable through telecommunication,
7      services were billed between -- or services could be
8      billed under servicing and billing with the physician.
9  Q.  Okay.  And you said you got that in July of '23?
10 A.  Yes.
11 Q.  From Dr. Hill?
12 A.  Yes.
13 Q.  Okay.  Do you remember like who published the article?
14 A.  I can't.
15 Q.  Okay.  Was it a CMS article?
16 A.  I can't.
17 Q.  Or some other secondary source?
18 A.  I believe it might have been secondary, but I can't be
19     sure.
20 Q.  When is the last time you saw that?
21 A.  When he gave it to me. That was July, so it's been --
22     I haven't looked at it since.
23 Q.  Okay. So I'm just going to go back to the COVID
24     regulation that you're referring to. Whose COVID
25     regulation is that?  When you say COVID regulation,

Page 40

1      whose regulation?
2  A.  I'm pretty sure it was through CMS.
3  Q.  Okay.  So did you ever read the actual, you know,
4      federal register of the CMS regulation itself?
5  A.  No.  I couldn't find it.
6  Q.  So when you said you couldn't find it, did you -- so
7      does that mean that you went and tried to look for it,
8      and couldn't find it?
9  A.  Right. So I tried to find some more confirmation for
10     it, and I couldn't find it other than what Dr. Hill
11     had provided me.
12 Q.  So you went and tried to look for the regulation after
13     you received this email from Hill in July of '23?
14 A.  Yes.
15 Q.  Okay.  So other than the email you got from Dr. Hill,
16     did you look at any other sources of information with
17     regard to the COVID regulation?
18 A.  No.
19 Q.  And so it's your understanding that under the COVID
20     regulation, CMS, using my terminology.  These aren't
21     your words.  I'm just going to ask you to confirm my
22     understanding of your testimony.  Your understanding
23     was that during COVID, CMS suspended all incident-to
24     billing?
25 A.  Yes.

Page 41

1  Q.  Okay. So when Dr. Hill sent you the email in July of
2      '23, did you discuss it with him?
3  A.  I can't recall.
4          MR. BREAUGH:  I'm going to object just as
5      to attorney-client.
6          MS. TAYLOR:  I asked if she talked to Dr.
7      Hill.
8          MR. BREAUGH:  I know.  I haven't said yet.
9      I'm saying it's around this time.  It was kind of a
10     collective one.
11         MS. TAYLOR:  Mark, I mean, let's just --
12         MR. BREAUGH:  Okay.
13 BY MS. TAYLOR:
14 Q.  Let's just stick with the questions that I have asked.
15     The question was whether she talked to Dr. Hill about
16     the email that he sent her.  And I believe your
17     testimony was that you can't remember if you did or
18     not.
19 A.  Correct.
20 Q.  Okay.  And you said that it was your understanding
21     that the COVID regulation that you're referring to,
22     that that lifted at the beginning of 2024?
23 A.  Right.
24 Q.  Okay.  So leaving aside COVID regulations, those are
25     kind of special rules, right?  So leaving that aside,

11 (Pages 38 - 41)

Page 74

1  them a lot.  Basically, it was just clarification like
2  as to what -- what K Heart was, and all that stuff,
3  because that was all brand new to me back when I
4  started billing for them.  And, you know, I would go up
5  to them, and I would have them explain like what these
6  vascular bodies are.  You know, what's the difference
7  between here, because certain CPT codes are more
8  elaborate than others.  And, you know, the terminology
9  would leave me confused, so then I'd go to the doctors
10 and say you need to explain this procedure to me.
11 Like what happened here.  I want to know what
12 happened.  And they would always take the time and sit
13 down and be like okay.  So they even went out as to
14 like draw diagrams and things like that for me to be
15 able to understand.
16 Q.  What is K Heart?
17 A.  K Heart is a facility where Dr. Pensler goes and does
18 either like angiograms, or venograms, and she rents
19 out the facility there in order to perform surgeries.
20 When she rents them out, she does not have to pay.
21 Well, she pays them their rental fees, but she
22 collects all of the money instead of like, for
23 instance, if she goes to a hospital, the hospital
24 takes over, and the hospital gets a bill for any
25 equipment, and any medicines, or whatever, and staff,

Page 75

1  and all that they use.  Whereas, with K Heart, Dr.
2  Pensler is able to bill for all of that.
3  Q.  Okay.  And when you say that, you know, the input from
4  the doctor would be, for example, to explain what the
5  vascular bodies are, does that refer to human anatomy?
6  A.  Yes.
7  Q.  And, you know, what's anatomically or medically going
8  on with a certain procedure?
9  A.  Correct.
10 Q.  Okay.  Any other input that they would give you on
11 billing and coding in '22 and '23?
12 A.  Every now and then Dr. Hill would come up and say,
13 hey, I feel like this is like the CPT code that fits.
14 Like Dr. Hill is very good about CPT codes.  He'll come
15 up to me, and if he wasn't sure, he would say I feel
16 like this is the best CPT code.  Give me your opinion,
17 or can you find something better, blah, blah, of this
18 sort.  And I'd either confirm or tell him, hey, this
19 is what's best, or what I found.
20 Q.  Okay.  And what's the -- you know, what's the goal
21 there when he comes to you and says that he wants to
22 use a different CPT code?
23 A.  It's not that he wants to use a different CPT code.
24 He's just trying to confirm whether or not that's the
25 most accurate, and that's the goal.

Page 76

1  Q.  So going back to '22 and '23, there were physician
2  assistants who worked for the practice, correct?
3  A.  Yes.
4  Q.  And they were seeing patients, correct?
5  A.  Yes.
6  Q.  And they were seeing patients when the doctors were
7  not in the office?
8  A.  Correct.
9  Q.  Okay.  How did you know how to bill in those
10 situations where a PA sees a patient, doctor's on
11 vacation?
12 A.  ==Well, like I said before, I didn't realize that there==
13 ==was an incident-to billing at that time, so everything==
14 ==was billed under the physicians.==
15 Q.  ==Okay.  And that's in '22 and '23?==
16 A.  ==Yes.==
17 Q.  ==And you said that's because you weren't aware that==
18 ==incident-to was a thing?==
19 A.  ==Yes.==
20 Q.  ==Okay.  So you didn't know -- by a thing you mean you==
21 ==didn't know the incident-to was an option?==
22 A.  ==I didn't know that the policy was even around.  I==
23 ==didn't know.==
24 Q.  Okay.  I think I just kind of colloquially understand
25 what you mean when you say it's a thing.  I just want

Page 77

1  to make sure that someone who's reading this two years
2  from now is going to understand what we mean.
3      Okay. All right.  I now want to ask you
4  just about the step-by-step process that you use when
5  you, you know, sit down to bill.  And you said that,
6  you know, one of your, you know, primary sources are
7  the patient charts, that's right?
8  A.  That's correct.
9      BATES NUMBER 145
10     Photo
11     12:22 p.m.
12 BY MS. TAYLOR:
13 Q.  Okay. I'm going to hand you what has been marked as
14 Bates Zimmerman 145.  Okay.  So just take a look at
15 that.  Is this, you know, a photo of a patient chart,
16 as you understand it, from Epic?
17 A.  The screen is a lot different from what comes to me.  I
18 can't say for certain what this part is where it says,
19 you know, level of service or not, because I don't get
20 that screen at all in my end.  But the only thing I'm
21 familiar with is the note on this side.
22 Q.  So the note on the far right hand side is what you're
23 pointing to?
24 A.  Correct.
25 Q.  Okay.  So but on this section on the right hand side