# EXHIBIT 4

Page 1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MICHIGAN

3                         SOUTHERN DIVISION

4

5     JULIA ZIMMERMAN,

6                         Plaintiff,

7        vs.                        Case No. 23-cv-11634

8                              Hon. Nancy G. Edmunds

9                              Mag. Judge Anthony P. Patti

10    ELIZABETH A. PENSLER, D.O., PLLC d/b/a

11    "PENSLER VEIN AND VASCULAR SURGICAL INSTITUTE"

12    and "ELIZABETH FACE + BODY MED SPA," a Michigan

13    Professional Limited Liability Company, ELIZABETH

14    A. PENSLER, D.O., an Individual, ELIZABETH MED SPA,

15    PLLC, a Michigan Professional Limited Liability

16    Company, DEREK L. HILL, D.O., PLLC d/b/a "HILL

17    ORTHOPEDICS," a Domestic Professional Limited

18    Liability Company, DEREK L. HILL, D.O., an

19    Individual, jointly and severally in their

20    individual and official capacities,

21                         Defendants.

22    _____

23

24

25         The Deposition of ELIZABETH A. PENSLER, DO

Page 2

1    Taken at 33 Bloomfield Hills Parkway, Suite 220
2    Bloomfield Hills, Michigan
3    Commencing at 11:09 a.m.
4    Monday, November 11, 2024
5    Stenographically reported by:
6    Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR
7
8    Job No. 6958535
9
10
11
12    APPEARANCES:
13
14    DEBORAH L. GORDON
15    ELIZABETH MARZOTTO TAYLOR
16    Law Offices of Deborah L. Gordon, PLC
17    33 Bloomfield Hills Parkway
18    Suite 220
19    Bloomfield Hills, Michigan 48304
20    248.258.2500
21    dgordon@deborahgordonlaw.com
22    emarzottotaylor@deborahgordonlaw.com
23        Appearing on behalf of the Plaintiff.
24
25

Page 3

1    MARK VINCENT BREAUGH
2    The Health Law Partners PC
3    32000 Northwestern Highway
4    Suite 240
5    Farmington Hills, Michigan 48334
6    248.996.8510
7    mbreaugh@thehlp.com
8        Appearing on behalf of the Defendants.
9
10    ALSO PRESENT:
11    Julia Zimmerman, PA
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            TABLE OF CONTENTS
2
3    WITNESS                    PAGE
4    ELIZABETH A. PENSLER, DO
5
6    EXAMINATION BY MS. GORDON:         5
7    EXAMINATION BY MR. BREAUGH:      200
8
9            EXHIBITS
10
11    EXHIBIT                    PAGE
12    (Exhibits not offered.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1    Bloomfield Hills, Michigan
2    Monday, November 11, 2024
3    11:09 a.m.
4            ELIZABETH A. PENSLER, DO,
5        was thereupon called as a witness herein, and after
6        having first been duly sworn to testify to the truth,
7        the whole truth and nothing but the truth by the
8        stenographer, was examined and testified as follows:
9            EXAMINATION
10    BY MS. GORDON:
11    Q.  Hi, doctor.  I'm Deb Gordon.
12    A.  Hi.  Nice to meet you.
13    Q.  And I represent Ms. Zimmerman, as you are well aware in
14        this matter.  If you don't understand my questions, if
15        you want me to repeat or rephrase just, you know, let
16        me know, all right?
17    A.  Okay.
18        MR. BREAUGH:  As far as answering, make sure
19        to always try and give solid like yes or nos, not
20        um-hmms, because reviewing for the transcript later is
21        not as fun.  And I know it's not as fun for the court
22        reporter for trying to decipher those.
23    A.  No problem.
24    BY MS. GORDON:
25    Q.  Alrighty. Doctor, have you been deposed before?

2 (Pages 2 - 5)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 6

1  A.  Yes.
2  Q.  Okay.  And have you been deposed in your capacity as a
3     physician?
4  A.  Yes.
5  Q.  Was it for a malpractice matter?
6  A.  Yes.
7  Q.  Okay.  And how many such depositions did you sit for?
8  A.  Two.
9  Q.  Okay.  And just roughly, what were the dates?
10 A.  So it would have been 2012 and 2015.
11 Q.  And what courts were those cases filed in?
12 A.  I think one was Macomb, and one was Wayne, I believe.
13 Q.  Okay.  Any other court cases you've been involved in
14    other than the two I'll call them med mal matters?
15 A.  No.
16 Q.  Okay.  What is your current address, home address?
17 A.  6705 Wing Lake Road, Bloomfield Hills, Michigan 48301.
18 Q.  And how long have you been at that address roughly?
19 A.  Around eight years, seven years.
20 Q.  Are you married?
21 A.  Yes.
22 Q.  Okay. And who are you married to?
23 A.  Derek Hill.
24 Q.  And what year were you married to Derek Hill?
25 A.  2015.

Page 7

1  Q.  Okay.  Were you married previously?
2  A.  Yes.
3  Q.  Okay.  Roughly, for how long?
4  A.  Be a year.
5  Q.  One year?
6  A.  Um-hmm.
7  Q.  There's some kind of a court proceeding, it looks like,
8     filed in Oakland County involving you and Dr. Hill?
9  A.  Oh, it was a -- well, I was going to file for divorce.
10    So I did file, and then we took it back or whatever. I
11    didn't pursue it.
12 Q.  You withdrew it?
13 A.  Yeah.
14 Q.  Okay. So at this time you remain married?
15 A.  Yeah, we're married. That got dropped, or whatever the
16    official term is.
17 Q.  All right.  And are you currently employed?
18 A.  Yes.
19 Q.  Okay.  So you are an employee of a corporate entity?
20 A.  Yes.
21 Q.  Okay. Who is your employer?
22 A.  Ferndale Management.
23 Q.  Okay.  What is Ferndale Management?
24 A.  It represents a group of our practices.
25 Q.  I don't know what that means.

Page 8

1  A.  Well, I'm not sure. It was just created as a legal
2     entity that was created to reference all of the
3     entities that we have.
4  Q.  Who owns Ferndale Management?
5  A.  Me and Dr. Hill.
6  Q.  Okay. So this is a corporate entity you and Dr. Hill
7     set up at some point in order to assist in running your
8     businesses?
9  A.  Yes.
10 Q.  Okay.  And what does Ferndale Management do for your
11    medical practices?  What are certain of the nature of
12    their responsibilities?
13 A.  The payroll, the health insurance for the employees,
14    401Ks and disability, Aflac.
15 Q.  How many employees are there at Ferndale Management?
16 A.  There's like 35, I believe.
17 Q.  Okay.  And so that's your employer, and you get paid
18    from Ferndale Management.  Is that correct or not?
19 A.  No.  I mean, I'm self-employed.
20 Q.  Okay.  All right. And same with Dr. Hill?
21 A.  Yeah.
22 Q.  Okay.  So other than Ferndale Management, what other
23    businesses do you own or have an interest in?
24 A.  None, just the Pensler Vein and Vascular Surgical
25    Institute and Elizabeth Face + Body Med Spa.

Page 9

1  Q.  Let's go over that for the record.  So we've got
2     Pensler Vein and Vascular. Is that Pensler Vein and
3     Vascular Surgical Institute?  Do I have that name
4     right?
5  A.  Yeah, but then I have a couple d/b/a's.
6  Q.  Okay.  I've got it. So what is your role with Pensler
7     Vein and Vascular Surgical Institute?
8  A.  The owner, medical director, the physician.
9  Q.  Okay.  And how long has that entity been in existence?
10 A.  I believe since 2015.
11 Q.  Okay.  Were you practicing medicine prior to 2015?
12 A.  Yeah, I was employed by DMC for about a year and a
13    half.
14 Q.  Okay. And what location were you at for DMC?
15 A.  I was at Harper Hutzel and Receiving.
16 Q.  Were you with a practice group, or direct employee of
17    the DMC?
18 A.  I was an employee of Tenet.
19 Q.  Okay.  And what other corporate entities, I'll call it
20    Pensler Vein and Vascular, other than that entity are
21    you currently involved in?
22 A.  Just the Elizabeth Face + Body Med Spa.
23 Q.  Okay.  And is that a separate corporate entity?
24 A.  Yes.  It has its own LLC.
25 Q.  Okay.  When did that get established?

3 (Pages 6 - 9)

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 10

1   A.   That one was 2020. No, had to have been later. No,
2        2021.
3   Q.   Okay. For the record, just give us an overview of what
4        the Med Spa, what kind of services are offered there?
5   A.   So at Med Spa we do facials, hydro facials. We have a
6        laser. We do hair laser removal, the neurotoxins, and
7        then the fillers, PRP, weight loss.
8   Q.   Okay. And where are these practices physically
9        located?
10  A.   928 East Ten Mile Road, Ferndale.
11  Q.   Any other corporate entities you're involved in
12       at this time other than these two?
13  A.   No.
14  Q.   All right. And what about Dr. Hill?
15  A.   He has Hill Orthopedics and Easy Solutions.
16  Q.   What is his area of expertise?
17  A.   He's a hip and knee orthopedic surgeon.
18  Q.   Okay. Where is his practice located?
19  A.   928 East Ten Mile Road, Ferndale.
20  Q.   Same building?
21  A.   Same building.
22  Q.   Okay. And do you share service providers in that
23       building?
24  A.   Yes, yes.
25  Q.   What types of service providers do you share?

Page 11

1   A.   We share front desk, medical assistants, managers, and
2        the physician assistants or nurse practitioners.
3   Q.   Okay. And what hospital does Dr. Hill work out of?
4   A.   He works out of Ascension Macomb, the Warren and the
5        other one on Dequindre. He also works out of Beaumont
6        Corewell in the old Botsford, which is now Beaumont
7        Corewell Farmington. And he also works out of Trenton.
8        There's a hospital there. And then Straith Clinic.
9   Q.   Okay. And are there two separate, two separate entities
10       with regard to how the proceeds from your vascular
11       practice, and Med Spa, and Dr. Hill's orthopedic
12       practice with regard to the funds that come into the
13       business?
14  A.   Well, they go into -- yeah, they go into separate
15       accounts, but we're married, so one thing.
16  Q.   Do you essentially share between the two of you?
17  A.   Yes.
18  Q.   Being married the profits from the two separate
19       corporate entities?
20  A.   Um-hmm.
21  Q.   Yes?
22  A.   Yeah.
23  Q.   Okay. And what hospitals are you working out of now?
24  A.   Henry Ford Macomb, Henry Ford Wyandotte, McLaren
25       Oakland.

Page 12

1   Q.   And how often in the last couple of years in any given
2        week are you at the hospital?
3   A.   I'm at the hospital probably anywhere between two to
4        three times a week.
5   Q.   Okay. And is that to make rounds? Is it for surgery,
6        all of the above?
7   A.   All of the above. Rounds, surgeries, procedures, call,
8        emergencies, stuff like that.
9   Q.   So you're there two or three times a week?
10  A.   Yeah.
11  Q.   For the patients that you're handling out of your
12       office?
13  A.   Or patients that come in through the ER, or on call,
14       stuff like that.
15  Q.   Are you on call at the hospitals?
16  A.   I am on call at the hospitals.
17  Q.   Okay. So two to three days a week you're at the
18       hospital for roughly how long?
19  A.   Well, depends. It depends on what timeframe you're
20       talking about. I've moved a lot of my practice now
21       into office based labs. So I'm doing a lot more
22       procedures not as much in the hospital. So I usually
23       show up to the hospital for a specific procedure. So
24       probably I would be -- I mean, it just depends. My
25       surgeries can go on for -- you know, I can have a five

Page 13

1        hour surgery. I can be there from 7:30 to, you know,
2        10 p.m. It just depends. So I'll say four to five
3        hours.
4   Q.   Okay. And these new labs you're using, this takes you
5        out of the hospital and allows you to do medical
6        procedures elsewhere; is that it?
7   A.   Yes, office based. I was doing them in the cath labs,
8        or interventional radiology suites there. And then
9        I've just been doing them at these other facilities
10       that are office based labs.
11  Q.   Okay. And how much time do you spend in those
12       locations?
13  A.   I spend three days a week probably from like eight to
14       five. Not, yeah, sometimes. Two, sometimes three.
15  Q.   Okay. So you're there quite often it sounds like?
16  A.   Yeah.
17  Q.   And how long have you been involved with the labs in
18       addition to the hospital? When did that start roughly?
19  A.   Like around four years ago I started going maybe three
20       times a month. Then I've just kind of -- because my
21       practice has grew, I had a higher demand, so I started
22       going more often.
23  Q.   So roughly three to four days a week you're in the
24       hospital or in the lab doing some kind of a procedure?
25  A.   Yeah, or both. I mean, I'm running emergency surgery,

Page 14

1    office, OBL, back to the hospital.  You know, it's a
2    very busy, busy schedule.
3  Q.  How about Dr. Hill?  How often -- I assume he has a
4    busy sort of surgical practice?
5  A.  Yeah, same kind of idea, but he doesn't have -- he
6    works at -- he doesn't have -- you can't do those
7    procedures in OBL, so he does his either at Straith or
8    the hospital. He takes call. So, you know, he'll go in
9    for an emergency surgery, or he'll see consults, you
10   know, same kind of thing.
11  Q.  Roughly how many days a week is he at the hospital?
12  A.  I'd say about three, two to three days a week.
13  Q.  And I assume he can often be there for many hours?
14  A.  Sometimes, yeah. His cases are shorter than mine.
15  Q.  Okay.  How many employees do you currently have between
16    the two practices?
17  A.  Sure.  I want to say 15.
18  Q.  15?
19  A.  15 or 20.
20  Q.  Are the employees assigned to both practices in the
21    case of the 15?
22  A.  Yes.
23  Q.  That you just mentioned?
24  A.  Yes.
25  Q.  Okay.  All right. So I would like to know the job

Page 15

1    titles.
2  A.  Sure.
3  Q.  Of these 15, and also names.
4        MR. BREAUGH:  I just want to double-check
5    for the two, when you're saying both entities, for
6    Elizabeth Face + Body Med Spa and Pensler Vein and
7    Vascular?
8        MS. GORDON:  Right.
9  BY MS. GORDON:
10  Q.  Because as I understand it, doctor, you all share
11    staff.  The two practice groups shares staff?
12  A.  Well, the Elizabeth Face + Body Med Spa does not share
13    staff with those other people.
14  Q.  Okay.  Well, let's set that aside, and we'll come back
15    to that. Okay. So let's go through the 15 people other
16    than the Med Spa.
17  A.  Sure.
18  Q.  And let's start with the titles and the names.
19  A.  Sure. So there's Tanya. She's a front desk person.
20    There's Katie. She's a front desk person. Ashley, she's
21    a front desk person. Madison, she's a manager. Rachel,
22    she's a manager.
23  Q.  Hang on one second, please. What do you mean when you
24    say manager?
25  A.  They're practice managers.

Page 16

1  Q.  What does that mean in your world?
2  A.  Practice manager's a person who does like the
3    administrative work, helps hire employees, helps in our
4    emails, helps pay bills.
5  Q.  Okay.
6  A.  Where did you leave?
7  Q.  We've got Tanya, Katie, Ashley, Madison and Rachel.
8  A.  Yeah. Then there's Sandy. She's a surgical coordinator.
9  Q.  Okay.
10  A.  There's Simrath.  She's our biller. There's Lindsey,
11    she's our -- she's another biller. There's the MAs
12    which would be Amy.
13  Q.  What does MA mean?
14  A.  Medical assistant. They're the person who gets the
15    patient in the room. Takes vitals. Changes dressing.
16    They'll do orders.  They help with notes. They help do
17    patient phone calls. They assist. They're not
18    physicians. They can't do any kind of medical
19    decision-making, but they help us.
20  Q.  Are they nurses?
21  A.  No, they're not nurses. Completely different. They go
22    to, I think, two years of school.
23  Q.  Got it.
24  A.  They don't have to graduate college or anything.
25  Q.  Okay. So you've got Amy in that position, and anybody

Page 17

1    else that's a medical assistant?
2  A.  We have Amy, Lexy, Gunny, Selina. Lindsey.
3  Q.  There's a different Lindsey?
4  A.  It's a different Lindsey. There's a Lindsey M and
5    Lindsey G.
6  Q.  And Lindsey M.  Got it.
7  A.  And then there's -- well, then there's the physicians,
8    we have two physician assistants and then a nurse
9    practitioner that works just for me. She doesn't cover
10    Derek. You just want the ones for both of us.
11  Q.  Right. Who are the physicians assistants?
12  A.  Her name is Julia Lonnie.
13  Q.  Okay.
14  A.  And then Kendall Pieroni.
15  Q.  Okay.
16  A.  And then, yeah, those are the two physician assistants.
17  Q.  Okay.
18  A.  And then we -- I'm trying to think. Those are all the
19    people who work between us.  There's ultrasound techs
20    that I have, but they don't cover his practice.
21  Q.  Okay.  And is there anybody on Dr. Hill's side that
22    you've not mentioned?
23  A.  No.  Those are all his people.
24  Q.  Okay.  How many employees are there ar the Med Spa?
25  A.  Just three, four.

Page 18

1 Q. What are their job titles?
2 A. One of them we have her name is Erin. She's a
3     nursing -- like she's a nurse injector. She works in
4     the capacity of a nurse, so she does the injectables.
5     She does, you know, like laser stuff.
6 Q. Okay. When did you hire Julia, the physicians assistant
7     Julia?
8 A. This one, Julia?
9     Julia Lonnie.
10 A. Lonnie. We hired her like maybe four months ago.
11 Q. Did she replace somebody?
12 A. Yeah, we had a couple turnovers so, yeah, she replaced
13     Kyle, who was another physician assistant we had.
14 Q. Okay. And Kendall?
15 A. Kendall came on as, you know, an additional person.
16 Q. When did she join roughly?
17 A. About a year ago.
18 Q. And she replace somebody too?
19 A. Well, she kind of replaced, I guess, Daryl. We always
20     had two. But we had Kyle, and then we wanted, you know,
21     a second one.
22 Q. Daryl was a physician assistant?
23 A. Yeah.
24 Q. What happened to Daryl? When did he leave, roughly?
25 A. He left probably maybe like a year and a half ago.

Page 19

1 Q. And where did he go, if you know?
2 A. He went to some orthopedic practice.
3 Q. Why did he leave, as you understand it?
4 A. He felt like he was doing too much vascular. He wanted
5     to do more ortho. He wanted to be in the OR. He wasn't
6     in the OR as much as he wanted.
7 Q. Did he resign, or was he terminated?
8 A. Yeah, he resigned. He was very pleasant. Gave us two
9     weeks.
10 Q. What was he earning, roughly, at that time?
11 A. I think about 115.
12 Q. All right. What other physicians assistants have you
13     had other than the ones you've named since roughly May
14     of 2023?
15 A. Just Kyle. Kyle, Julia Lonnie, and then Kendall.
16 Q. Okay. And what happened to Kyle?
17 A. His girlfriend, she's a doctor. She went to Cincinnati,
18     so he left.
19 Q. So do you typically have two physicians assistants at
20     any given time?
21 A. Yeah, we try to, yeah.
22 Q. Okay. Have you employed doctors in the last five years
23     other than obviously the two of you, you and Dr. Hill?
24 A. Yeah.
25 Q. Do you have any doctors that were employees?

Page 20

1 A. We didn't have any doctors that were employees.
2 Q. Okay. And who is responsible for the hiring of the
3     physicians assistants?
4 A. I would say me, Dr. Hill, Madison and Rachel, the
5     managers, the practice managers. And then because
6     they're higher up people, you know, obviously, we take
7     a big interest in who's going to work there.
8 Q. Right. Who supervises the physicians assistants?
9 A. It would be me and Dr. Hill, and then the managers.
10 Q. And when you say managers, tell me --
11 A. Rachel and Madison. They're the ones who are practice
12     managers.
13 Q. Okay. They don't have any expertise, obviously, in
14     medicine; is that correct?
15 A. No, they do. Madison was a medical assistant who like
16     got promoted several times, and now she's a practice
17     manager. And the other one has -- she was our surgical
18     coordinator, and then she was our marketer, medical
19     marketer, and then she now kind of does marketing and
20     managing.
21 Q. Okay. All right. Let's go to Med Spa. Do you use
22     physicians assistants there at all?
23 A. No.
24 Q. Have you ever used physicians assistants in the Med
25     Spa?

Page 21

1 A. Yeah.
2 Q. When was that?
3 A. So it would have been 2019, yeah, 2019 then through
4     2020 would have been when Julia left.
5 Q. Julia Zimmerman?
6 A. Yes.
7 Q. May of 2023?
8 A. Um-hmm.
9 Q. That's a yes?
10 A. Yeah.
11 Q. Okay. So you used between 2019 and 2023, you used
12     physicians assistants in the Med Spa?
13 A. Yes.
14 Q. Why did you stop using physicians assistants in the Med
15     Spa?
16 A. Well, they didn't have the correct -- we try to balance
17     having them cover the medical practices and having them
18     cover the Med Spa. What we found what was happening is
19     that the physician assistants were like hiding. They
20     were kind of getting out of their own duties by going
21     over there, even though there wasn't any work. So me
22     and my husband decided it was much better to have
23     people who have to stay in the medical practice. So we
24     wanted to use them for medical practice, and then get
25     someone who's just specific for injectables.

Page 22

1  Q.  What do you mean they were just going over there?
2  A.  Like so the way they shared a schedule, so like they
3      were supposed to be on like a Tuesday, they were
4      supposed to cover Derek's practice.  And then if there
5      were any Med Spa patients, they would go over there and
6      help. But the whole idea was that they were supposed to
7      cover where needed. So there'd be like maybe no Med Spa
8      patients, but they go sit over there as if they were
9      doing something.  And we know they were doing nothing,
10     because I had a manager there watching, and also there
11     were no patients.  There was no revenue. So we realized
12     it just became a place where people could kind of hide.
13 Q.  So how are the physicians assistants scheduled?  Don't
14     you have a schedule?
15 A.  Yeah, we do have a schedule, so they're primarily
16     working during -- we also had like more -- so now we
17     use the physician assistants.  They both like almost --
18     they cover the same things. They both are responsible
19     for Hill Ortho.  They both are responsible for Pensler
20     Vein and Vascular Surgical.  Before we had kind of them
21     separated out a little more where they covered more
22     percentages of things.  So Daryl was a higher
23     percentage covering ortho, and then the other ones I
24     had were more of, you know, covering vein.  But they
25     were supposed to both know each other's jobs.

Page 23

1  Q.  When Julia Zimmerman was there, who was the other PA?
2  A.  Daryl.
3  Q.  Anybody else other than Daryl that was there while
4      Julia Zimmerman was there?
5  A.  No.
6  Q.  So how were Daryl and Julia Zimmerman assigned during
7      the workday?
8  A.  Sure.
9  Q.  Let's start with the basics.  Did they have times they
10     had to --
11 A.  Yes.
12 Q.  -- report to work?
13 A.  Yes.
14 Q.  Do you keep a patient schedule in the office?
15 A.  Well, there's one on the computer.
16 Q.  And do you know in advance of patients coming in who's
17     going to see the patient?
18 A.  Well, it just -- well, like just depends. I mean, we'd
19     have an understanding that patients were to be split
20     among them if the other person didn't have anything to
21     do.
22         Like if Daryl was supposed to cover Derek's
23     surgeries, let's say Derek didn't have any surgeries,
24     the expectation was that he would come back and help
25     cover the Pensler Vein and Vascular patients.

Page 24

1  Q.  Let me ask you this. Do you have today roughly the same
2      number of patient visits per day in your office that
3      you did in 2022, 2023?
4  A.  I would say a few more.
5  Q.  A few more today?
6  A.  Yes.
7  Q.  So in 2022, 2023, how many patient visits typically
8      occurred in the vein and vascular center on any given
9      day?
10 A.  Well, my busy days are like Monday, Thursday, so I'd
11     say there'd be between like 30 to 40 patients.
12 Q.  Okay.
13 A.  And then Derek would see less.  His office hours aren't
14     as much.  So he would see, I would say, like 25 to 35
15     patients on his two days, Tuesday, Friday.
16 Q.  25 to 30?
17 A.  Yeah.
18 Q.  So let me just understand this. You're in the office.
19     At this time you were in the office Tuesdays and
20     Thursdays?
21 A.  Tuesdays, Thursdays, and then some Wednesdays.
22 Q.  Otherwise you were out of the office doing surgeries at
23     the hospital, or at the labs?
24 A.  Right.  Or sometimes I'm at my own office catching up
25     on work paperwork.

Page 25

1  Q.  But you're seeing patients Tuesday and Thursday, and
2      sometimes --
3  A.  No, Monday and Thursday.
4  Q.  I apologize.
5  A.  And then sometimes on Wednesdays.
6  Q.  Okay.  And then Dr. Hill -- and that's 30 to 40
7      patients split up on each of those days?
8  A.  Um-hmm.
9  Q.  Yes?
10 A.  Yes.
11 Q.  Okay.  So roughly you see about 70 or 80 patients per
12     week, you personally?
13 A.  Um-hmm, yes.
14 Q.  That's a yes?
15 A.  Yes.
16 Q.  Okay. And then Dr. Hill sees 20 to 30, and that's also
17     for two days a week?
18 A.  Yes.
19 Q.  Okay.
20 A.  He may see -- he does also -- like he was doing Port
21     Huron, so maybe he'd see 10 more patients or something.
22 Q.  So I want to talk about your practice for a minute.
23 A.  Sure.
24 Q.  So say it's a Monday, and you've got people coming in.
25     You've got patients coming in that day, 30 to 40

7 (Pages 22 - 25)

Page 26

1   patients. I assume you have a schedule?
2   A.  Yes.
3   Q.  Okay.  So by the time you get in the office, you know
4      there's a schedule of patients?
5   A.  Yes, we can see the schedule before, yes.
6   Q.  And does this schedule -- what is the schedule called
7      in your office?  How do you access it?
8   A.  Through Epic.
9   Q.  Okay.
10  A.  It's an EMR.
11  Q.  And so you can pull up Epic, and you can see who's been
12     scheduled for you on that particular Monday?
13  A.  Yes.
14  Q.  And I guess do you see whether these are first time
15     visits?
16  A.  Yeah. We can see if it's new patients or established
17     patients.
18  Q.  Okay.  And is there an allotment of time for new
19     patients that's different than established patients?
20  A.  Well, we kind of have them I think it's every like 15
21     minutes, and then we decide if -- because I have enough
22     people, we have enough MAs in our rooms.  We kind of
23     schedule them like that. And then just make sure, you
24     know, some people need more, and some people need less.
25  Q.  Okay.  So you schedule those appointments for roughly

Page 27

1      15 minutes?
2   A.  They're scheduled like that, yes.  But some of them get
3      a lot more time, and some of them get the 15 minutes.
4   Q.  And under the governmental rules, is that what you're
5      allotted, 15 minutes?
6   A.  I didn't know there was a governmental rule on that.
7   Q.  I'm just asking you.
8   A.  I don't know.  I'm not aware.
9   Q.  You can bill for X amount of time per patient. I don't
10     think you can bill an hour of time just because you
11     feel the patient needs it; is that correct?
12  A.  Whatever amount of time I spend with the patient, I can
13     bill for that amount of time. Doesn't matter if I made
14     them in 15 minute increment, half an hour increments.
15     Whatever amount of time I spend with them I can bill
16     for it.
17  Q.  Okay.  So you bill -- you schedule for every 15
18     minutes. And out of those 30 to 40 patients that are
19     there in the office, this is roughly -- I assume it's
20     the same today as it was in 2022, 2023 with regard to
21     how much time you're spending with people and so on?
22  A.  I mean, sometimes it's more, and sometimes it's less.
23  Q.  It varies?
24  A.  Yes.
25  Q.  But you're seeing roughly 30 to 40 patients today just

Page 28

1      as you did for the last several years?
2   A.  No.  I see way more than I did before but like --
3   Q.  You see way more?
4   A.  Than I did when I first started off in practice.
5   Q.  So as of today's date, you see roughly 30 to 40
6      patients each day you're in the office?
7   A.  Yeah, um-hmm.
8   Q.  Is that roughly how many you've been seeing over the
9      last several years?
10  A.  I'd say last -- several is too big of a word.
11  Q.  Okay.  Well, you give me a number of yours.
12  A.  I'd say five years.
13  Q.  For the last five years, you've been seeing roughly 30
14     to 40 patients a day?
15  A.  Um-hmm.
16  Q.  In your office?
17  A.  Yes, yes.
18  Q.  Okay.  And of those 30 to 40 patients, how many are you
19     able to actually go in and -- I don't know what your
20     right terminology is, but meet with, see, treat?
21  A.  Yeah.
22  Q.  Of those 30, 40, how many do you actually see?
23  A.  Yeah, it depends on what the patients are, and things
24     like that. It's anywhere between like 20, 25 patients I
25     see.

Page 29

1   Q.  Okay.  And then the patients you don't see, I assume
2      the PAs see them?
3   A.  Yeah, or the PAs see them with me. Now we have the PAs
4      always see -- I go in with the PAs always. There is
5      always me and a PA.
6   Q.  Okay.  And when did that start?
7   A.  That started, I guess, a year ago.
8   Q.  Okay. Why do you do that now?
9   A.  We do that now because we wanted them to be responsible
10     for making sure they knew what was going on with the
11     patients, and that they were able to document more.
12     Like they were in every room.  So if there's a
13     question, they were there too.  You know, they could
14     actually document and figure out what was going on.
15  Q.  Okay.  But prior to a year ago, the PAs were seeing
16     patients, and that's a normal part of the practice?
17  A.  That's a normal part, and sometimes, yeah, they still
18     go in by themselves obviously.  That part being a PA.
19  Q.  Sure. Okay.  And do you understand what the requirements
20     are to become a PA in general?
21  A.  Yes.
22  Q.  Okay.  And are you familiar with what services a PA is
23     allowed to provide?
24  A.  Yes.
25  Q.  Okay.  And in your vascular vein center, what types of

Page 30

1    services is a PA allowed to provide?
2    A.  They can see the patient. They can examine the patient.
3        They can do injections, vein injections. They could do
4        wound examinations. If they needed a wound dressing
5        change, things like that.
6    Q.  Okay.  Now, with regard to the days you are not in the
7        office, do patients still come in?
8    A.  Yes.
9    Q.  Okay. And so for your schedule, let's talk about
10       Tuesday, Wednesday and Friday. You've given me Monday
11       and Thursday you're scheduled all day?
12   A.  Yeah.
13   Q.  So the other days when you're not scheduled all day,
14       are patients coming in?
15   A.  Patients are coming in for scans.
16   Q.  What else?
17   A.  Ultrasounds. They could come in for procedures.  Come
18       if they have a problem, dressing changes, wound care.
19   Q.  Who handles all that?
20   A.  The physician assistants.
21   Q.  And so on the days other than Monday and Thursday,
22       roughly, how many patients are seen -- over the last
23       couple of years, how many patients are seen in your
24       office?
25   A.  I would say on the days I'm not in the office somewhere

Page 31

1        between 10 to 20.
2    Q.  Okay.  All right. Now, with regard to scheduling, how
3        is this decided on the days you're in the office, 30,
4        40 patients a day, do you make a decision once you get
5        in there as to whether the PA's going to go in and do
6        things, or whether you're -- let me start again.
7            Let me get rid of this past year because,
8        according to you, you're now in there with every
9        patient and the PA. Prior to that time, how is a
10       decision made, and when is a decision made as to who's
11       going to do what with regard to a patient who's now in
12       a room?
13   A.  Well, new patients I see. I would always see my new
14       patients.  And then some patient were, if they had any
15       issues, higher maintenance issues, patients who just
16       wanted to see me and didn't want to see the PA,
17       post-ops, follow-ups, I would go in.  But something
18       very routine, very standard, they're coming in for a
19       vein treatment that's very straightforward, then the PA
20       could handle that themselves.
21   Q.  Okay. I'm sorry.  Dr. Hill's in the office what days?
22   A.  He's in the office, Tuesday and Friday.
23   Q.  Okay.  By the way, do you own a home elsewhere other
24       than the address you gave us?
25   A.  Yes.

Page 32

1    Q.  Okay.  And where is that located?
2    A.  It's in Boca Raton.
3    Q.  How long have you owned that home?
4    A.  Since 2019. No, 2020. I think 2020.
5    Q.  Any other homes you own?
6    A.  No.
7    Q.  All right. What kind of a calendar do you keep at the
8        office with regard to patients, things you have to do
9        out of the office, travel, that sort of thing?
10   A.  Yeah, a work calendar.
11   Q.  And is there a particular name for that work calendar?
12   A.  It's just an Apple one people can access. You know,
13       invite them.
14   Q.  Is that where all your patients are listed?
15   A.  No.  There's no patients listed. It's just if we have
16       vacations, or I guess they put the surgeries on there
17       as well.
18   Q.  Okay.  So it's doctors' schedule?
19   A.  Yeah.
20   Q.  Doctors' calendar.
21   A.  As best you can. Sometimes if it's on call emergency
22       stuff, it might not be in there.
23   Q.  Who has access to that Apple calendar?
24   A.  Everybody. All the employees.
25   Q.  So they can see where the doctors are, you and Dr.

Page 33

1        Hill?
2    A.  Yeah.
3    Q.  At any given time, okay. And you're still -- you've
4        been using that Apple calendar for roughly how long?
5    A.  Since 2015.  Or Derek used it longer, but yeah.
6    Q.  Okay.  With regard to the patient calendar, how is that
7        kept?
8    A.  Patient calendar, you mean the Epic?
9    Q.  Right.
10   A.  It's just put in the EMR.  And then, you know, if
11       someone calls we schedule them accordingly.
12   Q.  And who has access to that calendar?
13   A.  Everybody has access to Epic, which I think is the
14       whole staff.
15   Q.  Have you terminated any employees other than my client,
16       Ms. Zimmerman?
17   A.  Yes.
18   Q.  Who else have you terminated?
19   A.  We had an ultrasound tech we terminated. Her name was
20       Hanna. Who else did I terminate?
21   Q.  Go ahead.
22   A.  We terminated an aesthetician named Christine.
23   Q.  Hanna, Christine?
24   A.  Yeah.
25   Q.  Okay.  Was Christine in the Med Spa?

Page 34

1  A.  Yes.
2  Q.  And why was she terminated?
3  A.  Because she would, you know, show up late. She was
4     disrespectful to my manager, Jennifer. She would miss
5     patient appointments.
6  Q.  Okay.
7  A.  She was a bad employee.
8  Q.  Okay. Who else have you terminated, if anybody?
9  A.  Pavlina. She was our ex employee, or she was our ex
10     manager.
11  Q.  Okay.  And what happened to Pavlina?
12  A.  She gave herself a $15,000 raise.
13  Q.  How long had she been with you?
14  A.  She'd been with us for -- let's see. She had been with
15     us before we had the new building. Seems like 2018,
16     yeah, that's about right.
17  Q.  And what was her title?
18  A.  She was practice manager.
19  Q.  And did she report directly to you and Dr. Hill?
20  A.  Yes.
21  Q.  And how did she give herself a $15,000 raise?
22  A.  She proceeded to email just our bookkeeper as if -- you
23     know, she didn't cc me. And then she used my husband's
24     credentials to change it in payroll, so it didn't get
25     recognized.  We are very busy, so we rely on all these

Page 35

1     people.  You know, she was very trusted.  She had
2     access to all the bank accounts. She had been with us
3     for a long time.
4  Q.  How did you find out about it?
5  A.  One day my husband was looking at payroll, and he's
6     like why is she the second highest paid employee?  We
7     have PAs who get paid over $100,000.  And we started
8     looking, and then we started reviewing it and we saw.
9  Q.  What did she say when you raised it with her?
10  A.  She was upset, obviously. She -- she didn't really have
11     any words for it. She was sorry.
12  Q.  I mean, did she admit she'd done something wrong, or
13     did she say, no, you knew about this.  You told me to
14     do it.  What did she say about it?
15  A.  She said she was sorry. She thought -- I guess she said
16     she thought she could. She thought I said okay to her.
17  Q.  Okay. So she thought she had a conversation with you
18     and you'd approved it?
19  A.  Yes.
20  Q.  Did you put something in writing about her termination?
21  A.  I believe so. Now I can't remember.
22  Q.  Was it something to her?
23  A.  No, we did it in person.
24  Q.  Do you have anybody at your practices that is in charge
25     of what I'm going to call human resources?

Page 36

1  A.  Yes.
2  Q.  Okay. And who is that?
3  A.  Those are the practice managers.
4  Q.  What training do they have, as far as you understand
5     it, in human resources, if any?  I realize they oversee
6     people, and they probably watch their time, and their
7     schedule, and so on. But other than that, do they have
8     any experience in the human resources field?
9  A.  No, except for what they've learned with us and working
10     at other places.
11  Q.  So what kind of human resource things do they handle,
12     if any?
13  A.  We have our employee handbook. Any kind of compliance
14     training. Any issues with like disability, you know,
15     organizing the different -- disability, having the reps
16     come for that, so if there's any issues with the person
17     with the employee.
18  Q.  Okay.  What do you mean when you say compliance, they
19     handle compliance?  What are you referring to there?
20  A.  I think they do like any kind of JCAHO, or things that
21     we're supposed to have. I'll give you an example.
22  Q.  For the record, when you're talking about JCAHO, what
23     are you referring to there?  What is JCAHO?
24  A.  JCAHO is just work safety.
25  Q.  What does it stand for, as you understand it?

Page 37

1  A.  I can't remember.
2  Q.  So what do you mean by work safety?  Can you explain
3     that?
4  A.  Yeah.  Like to make sure like let's say someone sticks
5     themselves with a needle, the protocol that we have in
6     place to, you know, how we handle that.
7  Q.  Okay. Is that in writing somewhere?
8  A.  Yes.
9  Q.  Okay.  Anything else that they handle other than what
10     you've said?
11  A.  HIPAA.  Like let's say there's Epic training, and
12     everybody's supposed to have filled out a form.
13  Q.  Okay.
14  A.  They'll make sure that they do that.
15  Q.  And that's on Epic?
16  A.  Yeah.
17  Q.  Okay.  Does anybody at your office -- is anybody at
18     your office, I'm sorry, responsible for keeping
19     personnel records?
20  A.  Yes.
21  Q.  Okay.  And what is a personnel record in your office?
22  A.  It's the person, if they were hired, any kind of
23     letter, I guess, that was given to them, and then any
24     issues.  Any evaluations.
25  Q.  Okay.  Anything else that's in there?

Page 38

1   A.   No.
2   Q.   And who's responsible for keeping those personnel
3        records?
4   A.   The managers.
5   Q.   The two practice managers?
6   A.   Yeah.
7   Q.   Okay.  And do you have a hard copy of the file, or it's
8        electronic?  What is it?
9   A.   We have a hard copy.
10  Q.   Okay.  And if an employee is having, let's say, a
11       performance problem, are they to keep track of that in
12       some manner and put it in the file?
13  A.   Yes, yes.
14  Q.   Okay.  So how would they do that?  Would it be like
15       they make a note like I talked to the employee on this
16       date, put it in the file, something like that?
17  A.   Yes.
18  Q.   So you want to record any time you've had a problem
19       with an employee if it rises to that level?
20  A.   Yes.
21  Q.   If it rises to that level, the practice manager would
22       be responsible for putting something in a file?
23  A.   Um-hmm.
24  Q.   Is that a yes?
25  A.   Yes.

Page 39

1   Q.   Do you get sent that, or is that just in the file in
2        case you need it later?
3   A.   It's only if it's something that they feel they can't
4        handle.
5   Q.   Okay.  Do you have a practice with your two groups of,
6        you know, counseling employees that are having
7        problems, working with them, trying to help them
8        improve?
9   A.   Yes.
10  Q.   And you want to communicate with them, I assume, about
11       any problems you think they do have?
12  A.   Yeah.  We do try to do that.
13  Q.   And how do you go about doing that?
14  A.   Usually we'll like make a meeting with them, me and the
15       managers, if it needs to be me included. Sometimes it's
16       not.  Usually the medical assistant issues are just
17       handled by the two managers and the medical assistant.
18       And then if they have like a lead, sometimes we have
19       certain leads, or people kind of in charge of the more
20       lower medical assistants, so they'll have a meeting to
21       discuss it.
22  Q.   Okay.  And, again, that's documented?
23  A.   Yes.
24  Q.   Okay.  What about performance reviews?
25  A.   We do try to do the performance reviews on everybody.

Page 40

1        But, you know, it's not -- we haven't always been the
2        best about doing performance reviews.
3   Q.   Okay.  And so when you do give performance reviews, what
4        is that?  What format is that in?
5   A.   It's a piece of paper in which the employee writes out
6        how they think they're doing.  And then there's parts
7        where other people write out what they're doing, which
8        would be like people who work with them.
9   Q.   Okay.  And do you try to do that for every one of your
10       employees every year?
11  A.   We do try. We try to do it, I believe, it's every six
12       months.
13  Q.   Okay.  And do you see those documents yourself?
14  A.   Not always, no.
15  Q.   Do you see them from time to time?
16  A.   If there's an issue.
17  Q.   Okay.  And the practice manager, though, is the one
18       that's responsible for getting those documents
19       completed?
20  A.   Uh-ha.
21  Q.   That's a yes, for the record?
22  A.   Sorry. Yes.
23  Q.   That's okay. Okay. And does the employee get a chance
24       to see that if they've had any problems?
25  A.   Yes.

Page 41

1   Q.   So what percentage of your employees would you say the
2        last several years have actually been able to receive a
3        performance review?
4   A.   I would say probably maybe 15 to 30 percent.
5   Q.   Okay.  And what time of year are those given?  Is there
6        a certain time of year?
7   A.   We try to do them at the six month mark.  It usually
8        correlates like if the person wants a raise, so usually
9        they'll go to the manager and say I want a raise. So
10       then once they want a raise, then we'll start, you
11       know, a performance review.
12  Q.   Okay. All right. All right. You mentioned a handbook.
13       What's the name of the handbook?
14  A.   Employee handbook.
15  Q.   And what does that cover?
16  A.   Covers the things that were, you know, process and
17       procedures in the office.
18  Q.   Can you give me a list of what's included there?
19  A.   I'd have to get it out. I don't know exactly.
20  Q.   What's the big picture then?  What's the goal?
21  A.   Like how many days off you can have.  You know, if
22       you -- let's say you call in too many times.
23       Inappropriate behavior, showing up late, things like
24       that.
25  Q.   All that's in the handbook?

11 (Pages 38 - 41)

Page 42

1   A.  Yes.
2   Q.  And is that in a hard copy form?
3   A.  I believe so, yes.
4   Q.  And can employees also access it online or not?
5   A.  I don't think they can access it online.
6   Q.  So everybody gets a hard copy?
7   A.  Yes.
8   Q.  And my client would have gotten that presumably when
9        she hired in?
10  A.  They hadn't finished -- we had been working on the
11       handbook. There were variations. We just recently
12       finished it.
13  Q.  What do you mean you just recently finished it?
14  A.  We didn't have -- we had pieces of it, but we didn't
15       have it completed.
16  Q.  So let's talk about that. Did it ever get completed?
17  A.  It got completed approximately maybe a year ago.
18  Q.  So we would be talking about late 2023 or not?
19  A.  Yeah, I think so.
20  Q.  Okay.  Are you sure it's done now?
21  A.  Yes.
22  Q.  Okay.  Have you seen the handbook?
23  A.  Not the whole -- I haven't read through the whole
24       thing, but I have seen pieces of it.
25  Q.  And who's responsible for putting that together?

Page 43

1   A.  The manager.
2   Q.  Who's the manager?
3   A.  Madison and Rachel. That was one of Pavlina's
4        responsibilities, and that was another thing she never
5        completed.
6   Q.  Okay.  All right. When my client was working for you,
7        was there a handbook?
8   A.  There was, but it wasn't completed.
9   Q.  Okay. Was it used with -- with what did exist, was that
10       used?
11  A.  Yeah, there were always, you know, the big issues were
12       always, you know, people -- how much time everybody
13       would get off, how much paid time off. How many no
14       call, no shows were allowed. You know, those are what
15       everybody wanted to know.  You know, the employees
16       wanted to know. So we always made sure we had that
17       standardized.
18  Q.  You had that in writing?
19  A.  Yeah.
20  Q.  Employees got that?
21  A.  I believe employees got that.
22  Q.  Okay.  So when a new physicians assistant comes into
23       your office, is there any training?
24  A.  Yes.
25  Q.  Who trains?

Page 44

1   A.  They usually get trained by the other physician
2        assistant, or by me or Dr. Hill.
3   Q.  Okay.  Is there anything in writing about the training?
4   A.  No. Unless there's -- no, there's nothing in writing.
5   Q.  Okay.  So is there -- so there's not, for example, a
6        written outline of what's covered, or anything like
7        that?  Is it kind of on-the-job training?
8   A.  On-the-job training.
9   Q.  So you don't have a session where you sit down and talk
10       to people about --
11  A.  When we hire them, there's a discussion about the
12       things that they are supposed to be doing, and what,
13       yeah, what it entails.  You know, we explain you're
14       going to do vein procedures.  You're going to have to
15       read x-rays.  Look at ultrasounds.  You know, examine
16       patients. We go through that when we hire them to make
17       sure they understand what they're supposed to be doing.
18  Q.  And who does that?  Who goes through it with them?
19  A.  Me and Dr. Hill.
20  Q.  Do you both sit there and go through it?
21  A.  Yes, yes.
22  Q.  When was the last time you sat down with a PA and went
23       through things?
24  A.  When we hired Julia, the other Julia Lonnie, so that
25       would have been -- I think we hired her like five

Page 45

1        months ago, and she couldn't work right away.
2   Q.  Okay.  And how long did you spend with her?
3   A.  Probably spent a half an hour to an hour.  Plus I'll go
4        in and talk to them about different, you know,
5        different disease processes. We kind of go through it.
6        It's a lot of material, it's so specialized, that, you
7        know, just to take it all in one second you kind of
8        have to review things.
9   Q.  Okay.  What is CMS?
10  A.  Center medical services.
11  Q.  And what is that in your world?
12  A.  That's the people who run Medicare and Medicaid.
13  Q.  Okay. And both you and Dr. Hill provide services that
14       are covered by Medicare and Medicaid; is that correct?
15  A.  Yes.
16  Q.  Okay. Roughly, what percent of your practice is that?
17  A.  Varies, but it can be anywhere between 30 to 50
18       percent.
19  Q.  Okay. And so does your staff need to know how to be
20       compliant with CMS policies and procedures?
21  A.  The people who need to be compliant, as far as like
22       billing issues, that is with our biller -- billing
23       department.
24  Q.  Okay.  So let's talk about the billing department.
25       Who's in charge of the billing department?

Page 46

1    A.   Well, it's Simrath now, but prior to that we had like a
2         third party biller.
3    Q.   And who was the third party biller?
4    A.   MBR.
5    Q.   And when did you have MBR?
6    A.   We had MBR up until -- it was after COVID, 2021, 2021
7         or 2022. I'd have to review. We transitioned away from
8         them.
9    Q.   Okay. And what services did MBR provide to you?
10   A.   They did the coding, and then they submitted the bills.
11   Q.   Okay.  And where do they get the information for the
12        coding?
13   A.   We would send them over office notes.
14   Q.   What's an office note in your world?
15   A.   It's a note that we document about the patient.
16   Q.   Okay.  So let me just understand what you did with MBR
17        in order to get them the information they needed to
18        create the bill?
19   A.   Well, originally it was just on a piece of paper we
20        tell them what we did. And then when we were able to
21        figure out a way to send it, they could actually access
22        Epic, and they could access the different EMRs.
23   Q.   Okay.
24   A.   So they could access the hospital EMRs and see what
25        surgery we did.

Page 47

1    Q.   All right.  So you got rid of MBR?
2    A.   Yeah.  Actually Derek just got rid of MBR more recently
3         than I did.  But, yeah, we got rid of MBR. I think we
4         had them up until -- I can't remember. He had them a
5         little bit longer than I did.
6    Q.   As I understand it, my client did not work with MBR,
7         and she would have joined in 2022. So does that sound
8         about right?
9    A.   Yeah, that's about right.
10   Q.   Okay. So what happened after you got MBR?
11   A.   After?
12   Q.   With regard to the billing.
13   A.   When we got MBR?
14   Q.   After you got rid of them.
15   A.   Oh, well, we had transitioned into having Simrath be
16        our biller.
17   Q.   Okay.  And what's the system you use for billing?
18   A.   Epic.
19   Q.   And, again, I'm sorry. I have to go back through my
20        notes.  Simrath's title at that time was what?
21   A.   She was the biller.
22   Q.   Just a biller?
23   A.   Yes.
24   Q.   And when did she hire in?
25   A.   She hired in 2021, '21, '22.  Maybe it was during

Page 48

1         COVID, '20.  I'll say '20.
2    Q.   Okay.  And did you have a biller there before Simrath?
3    A.   No.
4    Q.   Okay.  Where did Simrath come from?
5    A.   We hired her. She worked at the hospital.
6    Q.   Okay.  And had she done billing previously?
7    A.   Yes.
8    Q.   For what kind of practice?
9    A.   It was a hospital practice.
10   Q.   What does that mean?
11   A.   It means physicians who work for the hospital.
12   Q.   Okay.  And what areas of expertise?
13   A.   It was a large practice. She billed office visits,
14        procedure visits. Whatever they did in the office.
15   Q.   And did you bring in Epic at that point?
16   A.   No, no. We always -- we had Epic as an EMR, but the
17        bills were submitted -- MBR submitted them through a
18        different platform prior to us getting Simrath, because
19        then we converted to Epic then, handling bills through
20        Epic.
21   Q.   Okay.  What kind of training has Simrath had with
22        regard to billing, if any?
23   A.   Well, she's a coder.
24   Q.   Okay.  What kind of training has she had with you guys,
25        if any?

Page 49

1    A.   In what regard?
2    Q.   Just as to what she's supposed to -- let me take a step
3         back. Billing involves legal compliance; is that
4         accurate?
5    A.   Billing involves, yeah, well, knowing what procedures,
6         like what procedures are covered, you know, do you
7         need -- a big part is authorizations. Do we need
8         authorizations to do things, retro authorizations,
9         surgeries, figuring out about how you bill the
10        surgeries, things like that.  That's probably the
11        biggest thing about billers.
12   Q.   Well, give me an example.
13   A.   Like when I do an angiogram, and I've done 10 different
14        procedures in that one surgery, you know, it's figuring
15        out what are the modifiers.  What are the codes.  What
16        order you put them in. So it's very kind of sort of
17        complicated.
18   Q.   So to try to figure out what to call -- how to
19        reference what you actually just did?
20   A.   Right.
21   Q.   Your performance, so that you can get paid for the
22        services rendered?
23   A.   Yes.
24   Q.   So you need to find the correct code so that you get
25        reimbursed or compensated?

Page 50

1 A. Right.
2 Q. Okay. What else goes along with billing?
3 A. Billing, so a lot of prior auths. If there's any issue
4 like people want documents, they'll send the documents.
5 They'll arrange peer to peers if sometimes insurance
6 companies wanted to speak directly to the physician, so
7 they'll help arrange that. That's pretty much, you
8 know, how to get paid as a physician. That's what the
9 biller does.
10 Q. Okay. And since Simrath has been with you, it sounds
11 like she hasn't had any formal training on Medicare or
12 Medicaid; is that correct?
13 A. I don't know if that's correct, because she does her
14 own training and her own education.
15 Q. Nothing that you're aware of; is that correct?
16 A. Nothing that I provided her with. But she does, you
17 know, have a good understanding. She understands
18 everything.
19 Q. Okay. She understands everything?
20 A. Well, she understands what things mean, and stuff like
21 that.
22 Q. What do you mean by things? What things were you
23 referring to?
24 A. She understands, you know, what each insurance wants as
25 far as in order for us to bill things.

Page 51

1 Q. All right. Do you use onboarding procedures when you
2 hire in somebody at your office?
3 A. What does that mean?
4 Q. I'm not sure. It's just a term I've seen, and I'm
5 wondering when you hire somebody is there some process
6 you go through to get them acclimated?
7 A. Yeah. They have to fill out all the paperwork so they
8 can get put in the -- they can get paid. We get them
9 set up with Epic so they can access medical records.
10 They always spend time with whoever -- whatever
11 position it is that they were hired. So they'll shadow
12 another MA. Or if it's a front desk, they shadow the
13 front desk, so the other employees help train them.
14 Q. All right. So now let's talk about training with regard
15 to the government reimbursing the practice. Is there
16 any training on that? I heard you say you've got to
17 understand all the various insurance carriers, and
18 that's private, or semiprivate insurance you're talking
19 about, correct?
20 A. Yes.
21 Q. So is there any -- has there been any training,
22 specific training since 2022, January 1, 2022 that's
23 been used in your office with regard to billing to the
24 government, Medicaid or Medicare that you know of?
25 A. No.

Page 52

1 Q. Are you familiar with CMS guidelines on billing?
2 A. Yes.
3 Q. Okay. How so? Have you had any training on it?
4 A. Just was explained to me by the people who bill for me.
5 Q. I'm sorry. It was what?
6 A. This has been explained to me by the people who have
7 billed for me. Like just by being a physician. When you
8 work in a hospital, I came from a hospital, there's
9 never a discussion about any of it. Everything is
10 always handled by the billers. And the physicians spend
11 their time being doctors, not billers, so we understand
12 what we need to be able to, you know, get paid for
13 what we do. And, you know, whatever that's supposed to
14 be as far as the rules for that.
15 Q. Okay. But when it comes to billing the government,
16 there are certain rules; am I correct on that?
17 A. Yes.
18 Q. As to what you can bill for?
19 A. I mean, what does that mean? I can bill for services I
20 provide.
21 Q. Any service?
22 A. Any service I provide I can bill for.
23 Q. Okay. And what are the services? Give me a couple of
24 examples of the services you provide that you can bill
25 for to the government?

Page 53

1 A. Office visits.
2 Q. What else?
3 A. Any procedures.
4 Q. Any procedures?
5 A. Any procedures.
6 Q. Okay. Anything else?
7 A. I guess if you -- I didn't have one, but Derek had
8 sometimes Daryl go in so he can bill for him as a first
9 assist.
10 Q. What's that?
11 A. It's a person who helps you in surgery.
12 Q. Okay. Am I correct that -- well, strike that.
13       How do patient charts work in conjunction
14 with billing, if they do?
15 A. Basically the biller can see the chart, and then
16 reviews it to make sure the codes are correct. They
17 double-check what we put in.
18 Q. So let's walk through that. So you've got a patient
19 chart in your office, correct?
20 A. Um-hmm.
21 Q. All right. So you see a patient. While you're in the
22 room with the patient, do you have somebody in there
23 taking notes for you?
24 A. Yes.
25 Q. Do you take the notes or what?

14 (Pages 50 - 53)

Page 54

```
1  A.  The medical assistant.
2  Q.  Do you always have a medical assistant in there?
3  A.  Yes.
4  Q.  How does a medical assistant take notes?
5  A.  She has a computer.
6  Q.  Okay. And that's been true for how long that that's
7      been your process?
8  A.  The whole time.
9  Q.  Since 2015?
10 A.  Yes.
11 Q.  Okay.  So since 2015, just to be clear, what's the
12     title of the person that comes in, the medical --
13 A.  Medical assistant.
14 Q.  Medical assistant comes in, and this is a person with
15     what skill set?  What criteria do you need to be a
16     medical assistant?
17 A.  They go through a short course, and they know how to
18     take vitals, you know, talk to the patient, room a
19     patient. A lot of their training is also on the job.
20 Q.  Is there a certification to be a medical assistant?
21 A.  Yeah.
22 Q.  Do you have to have a college degree?
23 A.  No.
24 Q.  What's the coursework you have to take to be a medical
25     assistant?
```

Page 55

```
1  A.  I have no idea.
2  Q.  Okay.  So when you're hiring a medical assistant, what
3      are you looking for?
4  A.  Well, we're looking for people who show up on time.
5  Q.  I'm sorry.  Let me interrupt you.
6  A.  Yeah, yeah.
7  Q.  What are the requirements to be a medical assistant in
8      your office to be hired?
9  A.  They have to have a certification.
10 Q.  Okay.
11 A.  And that you show up on time, don't call in, pleasant,
12     respectful, pleasant to the patients.
13 Q.  Okay.
14 A.  A lot of personality stuff.
15 Q.  And what kind of training does a medical assistant have
16     with regard to taking notes while you are seeing a
17     patient, or a PA is seeing a patient?
18 A.  What they learn from the other people, the other
19     medical assistants.
20 Q.  Okay.  So if somebody's got a recent certification as a
21     medical assistant, and they come into your office,
22     they're taking notes. They've received some training on
23     taking notes?
24 A.  Yes.
25 Q.  What are they supposed to write down, as you understand
```

Page 56

```
1      it?
2  A.  They're supposed to try to name any of the complaints
3      the patient is having, any issues the patient's having,
4      any recent medications the patient's taking.
5  Q.  So that's on the initial visit?
6  A.  That's on initial visit, but every visit. Every time a
7      patient walks in, we do an evaluation of the patient.
8  Q.  Okay. Then what else happens?
9  A.  Then we'll tell them a physical exam, so they'll put
10     the physical exam in.  And then they try to write down,
11     you know, assessment and plan. They try to act as a
12     scribe/medical assistant.
13 Q.  Okay. So then the medical assistant's notes go where?
14     What's the next step in the process?
15 A.  The next step would be the PA should review them.  And
16     then the PA reviews them, then I'll review them.
17 Q.  So how does the PA review them?
18 A.  What do you mean?
19 Q.  And just walk me through your system here.  So
20     hypothetically you're in a room.  The medical assistant
21     is in a room. You're handling the appointment. The
22     medical assistant's there typing into the computer
23     system. You leave the room. The medical assistant
24     leaves the room. What happens now?  Is that now called
25     the patient chart?
```

Page 57

```
1  A.  Yeah, that's the patient chart.
2  Q.  So what's the next step that happens with regard to
3      billing with regard to that patient chart?
4  A.  Well, it gets reviewed by -- we make sure there's a
5      physical exam.  There's a review of systems.  That if
6      we did a procedure, that the procedure's documented
7      correctly. If there was wound dressing changes, that
8      the wound dressing was documented correctly.
9  Q.  Who does that?  I'm sorry. Keep going. I didn't mean to
10     interrupt you.
11 A.  Sure. The different diagnosis codes, the MA will try
12     to -- the medical assistant will put those in the best
13     they can. So they try to fill out the chart.
14 Q.  As best they can.
15 A.  As best they can.  And then they'll move on to -- if
16     the physician assistant was -- like now we always have
17     the physician assistant in the room, they'll review the
18     chart, and then I'm the final person who reviews the
19     chart.
20 Q.  Okay.  When does the chart get reviewed by the medical
21     assistant after the appointment?  How does this work?
22 A.  They usually fill it out right at the time.
23 Q.  I'm sorry. I meant the PA.  You've got the medical
24     assistant in there taking notes with the doctor.
25 A.  Yeah.
```

15 (Pages 54 - 57)

Carroll Reporting & Video
A Veritext Company

586-468-2411

www.veritext.com

www.veritext.com

Page 58

1   Q.   The information has been inputted into the system, and
2        now when is it reviewed by a PA?
3   A.   It's usually either the same day or the next day.
4   Q.   So a PA, in addition to being in rooms with patients,
5        has a responsibility of reviewing patient charts?
6   A.   Yes.
7   Q.   Okay.  Do you have a job description for your PAs?
8   A.   No.  Just what we go over with them.
9   Q.   What do you go over with them?
10  A.   That they're supposed to go in and examine the patients
11       and, you know, help with the documentation the best
12       they can.  Help with any like patient phone calls,
13       patient issues.
14  Q.   Okay.  And they are supposed to be knowledgeable about
15       what happened during the medical appointment what
16       occurred, and then it's written down appropriately in
17       the chart?
18  A.   Yes.
19  Q.   Okay.  And so a PA is now looking at a chart from an
20       appointment where the medical assistant took notes.
21       What is the PA looking for?  Let's say the PA was not
22       in the room.  What's the PA looking for?
23  A.   Well, usually if the PA -- well, at least if there's
24       parts filled out that they've put a physical exam.
25       That's there is a review of systems.  That there was

Page 59

1        some diagnoses placed.  That there was some kind of
2        assessment and plan for them, so at least there's some
3        form of, at best as they can, all the pieces are there.
4   Q.   What do you mean by all the pieces?
5   A.   Well, there's a history and physical.  There's an HPI.
6        That's the first part where the patient says what's
7        going on.  Then a review of systems where you cover what
8        issues the patients are having.  And then there's the
9        physical exam component.  Especially with wounds, you
10       want to make sure there was -- like they documented the
11       size of the wound.
12  Q.   Okay.
13  A.   Then there was diagnoses codes.  And then if there
14       were -- like we sometimes do dressing changes, that
15       that's documented.  And then a follow up like when is
16       the patient supposed to come back and for what.  So we
17       hope all those are filled out.  And then the PA would
18       look at them and be able to hopefully ask questions if
19       they were in the room to me, or the MA to try to
20       complete that.
21  Q.   Okay.  And so is the PA looking to be sure that the
22       activities that took place during the appointment
23       actually occurred?
24  A.   Right.  I mean, in general, yeah, we want to make sure
25       that we documented accurately what occurred.

Page 60

1   Q.   Okay.  And who actually rendered the services; is that
2        correct?
3   A.   No.  There's nothing about rendering services.  It's just
4        about documenting.
5   Q.   Okay.  So after the PA looks at the chart, what's the
6        next thing that happens?
7   A.   Then I will review the chart.
8   Q.   What are you looking for?
9   A.   Again, to make sure that, you know, like I'll have
10       where we did a procedure on the right side, but
11       somewhere -- all parts of the chart will say the left
12       side.  Or they're missing complete portions where it
13       wasn't documented, the operative report, a procedure we
14       did.  So then I'm like verifying, you know, did it
15       happen.  Did it not happen.  Was that the correct side.
16       So we'll go through -- or they're missing, like pieces
17       are missing of the chart.
18  Q.   Okay.  And do you correct the chart from time to time?
19  A.   Yes.
20  Q.   And then what happens?
21  A.   And then it gets -- then I sign the chart, and then
22       that chart gets sent to the biller.  I guess they have
23       a folder that it pops into.
24  Q.   Do you know what the main job duties of the physician
25       assistant was at your office?  Do you have anything in

Page 61

1        writing?
2               MR. BREAUGH:  Object to form.
3               MS. GORDON:  Fair enough.
4   BY MS. GORDON:
5   Q.   Go ahead.  Do you know what the physician assistant
6        duties are at your office?
7   A.   I know what they are.
8   Q.   Okay.  What are they as you understand it?
9   A.   They're to see the patient, examine the patient, do
10       like either some kind of injection, if needed
11       treatment, review any of the studies done.  Do like a
12       treatment plan.  Write prescriptions if needed.  Order
13       extra tests if needed.  Come up with what the next step
14       would be for the patient.
15  Q.   Okay.  I'm going to read you something that's in our
16       complaint about the duties of a medical assistant --
17       physician assistant, I'm sorry, and then you can tell
18       me whether this is accurate, okay?
19  A.   Okay.
20  Q.   A physician assistant's job duties included reviewing
21       patient's medical histories, consulting with and
22       examining patients, providing treatments, conducting
23       procedures, diagnosing patient's conditions, and
24       ordering diagnostic tests; is that accurate?
25  A.   Yes.

16 (Pages 58 - 61)

Page 62

1 Q. Okay. So in your answer to my question, are you aware
2    that you answered our complaint, that you filed an
3    answer to it? We filed a complaint setting forth
4    certain facts that we say happened, and then you
5    responded. Are you aware of that?
6 A. Yes.
7 Q. Okay. And you've been involved in litigation before,
8    correct?
9 A. Yes.
10 Q. Okay. So with regard to what I just read to you, it's
11    paragraph 12 in our complaint. And then your answer
12    you say, Defendants are without information or
13    knowledge sufficient to form a belief as to the truth
14    of the allegations complained in paragraph 12. And,
15    therefore, deny them.
16 A. I don't under -- you're asking me -- I don't
17    understand, I guess, what you're asking me. You're
18    asking me in general what a physician assistant does?
19 Q. I just read you paragraph 12 from my complaint which
20    says what the the physician assistant's job duties are.
21    I'm looking at your answer, and you say, Defendants are
22    without information or knowledge?
23         MR. BREAUGH: Object to form.
24         MS. GORDON: Can I get my question out?
25 BY MS. GORDON:

Page 63

1 Q. Sufficient to form a belief as to the truth of the
2    allegations in paragraph 12.
3 A. I don't understand what you're asking.
4 Q. Okay.
5         MR. BREAUGH: Objection to form on it for
6    different citations, and how you read out each time
7    there.
8         MS. GORDON: What do you mean by that?
9         MR. BREAUGH: First one you had job duties
10    include, and your question was formed around stating
11    that was the job duties for this situation.
12 BY MS. GORDON:
13 Q. Okay. All right. So do you know what my client's main
14    job duties were?
15 A. Yes.
16 Q. And were they -- did they include reviewing patient's
17    medical histories?
18 A. Yes.
19 Q. Consulting with and examining patients?
20 A. Yes.
21 Q. Providing treatments?
22 A. Yes.
23 Q. Conducting procedures?
24 A. Yes.
25 Q. Diagnosing patient conditions?

Page 64

1 A. Yes.
2 Q. And ordering diagnostic tests?
3 A. Yes.
4 Q. Okay. Did you review the answer to your complaint that
5    you filed with the federal court before you sent it in?
6 A. Yes.
7 Q. Okay. Did you have any input into the answer to the
8    complaint?
9 A. Yes.
10 Q. Okay. And what was your input? Just to be sure
11    everything was accurate, or what?
12 A. Whatever was reviewed with me, whatever we went over.
13 Q. Okay. So I'm going to hand you the answer I just read
14    you number 12. I'm going to bring you in a copy of it
15    in a minute. But I'm going to circle this what I just
16    read my client's duties were. If you look at number
17    12, can you read that into the record.
18         MR. BREAUGH: I'm going to object again to
19    form for what 12 actually said versus the summarization
20    of 12 now.
21         MS. GORDON: Okay. Then let's hold off.
22    I'll take that back. Let me keep going while I'm
23    waiting for that to come in.
24 BY MS. GORDON:
25 Q. Okay. I'm going to keep going, and we'll come back to

Page 65

1    that. All right. Let's keep going to the billing
2    situation that we were talking about. So you have the
3    medical assistant and the notes. Then the PA looks over
4    them. And is the PA looking to ensure that everything
5    is coded correctly?
6 A. No. The PA's just making sure that, as I said,
7    different parts are filled out. If they're not, to try
8    to get to the -- figure out the correct things that are
9    supposed to be there.
10 Q. And who codes the complaint, excuse me, the procedures?
11 A. So originally just MBR was coding them, and then I
12    started taking over coding them.
13 Q. Okay. And what do you mean when you say you took over
14    coding?
15 A. I had never put the little codes in before, the little
16    procedure codes.
17 Q. Okay. And did you start doing that?
18 A. Yeah.
19 Q. How did you learn how to do that?
20 A. I was taught by my biller.
21 Q. Okay. Who was that?
22 A. Simrath.
23 Q. Okay. And but she doesn't actually have any knowledge
24    or expertise in what the procedures are, and how
25    they're supposed to technically be coded; is that

17 (Pages 62 - 65)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 66

1    correct?
2  A.  No, she has knowledge of it.
3  Q.  What kind of training did she get?
4  A.  As I said, she worked in a hospital before, so she had
5      that.
6  Q.  But with regard to your practice.
7  A.  Well, she -- there was a transition period, so she was
8      training basically seeing what MBR did, and then
9      figuring out how to do the same thing.
10 Q.  Okay.  So let's -- I'm going to -- I now have an extra
11     copy of the complaint. I'm going to hand you my
12     complaint dated 7/19/2023. Just read paragraph 12. I
13     already read it to you, doctor, a couple of times. Go
14     to paragraph 12.  I just read it out loud on the
15     record, but take a look at that.
16 A.  Okay.
17 Q.  Is that accurate?
18 A.  That's what a physician assistant can do, yeah.
19 Q.  So in your answer, though, you didn't say that. You
20     denied that that statement was true.
21 A.  Are you talking about the defendant, or are you talking
22     about in general or whatever.  Are you talking about in
23     general what the PA does?  Is that like a general?
24 Q.  No.  I'm talking about my complaint that's in front of
25     you.  It's a legal document, paragraph 12.  And I'm

Page 67

1    going to give you your answer right here. I'm handing
2    you now you the complaint, which is dated September
3    3rd, 2024, and I've circled for you number 12.
4         MR. BREAUGH:  I'm going to --
5  A.  I don't understand what you're asking.
6         MR. BREAUGH:  I'm going to object real quick
7    again to form, as 12 is read as in general, and you're
8    asking her to answer speculatively now.
9  A.  Yeah, I don't understand, exactly.
10 BY MS. GORDON:
11 Q.  I'm not asking for speculation.
12 A.  Are you asking about what are my PAs supposed to do?
13 Q.  Doctor, that's a legal document in front of you. It's
14     the complaint. It's a statement made to the court on
15     the record. You have to answer it by court rule and
16     law.
17 A.  Okay.
18 Q.  You answered it. You filed the complaint. Are you with
19     me -- and answered. Are you with me so far?
20 A.  I'm not an attorney. I have attorneys to do that.
21 Q.  You're a defendant in a lawsuit. It doesn't matter. Is
22     your attorney an expert in what your physician
23     assistant does? I don't think so, is he?  Who knows
24     more about what a physician assistant does in your
25     office, you and your husband, or the law firm you've

Page 68

1    hired?
2         MR. BREAUGH:  Object to speculation.
3  BY MS. GORDON:
4  Q.  Who knows more about that? Speculation? Okay.  Who
5      knows more about what a physician assistant does for
6      your practice, you or the lawyers?
7  A.  Me.
8  Q.  Okay. So you said you looked at the answer to the
9      complaint. You told me you looked at it. I asked you
10     did you look at the complaint, and you said -- the
11     answer to the complaint, and you said yes.  And you
12     said you were looking at it, you know, to be sure it
13     was accurate and so on. Do you remember that a few
14     minutes ago?
15 A.  Yes.
16 Q.  Okay. All right. That's the answer. So now I'm asking
17     you why you denied my paragraph 12 about the duties my
18     client performed as a physician assistant?  Why do you
19     say in number 12 defendants are without information or
20     knowledge to form a belief as to the truth of the
21     allegation, which is my client's job duties?  Why do
22     you say --
23         MR. BREAUGH:  Objection to form.
24 A.  I don't know. I don't have an answer for you.
25 BY MS. GORDON:

Page 69

1  Q.  So your answer is incorrect on number 12?
2  A.  I don't know.
3  Q.  You just told me that you don't know if your answer is
4      correct or not.
5  A.  I don't know what you're asking me. You're asking me to
6      be an attorney, and I'm not.
7  Q.  No, I'm not. I'm just asking you --
8  A.  You are asking me -- you're asking me to understand
9      legal stuff, and I don't.
10 Q.  Okay.  I'm not going to get into an argument with you
11     about this.
12 A.  Sure.
13 Q.  It's you that is responsible for your answer to your
14     complaint, and whether it's accurate. I'm just
15     wondering why you denied what my client's job duties
16     are in number 12, but I guess your answer is you don't
17     know. Is that accurate, you don't know?
18 A.  Yes, I don't know.
19 Q.  Why you denied that. Okay. Okay. Am I correct that in
20     your practice you bill insurance providers for
21     services, including state and federal Medicare and
22     Medicaid programs?
23 A.  Um-hmm.
24 Q.  That's a yes, for the record?
25 A.  Yes.

Page 70

1  Q.  So I'm going to hand you my complaint, paragraph 18.
2      I'm sorry.  Number 17.  I just asked you this question.
3      I'm going to read it again.  Defendants bill insurance
4      providers for the above services, including state and
5      federal Medicare and Medicaid programs.  That's an
6      accurate statement?
7          MR. BREAUGH:  Object to form for what the
8      above services refers to.
9  BY MS. GORDON:
10  Q.  Is that -- is that --
11  A.  I don't know.  I don't know what you're referring to.
12  Q.  Do you bill insurance providers for services?
13  A.  Yes.  I bill insurance providers for services.
14  Q.  And do you bill them for vein and vascular treatment?
15  A.  Yes.
16  Q.  Okay.  Does Dr. Hill bill for services, including total
17      and partial knee replacement, hip replacement
18      surgeries, and pain control?  Does he bill for those
19      things from time to time?
20  A.  I don't know about the pain control, but I know he does
21      hip replacements.
22  Q.  Doesn't he give pain medication for people that are
23      having hip replacements?
24  A.  Yeah.  You don't bill for that though.
25  Q.  Okay.  I just said the services.  I'm reading to you the

Page 71

1      services that he provides.  He provides -- he provides
2      as a service writing a prescription, correct?
3  A.  That's not separately billed.
4  Q.  I'm not talking about billing.  I'm just saying
5      services provided?
6  A.  Yeah.
7  Q.  So take a look at the answer to number 15.  Excuse me.
8      Our statement in number 15 as to what you do.  Do you
9      see it says Pensler Vein and Vascular?  Do you see
10      that, doctor?
11  A.  Yes.
12  Q.  Okay.  So let's look at 15.  Pensler Vein and Vascular
13      Surgical Institute, Pensler Vein and Vascular provide
14      vein and vascular treatment, including aortic aneurysm
15      surgery, blood clot treatments, carotid artery surgery
16      for stroke victims, spider and varicose vein removal,
17      and Raynaud's disease access.  Is that statement
18      accurate that you provide those services from time to
19      time?
20  A.  Yes.
21  Q.  Okay.  Let's go to paragraph 16.  Hill Orthopedics
22      provide services, including total and partial knee
23      replacement surgeries, hip replacement surgeries, and
24      pain control treatments.  Is that an accurate statement?
25  A.  Yes.

Page 72

1  Q.  Okay.  Now, let's go to paragraph 17.  Defendants bill
2      insurance providers for the above services, including
3      state and federal Medicare and Medicaid programs.  Is
4      that accurate, you bill for the services you provide?
5          MR. BREAUGH:  Object to form.  It's something
6      we already went over were not billed.
7  BY MS. GORDON:
8  Q.  Go ahead.
9  A.  If the person -- if we complete the surgery, and that's
10      the person's insurance, then we will bill.
11  Q.  Sure.
12  A.  Their insurance.
13  Q.  Sure.  I assume -- I assume it's got be 99 percent of
14      your patients have some kind of insurance, correct?
15  A.  Yeah.  We don't, unless they come in through the
16      hospital and they're uninsured, we don't take patients.
17  Q.  So read number 17 again.  Defendants bill insurance
18      providers for the above services, including
19      federal Medicaid and Medicare programs, correct?
20      That's just what you do?
21  A.  Yeah.
22  Q.  Okay.  So but in your answer, you deny this.  Therefore,
23      defendants are without information.  I'm going to read
24      you your answer.  Plaintiff lumps all defendants
25      together.  Some defendants bill insurance providers, and

Page 73

1      Medicare and Medicaid.  Some do not.  Therefore,
2      defendants are without information or knowledge
3      sufficient to form a belief as to the truth of this
4      allegation and, therefore, deny what I've said there.
5      Why are you denying it?  You just read to me that
6      that's all accurate.  Why are you denying it to the
7      federal court, if you know?
8  A.  I don't know.
9  Q.  Okay.  Okay.  Look at paragraph 18, if you would.  That's
10      again my complaint I'm handing you.  And paragraph 18
11      says under CMS guidelines, services solely provided by
12      physician assistants are typically reimbursed at a
13      reduced rate of 85 percent of the CMS fee schedule
14      amount for the value of services.  Is that accurate,
15      doctor?
16          MR. BREAUGH:  Object to form for typically,
17      its definition.
18          MS. GORDON:  You can't object to form,
19      because I'm reading something that's in a file
20      complaint with the federal court.
21          MR. BREAUGH:  The allegations itself are
22      accurate.
23          MS. GORDON:  It's not my question.  I'm
24      reading it.
25          MR. BREAUGH:  Not if it's accurately read

Page 74

1  off.
2        MS. GORDON:  Okay.  Fair enough.
3  BY MS. GORDON:
4  Q.  Okay.  Is that accurate, number 18?
5  A.  No.
6  Q.  What's inaccurate about it?
7  A.  That's not always true.
8  Q.  Okay.  Is it true that physician assistants are
9     typically reimbursed?
10       MR. BREAUGH:  Object to form on typically.
11       MS. GORDON:  I'm not done with my question,
12    and I'm reading from a complaint, so there's nothing
13    wrong with my question, okay?
14       MR. BREAUGH:  You just said is it true that
15    typically.  That's when I objected, because now it's
16    beyond what's contained in there.
17       MS. GORDON:  Okay.  Your objection is noted.
18  BY MS. GORDON:
19  Q.  Is it true that typically physicians assistants are
20    reimbursed at a rate of 85 percent?
21  A.  No.
22  Q.  Okay.  What's the typical reduction for physician
23    assistants?
24  A.  Depends if there is a reduction.
25  Q.  Well, tell me if there is a reduction, what is it?

Page 75

1        MR. BREAUGH:  Object to form.
2  BY MS. GORDON:
3  Q.  Do you know?
4  A.  If a physician assistant was just billing their own
5     services not under any kind of physician, then I
6     believe that's correct.
7  Q.  Okay.  So if we go back to what I said in my complaint,
8     services solely provided by -- solely provided by
9     physician assistants are typically reimbursed at a rate
10    of 85 percent; is that accurate?
11  A.  Not in what you're regarding to.
12  Q.  What is not accurate about it?
13  A.  You're regarding some specific -- you're citing some
14    kind of specific detail.
15  Q.  Just read paragraph 18.  That's all I'm asking you to
16    look at, doctor.  Just read paragraph 18.
17  A.  Um-hmm.
18  Q.  And let me know when you're done.  Take your time.
19  A.  Okay.
20  Q.  Do you understand paragraph 18?
21  A.  Um-hmm.
22  Q.  That's a yes?
23  A.  I understand it, yes.
24  Q.  Okay.  Is that accurate?
25  A.  In certain circumstances.

Page 76

1  Q.  Okay. Where is it not accurate?
2  A.  If there's a physician.
3  Q.  Okay.  Go back to --
4  A.  Physician present.
5  Q.  Go back to paragraph 18.  Do you see where it says
6     services solely?
7  A.  I'm not sure what solely means.
8  Q.  It means only.
9  A.  It depends on each situation.
10  Q.  A sole person.
11  A.  But they're not solely doing things.  They're under a
12    physician.
13  Q.  But if there's not a physician in the room, and the
14    physician assistant performs the services.
15  A.  It's still not accurate.  Because if a physician's
16    available or there, then it gets billed to the
17    physician.
18  Q.  Okay.  Do you know what the term incident to means?
19  A.  Um-hmm.
20  Q.  What does it mean?
21  A.  It means that the physician is available or in the
22    building.
23  Q.  And so what do you mean by available or in the
24    building?
25  A.  Available means can make a phone call, a text message,

Page 77

1     can get a hold of them somehow.
2  Q.  Okay.  And a text message qualifies as being available
3     under your definition of incident to?
4  A.  Being able to get a hold of the physician, yes.
5  Q.  Okay.  We'll get back to that. Are you familiar with
6     the Medicare benefit policy manual?
7  A.  No.
8  Q.  Is there anybody in your office that's familiar with
9     the Medicare benefit policy manual?
10  A.  The biller.
11  Q.  And how do you know she's familiar with that?
12  A.  Because she speaks about Medicare.
13  Q.  Well, what does she say about Medicare?
14  A.  I don't have a thousand conversation with her, because
15    I'm not a biller. I'm a doctor.
16  Q.  Okay.  I'm just asking you whether or not your biller
17    is familiar with the Medicare benefit policy manual?
18  A.  I can only say I believe so.
19  Q.  You're not sure; is that correct?
20  A.  I don't know what you're asking. I believe she is.
21  Q.  But you're not sure; is that accurate?
22  A.  No, she's -- she's familiar with it.
23  Q.  Well, how do you know that?
24  A.  Because she references it.
25  Q.  Okay.  Are you familiar with it?

Page 78

1   A.   I don't -- I'm not familiar with the whole thing, but I
2        understand it for what she references.
3   Q.   Okay.  And what has she referenced to you?  Give me a
4        couple of examples of when she has referenced the
5        Medicare billing manual?
6   A.   If we need to get authorization for different things.
7   Q.   Like give me an example.
8   A.   Like if we need to get authorization for a laser
9        procedure.
10  Q.   Okay.  So that she's familiar with getting
11       authorizations?
12  A.   Yeah.
13  Q.   Okay.  Is she familiar with the part of the manual that
14       says when a doctor can legally bill?
15  A.   Yes.
16  Q.   Okay.  And what have you discussed with her about that?
17  A.   As long as I'm in the facility, or available, as long
18       as I'm in the facility, then you can bill as a
19       physician.
20  Q.   Okay.  And how does the biller know what's down on the
21       piece of paper on the chart, whether you were in the
22       building or available?  How does the biller know that?
23  A.   They send the schedules.
24  Q.   And so you told me earlier the biller just gets the
25       chart.  The biller gets a chart that's been inputted by

Page 79

1        the medical assistant, reviewed by the PA, and then by
2        you.  That's what you said here today, correct?
3   A.   Yes.
4   Q.   Okay.  And then that chart goes to the medical biller?
5   A.   Yes.
6   Q.   Okay.  And how does the medical biller know then
7        whether you were available?  Is it on the chart?  Does
8        the chart say Dr. Pensler was available, and we called
9        her during this appointment?  Does the chart say that
10       if I get all the charts?
11  A.   No.
12  Q.   Okay.  So the biller doesn't know whether Dr.
13       Pensler -- hang on.
14  A.   The biller knows the schedule.  The biller knows the
15       schedule.
16  Q.   You have to let me finish my question.
17  A.   Okay.
18  Q.   The biller doesn't know when she's just looking at a
19       patient's chart whether or not you were available,
20       correct?  Just if she has a chart in front of her
21       alone, she doesn't know.
22  A.   But it's in a schedule.  It's not like she just has a
23       chart.
24  Q.   I'm taking it question by question here.  When the
25       biller gets the chart, she does not know just from the

Page 80

1        face of the chart whether you were in the building or
2        available, correct?  The chart doesn't reflect that?
3   A.   No.
4   Q.   Okay.  So then how does she know?
5   A.   Based on the schedules.
6   Q.   So what does she do when she has the chart in front of
7        her?  Does she look at the schedule?
8   A.   Yeah.  It's all known.
9   Q.   Okay.  And is she required to go look at the schedule?
10  A.   Yes.
11  Q.   And where is that in writing?
12  A.   It's part of her job to make sure she's filling out
13       things accurately.
14  Q.   Is that in writing?
15  A.   No.
16  Q.   Okay.  Is that one of your job requirements for your
17       billers that they go look to see whether you were
18       available, for the law?
19  A.   Yes.
20  Q.   That's a requirement?
21  A.   Yes.
22  Q.   Okay.  Have you ever questioned a biller and said why
23       did you bill under my name, because I wasn't there that
24       day?  Has that ever happened?
25  A.   No, because I don't -- I'm not involved in every aspect

Page 81

1        of billing.
2   Q.   Okay.
3            MR. BREAUGH:  If possible in the next --
4        whenever you want to wrap up this line, but just a
5        brief break?
6            MS. GORDON:  That's fine.  If you guys want
7        to take a break now, go ahead.
8            MR. BREAUGH:  Now is good.
9            MS. GORDON:  Sure.
10           (Break at 12:41 p.m.)
11           (Back on the record at 1:04 p.m.)
12  BY MS. GORDON:
13  Q.   Doctor, how many vacation days roughly do you take a
14       year or are out of the office on vacation in another
15       location out of state?
16  A.   Probably maybe a month split apart.
17  Q.   Okay.  So that's you and your husband, or both, I
18       assume together vacationing?
19  A.   Mostly, yeah.  I would say 90 percent of the time.
20  Q.   Typically, and your home in Florida, or where else?
21  A.   My home in Florida, or we'll go to New York, or go to
22       Europe.
23  Q.   Okay.  And your calendars for 2022 and 2023, I assume,
24       are going to reflect your time out of the office?
25  A.   Um-hmm.

21 (Pages 78 - 81)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 82

1   Q.   That's a yes?
2   A.   Yes.
3   Q.   And you have these calendars; is that accurate?
4   A.   Yes.
5   Q.   Okay.  And I assume it's important for you to be sure
6        your staff knows when you're actually not going to be
7        physically present, correct?
8   A.   Um-hmm, yes.
9   Q.   That's a yes, okay. What other kinds of things take you
10       out of the office on a regular basis?
11  A.   Regular, I would say just -- I wouldn't say regular.
12       Like emergency surgeries, if there's an emergency.
13  Q.   Okay.  And that takes you out of the office because you
14       then have to be at the hospital performing a surgery?
15  A.   Yes.
16  Q.   Okay.  What else?  Do you have any -- I've heard that
17       you do swimming.  You're a swimmer. You do so on a
18       regular basis?
19  A.   Yeah, but I swim before.
20  Q.   What time do you typically swim?
21  A.   8 or 9 o'clock.
22  Q.   That's on Mondays?
23  A.   Um-hmm. I swim -- I try to swim every day.
24  Q.   I see. So five days a week?
25  A.   I try, sometimes I have to do it afterwards.

Page 83

1   Q.   Is that on the calendar as well?
2   A.   No.
3   Q.   So if you schedule patients, your office opens at 8
4        a.m.; is that correct?
5   A.   Yeah.
6   Q.   Okay.  And so if you schedule patients for 8 a.m., or
7        8:30 a.m., 9 a.m., and let's say you're swimming that
8        day, you're not getting in the office then until later,
9        correct?
10  A.   After I swim, yeah.
11  Q.   What time do you typically get in on those days?
12  A.   10:30, 11.
13  Q.   And is that on the calendar as well so that the staff
14       can see?
15  A.   They know.
16  Q.   They just know that?
17  A.   Um-hmm.
18  Q.   Typically, you're not going to be in there until 10:30
19       or 11?
20  A.   Um-hmm.
21  Q.   That's a yes?
22  A.   Yes.
23  Q.   And that goes for five days a week typically?
24  A.   No, not five days a week. Again, as I said, I'm only in
25       the office the two days a week.  And when I have

Page 84

1        surgeries, I have to show up, so either I'll swim
2        before my surgery, or I swim afterwards.
3   Q.   So this is for the two days a week you're in the
4        office, people know and understand?
5   A.   Yeah.
6   Q.   You're not going to probably be in until 10:30, 11
7        a.m.?
8   A.   Yes.
9   Q.   Okay.  Where do you swim?
10  A.   At Equinox.
11  Q.   Which one, the one on Maple?
12  A.   There's only one, Maple and Telegraph.
13  Q.   Okay.  Anything else that takes you out of the office
14       other than surgeries, swimming or other exercise or
15       vacations?
16  A.   No.
17  Q.   Okay.  And when you're on a vacation out of the state,
18       your office bills -- excuse me.  Your office schedules
19       patients as if you were in the office, correct?
20  A.   Yes.
21  Q.   Same number of patients?
22  A.   No.  Usually it's less.
23  Q.   Well, if I've got the calendars, what am I going to
24       see?
25  A.   That it's less.

Page 85

1   Q.   Like how many less?
2   A.   10 or 15 less.
3   Q.   Okay.  So that means maybe you're going to have 25, 20
4        or 25 people instead of 40?
5   A.   Yeah, it's a lighter schedule.
6   Q.   So what do you do with the patients that are coming in
7        on those days?
8   A.   The physician assistant will see them.
9   Q.   Okay. And so the vacation days that I will see for you
10       when I get your calendars, we will know that on those
11       days the physicians assistants covered whatever
12       patients came in that day?
13  A.   Yes.
14  Q.   Okay.  Now, if I got the billing records, what am I
15       going to see on who the provider was for those days,
16       the service provider?
17  A.   Well, at the time that she was there, it was COVID
18       rules, so I was the billing provider.  But now because
19       those COVID rules changed, they bill based on the
20       insurance, and if I am or am not in the office.
21  Q.   Have you changed your billing provider name policy
22       since 2015?
23  A.   I didn't have any PAs in 2015, so I've only had PAs
24       during COVID.
25  Q.   When did you start -- when was your first PA hired?

22 (Pages 82 - 85)

Page 86

1    A.    2019.
2    Q.    Okay. And who was that?
3    A.    Jamie Peysakhov.
4    Q.    What happened to Jamie, by the way?
5    A.    She quit.
6    Q.    Why, as you understood it?
7    A.    She didn't want to work there any more.
8    Q.    Why? Did she have complaints about you or the office?
9    A.    No. She and my husband had got into like a discussion
10       or argument.
11   Q.    About what?
12   A.    She had lied about seeing a patient that was a cosmetic
13       patient that came in. She said -- she was saying that
14       she went over there. And when I asked her about the
15       patient, she said they never showed up, when actually
16       they did show up. She just was lying about it because
17       I'm not -- I'm unclear what she was doing, but she was
18       supposed to see the patient. So my husband asked her
19       about it, and she got angry that he questioned her.
20   Q.    And she quit?
21   A.    She quit, yeah.
22   Q.    Did she put anything in writing?
23   A.    Why she quit?
24   Q.    Yeah.
25   A.    She wrote -- she did. She wrote something saying --

Page 87

1       but it was all very nice stuff. That she was sorry she
2       couldn't help, and that she just feels like she needs
3       to move on, and all this other stuff. But it wasn't
4       anything nasty.
5    Q.    How long was she there altogether?
6    A.    She was probably there a year.
7    Q.    Did she do a good job other than what you're talking
8       about?
9    A.    She initially did a good job, and then it just sort of
10       started where the person just kept -- started, you
11       know, taking, you know, showing up late, taking extra
12       vacation days. They didn't ever -- she never grew her
13       Med Spa practice, which she was supposed to, meaning
14       that we're paying her a very large salary, and she
15       wasn't doing anything to increase the patients that
16       came in and/or make sure the patients were coming in.
17       So the Med Spa was losing a ton of money, and she just
18       didn't care. And so then she stopped -- just like I
19       said, she was not -- like she's having me -- she's
20       supposed to help me see patients, and she's hiding in
21       the Med Spa, and I'm doing all the work. And she
22       started having fights with a lot of the other
23       employees. So I started having complaints from, you
24       know, two different situations where she screamed at
25       one of the MAs. So initially I was surprised she turned

Page 88

1       like that.
2    Q.    Did you make a record of any of that?
3    A.    Well, there's a record of her not doing anything in the
4       Med Spa as far as there were no patients.
5    Q.    No. I'm sorry to interrupt you. I mean did you create
6       a written record of performance problems on her behalf
7       based on her conduct?
8    A.    No.
9    Q.    Okay. So there's nothing in writing where you're
10       critical of her?
11   A.    No.
12   Q.    Am I correct that on the documentation that's created
13       for billing to the government, there's a line for the
14       servicing provider and the billing provider?
15   A.    Yes.
16   Q.    Okay. And can you explain that to me?
17   A.    I am not in charge of putting -- there's a certain way
18       it has to be put in for different things.
19   Q.    What's your understanding?
20   A.    I really don't -- I have a poor understanding of it. I
21       just know that the biller has reviewed it, and she
22       knows who to put what for what instance.
23   Q.    Well, certainly as the owner of the corporate entity,
24       you must have some idea.
25   A.    I don't look at that.

Page 89

1    Q.    Hold on a second, please.
2    A.    Go ahead, please.
3    Q.    You must have some idea of how things are to be billed
4       appropriately. Do you not have an idea?
5    A.    No, I know what is supposed to -- how it's supposed to
6       be reviewed. I don't know the details of what is put in
7       the computer.
8    Q.    Did you work Dr. Mok?
9    A.    Yes.
10   Q.    Who was he at the time you worked for him?
11   A.    He was the, I guess, owner of Allure.
12   Q.    Okay. And what was your job there?
13   A.    I was a vein provider.
14   Q.    What does that mean?
15   A.    That means I would see the patients and do procedures.
16   Q.    You were working for him as a doctor?
17   A.    And working, yeah. It was a side job.
18   Q.    Did you learn that he had a legal problem with regard
19       to fraud and billing?
20   A.    Absolutely.
21   Q.    Okay. And what did you understand the issue was there?
22   A.    He overbilled. He billed when he didn't have -- he
23       overbilled, and he billed when he didn't actually do a
24       procedure. It was grossly fraudulent.
25   Q.    And what do you mean by overbilled?

Page 90

1  A.  Meaning instead of saying you did one vein, he'd always
2      put two no matter what.
3  Q.  Okay.  And you did billing while you were there?
4  A.  No, I never did any billing.
5  Q.  Okay.  What happened to him, as you understood it?
6  A.  I think he did a -- he's still in business, and he just
7      took a -- I have no idea. I assume he took a settlement
8      with the government, because he's still working, and
9      he's still in business, and he has hired physicians.
10 Q.  There was a government investigation?
11 A.  Yeah, around his COVID thing though.  He was doing
12     Vitamin C treatments, and he broke a ton of COVID
13     rules.
14 Q.  I'm not asking about that. I'm asking about during the
15     time you worked with him.
16 A.  Yeah, I didn't have nothing to do with the billing.
17 Q.  Okay.  And I understand that, but did you provide
18     any -- were you questioned by the government at all?
19 A.  Yes.
20 Q.  Okay.  What was that?  Was it an FBI investigation?
21     What was it?
22 A.  It was like -- I guess it was the FBI.
23 Q.  What year would this have been?
24 A.  Whenever COVID, 2020, 2019 or 2020. I'd have to -- it
25     was like in the middle of COVID.

Page 91

1  Q.  So I'm going to go back now to -- strike that.
2          And what kind of questions were you asked?
3  A.  Just about his, you know, what kind of patients they
4      would see. What the processes were. Just that kind of
5      stuff.
6  Q.  Okay.  Did you give a written statement?
7  A.  No.
8  Q.  This was a person to person interview?
9  A.  Yes.
10 Q.  All right. I'm going to go back to my question about a
11     servicing -- billing for servicing.  The provider that
12     does the servicing, and the provider that does the
13     billing. So you have a code, is that correct, as a
14     doctor for billing?
15 A.  Yes.
16 Q.  Okay.  And is it your name, or is it something else?
17 A.  I mean, again, as I said, I don't put that in. I don't
18     fill it out.
19 Q.  You've already told me you look at --
20 A.  I look at the codes, but I don't look at the servicing
21     provider, because there's certain things you have to --
22     it's like different rules. Different places, so I
23     don't --
24 Q.  I don't know what you mean by different rules at
25     different places. I'm talking about billing the

Page 92

1      government under a servicing name and a billing name.
2  A.  Um-hmm.
3  Q.  Do you understand the distinction?
4  A.  I have an understanding.
5  Q.  Okay.  Somebody sees the patient and services the
6      patient. And under some circumstances if the doctor is
7      not that person, it can still be billed under the
8      doctor's name, correct?
9  A.  Yes.
10 Q.  And that's, for example, if you're in the building,
11     correct?
12 A.  Yes.
13 Q.  And if it's not the patient's first appointment; is
14     that correct?
15 A.  Yes. I don't know. I'm not sure.
16 Q.  You're not sure?
17 A.  Well, I see mostly all the new patients.
18 Q.  I didn't ask you that.
19 A.  Yeah.
20 Q.  I'm just trying to find out your understanding of
21     what's legal?
22 A.  Okay.
23 Q.  Because you get a lot of income from the government,
24     don't you?
25 A.  Yes.

Page 93

1  Q.  50 percent of your income -- by the way, what are
2      your -- what are your profit margins there every year
3      roughly?  How much money does your corporate entity
4      make a year?
5  A.  Well, it goes up. I think we made -- well, one year we
6      made zero profit. Another year we made like a million.
7  Q.  Well, let's talk about 2023.
8          MR. BREAUGH:  Object to form.  For which
9      entity are you referring to?
10 BY MS. GORDON:
11 Q.  We can break them down. Let's talk about Vein and
12     Vascular.
13 A.  Probably a million.
14 Q.  That was your net profit?
15 A.  Um-hmm.
16 Q.  That's a yes?
17 A.  Yes.
18 Q.  Okay. And how about your husband's practice, orthopedic
19     practice?
20 A.  $400,000.
21 Q.  Okay.  And how about for '23?
22 A.  '23 was last year.
23 Q.  I'm sorry, '22.
24 A.  Which year did you say, 2020?
25 Q.  I was asking you a moment ago about 2023, which would

Page 94

1    have been this most recent year you filed your taxes
2    for.
3  A.  Yeah.
4  Q.  So let's go back. Let's not go to -- let's go to this
5    year, 2024.  You haven't filed taxes yet, but we're
6    coming to the yearend. How much have you -- has each
7    corporate entity been able to bring in this year?
8  A.  I think -- profit wise?
9  Q.  Yes.
10 A.  Around $2 million for me.
11 Q.  So you've had a good year this year?
12 A.  Yeah, I worked very hard. I did.
13 Q.  I'm sure you do.  And your husband?
14 A.  He did like, I think, $500,000.
15 Q.  Okay.  So obviously a definite portion of this comes
16   from government payments to you, correct?
17 A.  Um-hmm.
18 Q.  That's a yes?
19 A.  Yes.
20 Q.  Isn't it important for you to know how to bill properly
21   so that you're only being paid for what the government
22   legally allows you to be paid for?
23 A.  Yes.
24 Q.  Or do you not care?
25 A.  No, of course I care.  And the idea that everything is

Page 95

1    done correctly.  That's why the biller oversees it. She
2    understands it better than I do. So I just try to help
3    save her some time as far as just putting in codes of
4    things that were done. But as far as servicing and
5    that, they manage that. They have a list of when I am
6    or am not in the building, which PA sees the patient,
7    and they put that in.
8  Q.  So you don't know if fraud is occurring in your office?
9  A.  No, there is no fraud occurring.
10 Q.  Well, how do you know that? Because you don't know
11   what they're doing, and you don't know what the rules
12   are.  How do you know that?  You just turn it over to
13   the biller, and you don't know what the biller puts in.
14   That's what you've just told me.
15 A.  No, I don't.  You're asking me for like nuance things.
16   I'm giving you --
17 Q.  I'm not asking you for nuance things.
18 A.  Yeah, you are.
19 Q.  I'm asking you whether you are aware of whether fraud
20   has occurred in your office with regard to how things
21   are billed to the government?
22 A.  No, we bill correctly.
23 Q.  Well, how do you know that?
24 A.  Because I've spoke to the biller about it.
25 Q.  When did you last speak to the biller?

Page 96

1  A.  I spoke to the biller two months ago. We talk to each
2    other.
3  Q.  Do you know what the nature of our lawsuit is here?
4  A.  Yes.
5  Q.  What do you understand we're claiming you did wrong?
6  A.  No.  You're claiming I fired her because I thought that
7    she thought we were doing something wrong.
8  Q.  Okay.
9  A.  Instead of firing her for poor performance.
10 Q.  With regard to whether or not my client's complaints
11   about what you were doing wrong are accurate, do you
12   know sitting here today if she's correct?
13 A.  She's inaccurate.
14 Q.  Well, have you done an investigation?
15 A.  Yes.
16 Q.  What did you investigate?
17 A.  How things were being billed.
18 Q.  Okay.  What did you do?  Who did the investigation, you
19   personally?
20 A.  I did it with the biller. We reviewed stuff.
21 Q.  Okay. And who's the biller you're referring to here?
22 A.  Simrath.
23 Q.  Okay.  And is there a written investigation result or
24   report?
25 A.  No.

Page 97

1  Q.  Okay.  What did you do to investigate my client's
2    claims?
3  A.  We reviewed the processes of how things are billed, and
4    what was being put down.
5  Q.  So then you do know how they were billed, and what was
6    being put down?
7  A.  Yes.
8  Q.  So you told me a few minutes ago you didn't know.  It
9    was completely up to the biller.
10 A.  No, you're asking me for servicing provider and billing
11   provider, and they mean different things in different
12   instances.
13 Q.  Right.  So why don't you explain that to me.
14 A.  I don't know that, because she fills it out.
15 Q.  Okay.
16 A.  I'm not a biller.  That's why I hired her.
17 Q.  Have you ever had a physician assistant who has been
18   the billing -- who's had her name on the billing as the
19   provider?
20 A.  Yes.
21 Q.  For services?
22 A.  Absolutely.
23 Q.  And how many times has that happened?
24 A.  It happens when I'm not there.
25 Q.  Okay. So when did that begin?

Page 98

1  A.  After COVID rules ended.

2  Q.  Okay.  And what do you understand the COVID rules were?

3  A.  That the physician did not have to be present.

4  Q.  Under what circumstances?

5  A.  There was the circumstance as long as they could be

6      gotten ahold of.

7  Q.  Where'd you get that information from?

8  A.  From the CMS.

9  Q.  I'm sorry?

10  A.  CMS.

11  Q.  What have you read from CMS that makes you say to me

12      here today that you didn't -- as long as you could be

13      gotten ahold of, I think was how you put it, what are

14      you relying on for that?  Is that for anybody that

15      comes into your office so long as you could have been

16      gotten ahold of it's legal?

17  A.  Yes.

18  Q.  Okay. And where do you get that information from?

19  A.  From, I just told you, CMS.

20  Q.  I'm sorry?

21  A.  CMS.

22  Q.  Okay. And what did you read from CMS about COVID?

23  A.  That because of the situation with COVID, that as long

24      as the physician could be gotten ahold of that they

25      could bill.

Page 99

1  Q.  Okay.  And do you think that what you just told me is

2      accurate?

3  A.  Yes.

4  Q.  Hang on a second, please. Sorry. Okay. In order for you

5      to be out of the office, and be able to bill as a

6      physician, based on COVID, did you have to do a case by

7      case analysis of that particular patient coming into

8      the office to see you personally?

9  A.  No.

10  Q.  You're not aware that in order to be able to render

11      services and bill, excuse me, to be able to bill for

12      services when you're not in the office during COVID, it

13      had to be -- there had to be a medically indicated

14      reason on a case-by-case basis?  You're not aware of

15      that?

16  A.  Medically indicated?  What do you mean?

17  Q.  Yeah, because you had COVID or something, and couldn't

18      see the patient in person.

19  A.  I don't think that's what that meant.

20  Q.  What what meant?  What are you saying when you said

21      that meant?  What are you referring to?  Go ahead.

22  A.  My understanding of it was that because of the

23      stressful nature of the COVID situation where

24      physicians were placed in hospitals, and couldn't get

25      to places, that they loosened the rule. They also

Page 100

1      loosened the rule for telehealth too.

2  Q.  Okay.  Where do I find that what you're referring to as

3      a physician who was responsible for these practices?

4      Where do I find that?

5  A.  CMS. I'd have to get it to you.

6  Q.  Do you have something that says that?

7  A.  I believe I do. I don't have it on me.

8  Q.  And did you have any training on that?

9  A.  No.

10  Q.  What format did you become aware of that in?

11  A.  Piece of paper.

12  Q.  I mean, did you get something online?  How did you

13      become aware of this new policy?

14  A.  Online.

15  Q.  And are you guessing?  Sounds like you're not sure.

16  A.  It was a while ago. I can't remember exactly.

17  Q.  So you can't tell me anything here today that you

18      recall specifically reading about the COVID protocols;

19      is that correct?

20  A.  No.  I just told you I did read it, but I can't

21      remember exactly where I found it.

22  Q.  So during COVID, you were billing for procedures for

23      servicing a patient when you did not actually see the

24      patient, correct?

25  A.  They were all my patients, so I knew everything about

Page 101

1      them.

2  Q.  I didn't ask you that.

3  A.  Well, you're acting like I don't know the patient. I

4      knew the patients.

5  Q.  You know what, I didn't act like that. What I said was

6      you were billing for servicing a patient when you did

7      not service a patient in the office, correct?

8  A.  Me personally, no.

9  Q.  Okay.  And during COVID, did you use telehealth where

10      you were on a video with a patient?

11  A.  In certain circumstances.

12  Q.  Okay.  And how many circumstances were those?  Is that

13      on the calendar?

14  A.  Sometimes they put it in. My patients have to be seen

15      in person mostly.  But if it was a wound check or

16      something, you could do it.

17  Q.  So then who saw the patient during COVID?

18  A.  You mean the telehealth?

19  Q.  The physician.

20  A.  I would always do the telehealth.

21  Q.  Hang on a second. So let's stick with the COVID

22      protocol. So do I have it right that what was happening

23      was the physician's assistant was seeing the patient in

24      the office, but you were remote somewhere else and

25      could be reached by phone?

Page 102

1   A.   In certain circumstances, yes.
2   Q.   And you think that was protected, and gave you the
3        ability to -- even if you never saw the patient, to
4        bill as the servicer, correct?
5   A.   Yes.
6   Q.   So wasn't the purpose of the law to not expose a doctor
7        and a patient?
8            MR. BREAUGH:  Object for speculation.
9   A.   I don't know.
10  BY MS. GORDON:
11  Q.   I didn't get my question out yet.
12  A.   No.
13  Q.   Okay. That wasn't the purpose of the law?
14  A.   No.
15           MR. BREAUGH:  Objection to speculation.
16  BY MS. GORDON:
17  Q.   And during COVID, did you see any patients that you
18       would not ordinarily have seen?
19  A.   I don't understand.
20  Q.   Were you treating people for COVID?  Were you rushing
21       to the hospital to treat a COVID patient?  I assume
22       not?
23  A.   No, I treated COVID patients.  I had to cut off legs,
24       and try to save people's arms. Yeah, I was grossly
25       involved in that as well.

Page 103

1   Q.   Were you more busy during COVID?
2   A.   Well, I didn't see new patients, so it was a different
3        busy. I was in the hospital more.
4   Q.   What was your billing like in, let's call it, 2022?
5   A.   2022?
6   Q.   Was it up or not?
7   A.   Well, that was separate. I'm talking about COVID, like
8        the 2019 COVID.
9   Q.   Okay.  Well, when did the protocols come into effect,
10       the new COVID protocols?
11  A.   During COVID?
12  Q.   That we knew?
13  A.   I didn't have a PA then, so it didn't matter. I saw all
14       my own patients.
15  Q.   I'm just trying to find out what the COVID protocols
16       came in that you're relying on in this case?
17  A.   I'm relying on...
18  Q.   What are you relying on in this case, what time period?
19  A.   From what I remember, and what I read.
20  Q.   Okay.  But what was the time period where you were --
21       where you had PAs, and you were relying on the COVID
22       protocols?  What time period are we talking about here?
23  A.   2020 until 2023.
24  Q.   Did you have a PA in 2020?
25  A.   I did have a PA, but the PA didn't always see -- I

Page 104

1        mean, I was in the office. They didn't necessarily see
2        patients by themselves all the time.
3   Q.   Were your PAs seeing patients virtually?
4   A.   No.
5   Q.   When I get your patient billing records am I going to
6        see any patients for the year 2022 where a PA used her
7        name for the billing, billing of services as compared
8        to your name?
9   A.   Yes.
10  Q.   Okay.  How many times is that going to occur?
11  A.   A few hundred.
12  Q.   A few hundred?
13  A.   Yeah.
14  Q.   Where the PA would have been the person who's getting
15       the rate under which you were billing for?
16  A.   Yeah.
17  Q.   Was that 85 percent of what you would bill for?
18  A.   Yes. Whatever the rate's supposed to be.
19  Q.   So there was a financial advantage, obviously, for the
20       doctors to bill at their rate, correct?
21  A.   Yes.
22  Q.   And you said there were several hundred times during
23       2022?
24  A.   Yeah. Probably 200, several hundred over the top.  I
25       didn't see that many patients.

Page 105

1   Q.   And under what circumstance would that occur?
2   A.   If I wasn't able to be available.
3   Q.   Because why?
4   A.   If I was on a plane or in surgery.
5   Q.   Has any PA other than my client ever billed under her
6        own provider number and not yours?
7   A.   Yes.
8   Q.   Okay.  Who other than my client?
9   A.   Well, Kendall, Kyle.
10  Q.   Are you sure, or are you guessing?
11  A.   No, I know they billed under them.
12  Q.   Okay.  Did you maintain a hard copy of my client's file
13       throughout the course of her employment with you?
14  A.   We had one hard copy, and it was in the Med Spa, and
15       it's gone now, so I don't know what happened to it.
16  Q.   I just asked you if you maintained a hard copy of her
17       file.
18  A.   We did, but I don't have it.
19  Q.   So where are hard copies of the files kept?
20  A.   In the manager's office.
21  Q.   I don't know what you mean by that. Give me a name.
22  A.   In Madison and Rachel's office.
23  Q.   Okay.  And those are the medical assistants?
24  A.   No. Those are the practice managers.
25  Q.   I'm sorry. Okay. So where are their offices located?

Page 106

1  A.  Next to my office.
2  Q.  Okay.  And how far is that from the Med Spa?
3  A.  A walk.  A short walk.
4  Q.  Okay.  And is there -- are there offices in the Med
5      Spa?
6  A.  Yes.
7  Q.  Do you have an office in the Med Spa?
8  A.  I don't.
9  Q.  Okay.  Do the practice managers have offices in the Med
10     Spa?
11 A.  The one manager does who runs the Med Spa.
12 Q.  Who's that?
13 A.  Jennifer.
14 Q.  That's different than the other two?
15 A.  She was -- we transitioned when Pavlina left. It was a
16     transition, obviously, because she had been the
17     manager.  So Jennifer at that time was helping also on
18     our side. But once that was organized, she just deals
19     with the Med Spa.
20 Q.  Okay.
21 A.  She's the manager of the Med Spa.
22 Q.  All right. So all of the files are kept in the
23     practice manager's office?
24 A.  Right.
25 Q.  Okay. The practice manager has access to the files,

Page 107

1      correct?
2  A.  Yes.
3  Q.  And you do as well, correct?
4  A.  Yes.
5  Q.  Okay.  And so then my office made a request for my
6      client's file, correct?
7  A.  Yes.
8  Q.  Okay.  And what's the next thing that happened from
9      your understanding of that?
10 A.  We don't have a file.
11 Q.  I said what's your understanding after we -- when did
12     you learn -- let me restate.
13         When did you learn you did not have a file?
14 A.  After you asked for it.
15 Q.  Okay. And what did you do to find the file?
16 A.  We proceeded to look through everything.
17 Q.  Okay.  I want to know what happened. You got our
18     request in. How did you know we were seeking the file?
19 A.  Our attorneys told us.
20 Q.  Okay.  So what did you do then?
21 A.  We then started asking Jennifer do you have a file, and
22     then I asked Madison do you have a file, and then we
23     went through all the file cabinets.
24 Q.  Did you physically yourself go through the filing
25     cabinets?

Page 108

1  A.  I went through them physically, too, yes.
2  Q.  And what was the answer to why there was no file?
3  A.  It was not there.
4  Q.  I know. Why?  What was the answer?
5  A.  No one has an answer.
6  Q.  You have people that are responsible for files,
7      correct?
8  A.  Yes.
9  Q.  They have a responsibility, correct?
10 A.  Um-hmm, yes.
11 Q.  Okay.  So somebody obviously did what, either made a
12     mistake, or intentionally done something with the file?
13 A.  Had to have been one or the other.
14 Q.  Okay.  So did you put anything in writing that you were
15     trying -- about trying to find the file, and to locate
16     the file?  Anything exist in writing?
17 A.  I believe I'm sure there must be a text message or a
18     phone call.  I mean, I --
19 Q.  I just simply asked you is there anything in writing?
20 A.  I don't know. There might be a text message.
21 Q.  Do you text with all your employees?
22 A.  I do text with them.
23 Q.  All of them?
24 A.  Probably the managers the most, and then some of the
25     MAs and the PAs.

Page 109

1  Q.  How often do you text with the managers?
2  A.  Probably at least once a day.
3  Q.  Okay.  So you must have texts with the managers about
4      my client from the year time period she was there; is
5      that correct?
6  A.  Well, we were in the room together, so there may not be
7      a text to them.
8  Q.  I didn't ask you that. I just said you would likely
9      have texts with your managers. You just got done
10     telling us that the people you text with the most are
11     your managers?
12 A.  Yes, yes, yeah, yeah.
13 Q.  But you're now saying you're in a room with them, so
14     you don't text?
15 A.  Are you asking specifically about where her file is?
16 Q.  No. I changed my question.
17 A.  Okay. I didn't understand then.
18 Q.  My question was texting. You brought up the concept of
19     text. You said I must have texted with my managers
20     about the missing file.
21 A.  Yeah, I believe I texted Jenny.
22 Q.  Okay. So then I asked a follow-up question, which was
23     you must have texted with your managers about Julia
24     Zimmerman while she was your employee, correct?
25 A.  Yes.

28 (Pages 106 - 109)

Page 110

1  Q.  Okay.  Have you been asked to produce those texts?
2  A.  Yes.
3  Q.  Did you produce any texts?
4  A.  Yes.
5  Q.  How many texts did you produce?
6  A.  I'm not sure.
7  Q.  I assume you texted with your husband about Julia
8     Zimmerman as well; is that correct?
9  A.  Yes.
10 Q.  Did you produce those texts?
11 A.  I believe so.
12 Q.  Are you guessing?
13 A.  Yes.
14 Q.  Who else did you text with about Julia Zimmerman prior
15    to the decision time you terminated her?
16 A.  Just the managers and my husband.
17 Q.  Okay.  All right. So now you're saying you texted with
18    people about the missing file.  That's, I think, what
19    you've been telling me.  Who did you text with about
20    that?
21 A.  Jennifer Diaz.
22 Q.  And what did she say back to you in text about all
23    this?
24 A.  She said that -- she told me where they were. She
25    looked for them. She's out of town. She's remote now.

Page 111

1  Q.  As of when?
2  A.  As of July of this year, 2024.
3  Q.  Okay.
4  A.  So she's remote. So she said when she was coming in she
5     would look, because we couldn't find anything. I looked
6     where she told me, and I couldn't find it. So then she
7     said there's a cabinet -- there's a box that has all
8     the employee files in it from the Med Spa, which I
9     could see them all, except hers was not there.
10 Q.  Okay.  Did you write anybody up for this?
11 A.  No, because there were -- you know, it would probably
12    be Pavlina's fault if we were going to write someone
13    up, but she's not even there.
14 Q.  When did Pavlina leave?
15 A.  Pavlina left in June of 2023, June of 2023. No, it was
16    after. She was after. She was after like a month
17    after Julia was fired. A month, or two months, or
18    something. So whenever she was fired.
19 Q.  Okay.  Did anybody reach out to Pavlina and ask her
20    about the file?
21 A.  No, because we had access to all of Pavlina's things.
22    We had access to all her email. We had access to all
23    her file cabinets. We had access to all her --
24 Q.  I'm sorry.  What was her title?
25 A.  Who?

Page 112

1  Q.  Pavlina.
2  A.  She was a project manager at the time. Practice
3     manager, sorry, not a project manager.
4  Q.  Okay.  So somebody apparently put together a personnel
5     file for my client.
6  A.  Yes.
7  Q.  And sent it over to us.
8  A.  Yes.
9  Q.  Who did that?
10 A.  That was Madison.
11 Q.  And who told Madison --
12 A.  Rachel.
13 Q.  -- what to do?
14 A.  Well, anything we had about Julia we sent over.
15 Q.  And what did you have about Julia?
16 A.  We had her offer letter, her licenses, and we had the
17    commission, but that was in the computer, so we were
18    able to pull that.
19 Q.  What's the commission?
20 A.  Commission from the Med Spa. She got five percent for
21    anything she did at the Med Spa.
22 Q.  Just a couple more questions on this COVID protocol. Is
23    there anything that exists in writing at your office or
24    Dr. Hill's office instructing staff as to new
25    procedures because of COVID that were issued by the CMS

Page 113

1     or any other entity?
2  A.  No.
3  Q.  As I understand it, there was no training provided to
4     anybody in your office with regard to the new COVID
5     procedures with regard to billing; is that correct?
6  A.  No. Yes, we don't have to --
7  Q.  I don't need to know what you have to do.  I'm just
8     confirming.
9  A.  I'm trying to understand what you're asking me.
10    It was pretty straightforward. There was no --
11    I'm not sure what you're referring to, what timeline
12    you're asking about.
13 Q.  Okay.  Well, I've asked you when the new COVID
14    procedures --
15 A.  You're talking about when the COVID procedures were
16    done?
17 Q.  No.
18 A.  No.
19 Q.  I said the new COVID procedures.
20 A.  Yes.
21 Q.  And do you know what I'm talking about when I say that?
22 A.  Yes, I do know.
23 Q.  You've not given me a date.  You're very unclear on
24    when that occurred when the government issued the new
25    procedures. You know it was during COVID?

29 (Pages 110 - 113)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 114

1 A.  Yes.
2 Q.  Okay.  But you know there were new procedures?
3 A.  Yes.
4 Q.  And you've referenced them here today a bit?
5 A.  Yes.
6 Q.  Something about you could be remote --
7 A.  The telehealth.
8 Q.  -- or available by, I think you said, text or
9    something?
10 A.  Yes.
11 Q.  Right?
12 A.  Um-hmm.
13 Q.  Okay.  So my question was very straightforward.  You've
14    already said there was nothing in writing that was
15    distributed to your staff or employees about this, the
16    change.  You said that.  So then I went on and I said
17    was any training given about the new COVID procedures
18    about doctors not necessarily having to be on-site.
19 A.  There was no training.
20 Q.  For billing?
21 A.  There was no training.
22 Q.  There was no training, okay.
23 A.  No training.
24 Q.  Hang on one second. Okay. After my client became
25    employed at your practice, she raised some questions

Page 115

1    about how billing was being done, correct?
2 A.  I guess midway through her employment.
3 Q.  Okay.  And what did you understand her questions were,
4    or her concerns were?
5 A.  About when we bill the servicing provider, billing
6    provider who we were billing under if I wasn't there.
7 Q.  Okay.  And how did you learn about this?  I know that
8    Julia raised some issues with you directly, correct?
9 A.  Emailed. She emailed.
10 Q.  But she raised them with you directly, correct?
11 A.  I don't remember. I just remember I see the emails.
12 Q.  And you're on some of the emails, correct?
13 A.  Yes.
14 Q.  And didn't you talk to her directly about this?
15 A.  Afterward, yes, I did.
16 Q.  After what, after the complaint?
17 A.  She emailed, yeah, after she said something.
18 Q.  But you definitely sat down with her on several
19    occasions because she was raising questions, correct?
20 A.  I don't recall those occasions. I just know there were
21    a couple meetings we had.
22 Q.  And who was in those meetings?
23 A.  It would be me and Pavlina.
24 Q.  Okay.  And anybody else?
25 A.  No.

Page 116

1 Q.  And what was the purpose of the meetings?
2 A.  To try to go over what her issues were, and try to
3    figure out how to correct them.
4 Q.  Okay. And what did you figure out about how to correct
5    them?
6 A.  We tried to explain to her that private insurers don't
7    follow incident to billing, and that there were the
8    COVID rules were different than she referenced
9    something from I think was like 2007 or something, a
10    very old reference, and that wasn't relevant.
11 Q.  Didn't she email everybody some information about the
12    COVID rules?
13 A.  No.
14 Q.  Are you sure about that?
15 A.  I never got an email about COVID rules.
16 Q.  Did you give her anything about the COVID rules?
17 A.  No.
18 Q.  Okay.  Did you put anything in writing to her
19    explaining to her why she was allegedly incorrect, and
20    you were correct?
21 A.  No.
22 Q.  So there's nothing at all that exists in writing where
23    you are telling Julia Zimmerman here's why what we're
24    doing is correct. You don't have anything to worry
25    about. Something like that; is that correct?

Page 117

1 A.  No. I don't have anything.
2 Q.  Okay.
3 A.  That I wrote to her.
4 Q.  And Julia emailed you, and she also emailed Simrath; is
5    that correct?
6 A.  Which email are you referring to?
7 Q.  I just am not referring to a specific one right now.
8    I'm saying that she emailed with you and Simrath.
9 A.  Yes.
10 Q.  About many of her concerns; is that true?
11 A.  Yes.
12 Q.  Okay.  And you remember that one of her concerns was
13    the chart shouldn't contain billing diagnoses that
14    weren't actually existent as a diagnosis from the
15    finding. She was concerned about the diagnoses that
16    were being listed. Do you remember that?
17 A.  Vaguely.
18 Q.  Okay.  And the concern was that there was improper
19    logging of diagnoses in charts which would open up
20    issues in case you should get audited, correct?
21 A.  She never said that to me.
22 Q.  She never said what?
23 A.  Any of the words audited. She just said that she
24    thought that it was more accurate. My understanding of
25    billing diagnosis was something we were treating, and

Page 118

1    in certain circumstances ruling out.
2  Q.  You don't remember her telling you anything about --
3  A.  Vaguely remember she said something about it.
4  Q.  About the auditing?
5  A.  No.  She never said one word of audit.  She never said
6      that word to me.
7  Q.  Did she give it to Simrath?
8  A.  I never heard one time that would be said or seen in an
9      email or a text message.
10 Q.  Okay.  So Simrath never came to you and told you --
11     well, you texted with Simrath; is that correct?
12 A.  Yes.
13 Q.  Who's elizabeth@medspa.com, you?
14 A.  No.  It's the general email.
15 Q.  Okay.  And who does that go to?
16 A.  It goes to Jennifer, and then I think another -- I
17     think one of the aestheticians also sometimes check it.
18 Q.  Your name is on it, correct?
19 A.  Yeah.
20 Q.  You get it, correct?
21 A.  Sometimes I don't check it.
22 Q.  Well, that's a whole nother kettle of fish.  I realize
23     we don't always check everything.
24 A.  Yeah, I don't get that one. I don't even know the
25     password to that one.

Page 119

1  Q.  You're telling me you don't get
2      elizabeth@elizabethmedspa?
3  A.  I do not get that one.
4  Q.  Is that going to be true if I access -- have an expert
5      access your computer?  Am I going to see that you
6      didn't get any emails in there?
7  A.  I know there's one of the outlooks I get, but I'm not
8      sure if it's that one.
9  Q.  Okay.  So don't do anything to your computer, okay?
10     Don't delete anything.
11 A.  Yes.
12 Q.  About elizabeth@medspa or anything else, okay?  Because
13     we will, if necessary, have somebody come out and look
14     at your computer if it's your testimony here today that
15     you didn't get those.
16 A.  I might have gotten them, but I don't check them,
17     meaning I don't know if it's on -- like sometimes I
18     have access to it, and sometimes someone changes the
19     password, and I don't have access to it.
20 Q.  Well, you're supposed to have access to it, correct?
21 A.  That's not an email that anybody contacts me through.
22 Q.  You're supposed to have access to it, are you not, just
23     like other people are supposed to have access to it?
24     You may or may not, things may happen, but the concept
25     is that you're one of the people that's a recipient of

Page 120

1      the email address elizabeth@elizabethmedspa?
2  A.  Yes, but no staff member ever, ever, ever emails me
3      there. I never give that email out, because they know I
4      don't respond to that email.
5  Q.  Okay.  Well, apparently, my client used it.
6  A.  For herself?
7  Q.  She used to it send communications to the office.
8  A.  Okay. That's fine.
9  Q.  Isn't that what she's supposed to do?
10 A.  That wasn't -- no. That wasn't -- if you have an issue,
11     you don't email elizabeth@elizabethmedspa.
12 Q.  Okay.  What's your email at the office?
13 A.  Epensler@yahoo.com.
14 Q.  That's not a business address.
15 A.  I know. I don't have one, because we made everything
16     under Dr. Hill.
17 Q.  I'm sorry?
18 A.  When we formed the businesses, we made all the
19     employees are @drhill.
20 Q.  So do you have an @drhill email address?
21 A.  I don't have one.  I have an epensler@yahoo.com.
22 Q.  Do your employees send you emails @yahoo.com?
23 A.  Yes.
24 Q.  Okay.  You have those documents.  You're going to be
25     able to give those to me?

Page 121

1  A.  You got them all.
2  Q.  At the yahoo.com address?
3  A.  Yeah, you got those all.  You got the
4      epensler@yahoo.com. You got every one of those.
5  Q.  Fair enough. I do see that you were contacted by your
6      office.  You were also receiving emails at the
7      yahoo.com address. Do you recall getting those about my
8      client's concerns?
9  A.  Yes, she emailed me.
10 Q.  Okay.  And which email address did she use?
11 A.  I assume it's the epensler@yahoo.com address.
12 Q.  Okay.  So you just got done telling me that you never
13     received any communication from my client having to do
14     about being audited. Do you remember that?  You just
15     said that here on record.
16 A.  I've never heard the word audit.
17 Q.  Okay.  So I'm going to hand you Bates number -- this is
18     from your office, your lawyer's office, or your office.
19     The Bates stamps are 185 and 186.
20 A.  Okay.
21 Q.  That's an email chain, doctor. You're taking a look at
22     it. Do you recognize it?
23 A.  Yes.
24 Q.  Okay. So at the top it says from
25     elizabeth@elizabethmedspa.com, and then it's to

Page 122

1    epensler@yahoo.com, correct?
2  A.  Yes.
3  Q.  So who sent this to you, as you understood it?
4  A.  Well, I only see Julia. That's the only one that I see.
5  Q.  Okay. And then below that heading it's from
6    julia@elizabethmedspa.com to simrath@drhill.com, cc
7    elizabeth@elizabethmedspa.com, and then Madison
8    Carrier, correct?
9  A.  Um-hmm.
10  Q.  All right. So just take a look at this. This is from
11    my client. Are you with me?
12  A.  Um-hmm, yes.
13  Q.  Hi, Sim. Sorry to hit you with a few emails this
14    weekend. Skip down a paragraph. Main takeaway is that
15    they should not be using diagnoses if the diagnosis
16    doesn't actually exist as a finding, and could open us
17    up for issues if we were audited for billing. Do you
18    see that?
19  A.  Um-hmm.
20  Q.  Does that refresh your recollection?
21  A.  No.
22  Q.  Hang on. Let me get my question out, okay?
23  A.  Okay.
24  Q.  Does that refresh your recollection that my client did
25    raise the issue as to being -- you being audited

Page 123

1    potentially?
2  A.  I didn't read that email.
3  Q.  Okay. So now I've got you here telling me A --
4  A.  It says Sim. It's not written to me.
5  Q.  Hang on. Look at the top.
6  A.  I'm cc'd, but it's not written to me.
7  Q.  Okay. You received this. You just didn't read?
8  A.  I didn't read it because I get a billion emails
9    constantly.
10  Q.  So who gave this to your lawyers?
11  A.  It came up because you put in --
12  Q.  Who gave this email to your lawyers, you?
13  A.  No. Probably Jenny did.
14  Q.  So did you read this document before coming in here to
15    give your deposition?
16  A.  No.
17  Q.  So when I asked you the question a few minute ago I
18    said, well, my client raised a concern with you that
19    potentially you could be audited, and you said
20    absolutely -- I'm paraphrasing. Absolutely not. I
21    never heard the word audited. Do you remember telling
22    me that here?
23      MR. BREAUGH: Object to form on testifying
24    on her behalf.
25  BY MS. GORDON:

Page 124

1  Q.  You just said that a moment ago to me, and you were
2    really emphatic about it. Hang on. I never heard
3    anything about auditing. You didn't say I'm not sure or
4    I don't remember. You were very clear.
5  A.  Yes.
6  Q.  Hang on.
7  A.  Go ahead.
8  Q.  So now I've handed you this document, and you see that
9    my client did, in fact, say --
10  A.  I don't have that email. I'm trying to tell you that.
11  Q.  Hang on. You can't talk over me. We have a court
12    reporter here.
13  A.  Go ahead.
14  Q.  She's trying to get everything down on paper.
15  A.  Sure.
16  Q.  So now I hand you a document that you, in fact, did
17    receive that says -- that confirms what I said to you
18    that my client did raise a concern about you being
19    audited. So now your answer is, well, I just didn't see
20    it. Do I have that right?
21  A.  Yes.
22  Q.  Okay. Then why did you emphatically tell me she never
23    said that when you never went back to review anything?
24  A.  To my knowledge.
25  Q.  Well, your knowledge is wrong as you can see, correct?

Page 125

1  A.  It's a long time ago.
2      MR. BREAUGH: Object to form. Again, you're
3    summarizing her testimony.
4  A.  Yeah.
5  BY MS. GORDON:
6  Q.  Have you done anything to get ready to give your
7    deposition today?
8  A.  Of course.
9  Q.  What did you do?
10  A.  We reviewed emails.
11  Q.  Did you review this one?
12  A.  I did not review this one.
13  Q.  Why not?
14  A.  Because it's not important.
15  Q.  You reviewed emails. There's not many emails in this
16    case. Are you telling the truth right now?
17  A.  I'm telling the truth.
18  Q.  That you didn't review this email?
19  A.  I did not review this email.
20  Q.  Okay. What emails did you review?
21  A.  The emails between me and Julia, and some emails with
22    Sim and Pavlina.
23  Q.  Did somebody give you emails to review, or did you just
24    go find them on your own?
25  A.  I was given emails.

32 (Pages 122 - 125)

Page 126

1  Q.  Who gave them to you?
2  A.  My attorneys.
3  Q.  All right. So let's go back to the document in front of
4     you, Bates stamp 185. My client is saying, Main
5     takeaway is that they should not be using diagnoses if
6     the diagnosis doesn't actually exist as a finding, and
7     could open us up for issues if we were audited for
8     billing, or potentially in litigation. So, yes, staff
9     can use a venous insufficiency if there is actually a
10    venous insufficiency, but we shouldn't be adding venous
11    insufficiency as a diagnosis for the visit if the study
12    was negative for venous insufficiency.
13 A.  She is not a vascular surgeon. She never trained as a
14    vascular surgeon. She never worked except for the very
15    small amount I taught her, or showed her, so I
16    didn't -- you know, everything that came out of her
17    mouth or email I didn't believe was God, because she
18    doesn't know everything.
19 Q.  But you don't either. You've already said you don't
20    know any of this.
21 A.  What do you mean I don't know? I know about what
22    diagnoses are. I know what all these things are.
23 Q.  I'm not asking you about diagnoses. I'm asking you
24    about billing.
25 A.  No, you're asking about diagnoses. You're asking about

Page 127

1     diagnoses.
2  Q.  No. I'm asking you about what diagnoses.
3  A.  She doesn't know.
4  Q.  You can't interrupt me, okay, doctor?
5  A.  Okay.
6  Q.  I'm asking you about diagnoses that are placed on a
7     document for purposes of billing the government, okay?
8     Certain things are allowed, and certain things are not
9     allowed. Are you aware of that?
10 A.  Yes.
11 Q.  Okay. Because the government is concerned that the
12    diagnoses be accurate if they're going to pay for it,
13    correct?
14 A.  Correct.
15 Q.  All right. So if there is not a venous insufficiency
16    finding, you can't diagnose it?
17 A.  That's not necessarily true.
18 Q.  You've got to let me finish.
19 A.  That's not true. Go ahead.
20 Q.  You've got to let me get my question out.
21 A.  Go ahead.
22 Q.  So if there's a finding that there is no venous
23    insufficiency, can you bill for venous insufficiency,
24    in your opinion?
25 A.  If the patient had it diagnosed previously.

Page 128

1  Q.  Okay. So one diagnosis continues forever?
2  A.  It does.
3  Q.  Even if venous insufficiency is no longer existent?
4  A.  It does. You cannot cure venous insufficiency. It's a
5     chronic progressive disease. It doesn't go away.
6  Q.  You don't have to get upset here.
7  A.  Okay. Because you're -- that's fine.
8         MR. BREAUGH:  Let's take a break after you
9     finish your line of questioning.
10        MS. GORDON:  This line of questioning is
11    going to go on a while.
12        MR. BREAUGH:  We can take a break now.
13 A.  Okay.
14        MS. GORDON:  Go ahead.
15        (Break at 2:00 p.m.)
16        (Back on the record at 2:06 p.m.)
17 BY MS. GORDON:
18 Q.  Just to finish this out, this venous insufficiency, if
19    venous insufficiency was never diagnosed, you cannot
20    use it as a billing code; is that correct?
21 A.  No.
22 Q.  It's not correct, or it is correct?
23 A.  It's not correct.
24 Q.  So if you've never -- if it has never been diagnosed,
25    you can use that as a billing code, if it was never

Page 129

1     diagnosed?
2  A.  By me, never diagnosed by me?
3  Q.  No, by anybody. Don't the same rules apply to all
4     doctors?
5  A.  Yes.
6  Q.  Okay. So my client's point here is she says they
7     should not be using diagnoses if the diagnosis doesn't
8     actually exist as a finding. That's a correct
9     statement, isn't it? If it never existed, and doesn't
10    exist, you can't use that for billing; is that
11    accurate?
12 A.  Yes.
13 Q.  Okay. And you could write down, though, for billing
14    you could write down symptoms of venous insufficiency,
15    correct?
16 A.  Yes.
17 Q.  So what was the response to this email from Julia
18    Zimmerman that was sent on January 21, 2023?
19 A.  I don't know.
20 Q.  Did anybody respond to her?
21 A.  I don't think so.
22 Q.  Then on January 27, you received another email at your
23    Yahoo account from Simrath that included Julia. Do you
24    recall that?
25 A.  No.

Page 130

1   Q.  You didn't read that to get ready to give your
2       testimony here today?
3   A.  I'm not sure which one you're referring to.
4   Q.  Okay.  This is a discussion about May-Thurner's
5       disease.  Do you remember that, or syndrome?
6   A.  No.
7   Q.  So you must not have read this one in preparation for
8       your dep today?
9   A.  Probably not.
10          MR. BREAUGH:  Object to form as you're just
11      broadly summarizing these emails without them in front
12      of my client.
13          MS. GORDON:  What's improper about it?  What
14      did I do that's improper?
15          MR. BREAUGH:  Summarizing in your own words.
16          MS. GORDON:  Yeah, that's allowed.
17          MR. BREAUGH:  I'm saying we can't tell about
18      the authenticity of it.
19          MS. GORDON:  I didn't ask you to.
20          MR. BREAUGH:  I know.  That's hence the
21      objection.
22          MS. GORDON:  I just asked if she remembered
23      getting anything that referenced May-Thurner's disease.
24      That's all. There wasn't anything improper about it.
25  BY MS. GORDON:

Page 131

1   Q.  Is May-Thurner's, is it a syndrome?  Is it a disease?
2       What is it?
3   A.  Both.
4   Q.  Okay. Do you remember that my client was alerting your
5       office that May-Thurner's is not a covered diagnosis
6       under the law?
7   A.  I depends on what -- covered diagnosis for what.
8   Q.  Using May-Thurner's, that's T-H-U-R-N-E-R.
9   A.  Depends on what context. No, you can use May-Thurner's
10      as a diagnosis.
11  Q.  Okay.  Is it something that the State of Michigan
12      approves?
13  A.  To put it down just as its own as a diagnosis, yes.
14  Q.  My client wanted to know whether -- she asked a
15      question at the end of this email I'm about to show
16      you, can you confirm that 187.1 is a covered diagnosis.
17      Do you remember that?
18  A.  No.
19  Q.  187.1. I'll hand this to you. That would be Bates 183
20      and 184. Does that refresh your recollection?
21  A.  She's not referring to just --
22  Q.  Does this refresh your recollection?
23  A.  No, I don't -- I don't --
24  Q.  Did you read this one that came in?
25  A.  No.

Page 132

1   Q.  You never read this one either?
2   A.  Uh-uh.
3   Q.  No?  And you never read it in preparation for your dep
4       today?
5   A.  No.
6   Q.  Even though somebody handed you emails to read?
7   A.  I didn't review every one there was.
8   Q.  How many?
9   A.  500 or some documents or something.
10  Q.  Well, I'm talking about just emails.
11  A.  No.
12  Q.  Okay.  So if you go to the next page 184, can you
13      confirm my client's asking can you confirm that 187.1
14      is a covered diagnosis for this Doppler.  Do you see
15      that?
16  A.  Yes.  She's right.  It's not a covered diagnosis.
17  Q.  Okay.  Did anybody respond to Julia about this?  She's
18      asking for confirmation. Did you confirm for her that
19      she was correct?
20  A.  I don't remember.
21  Q.  Did anybody confirm for her?
22  A.  I don't know.
23  Q.  Okay. On or around March 3, 2023, there was
24      communication from Sara Barren. Who is she?
25  A.  I don't know.

Page 133

1   Q.  Okay.  To Pavlina asking about a request to change
2       Daryl Belding, PA at Dr. Hill's office, and Julia
3       Zimmerman, PA at Dr. Pensler's office to billing
4       providers.  Does that sound right to you?
5   A.  Yes.
6   Q.  Okay.  And then Sara Barren at HFHS.  Is that Henry
7       Ford Health Service?
8   A.  Um-hmm.
9   Q.  That's a yes?
10  A.  Yes.
11  Q.  Says J. Zimmerman was noted as servicing, but Dr.
12      Pensler has an open FT Epic license, which I will apply
13      to her account, and have her updated to a billing
14      provider. Do you remember that?
15  A.  Uh-uh, no.
16  Q.  Do you remember Julia wanting to ensure that she was
17      listed as a billing provider?
18  A.  Yes.
19  Q.  And needed a number?
20  A.  No, I didn't know that.
21  Q.  You knew she felt she needed to be able to list herself
22      as a provider; is that correct?
23  A.  Yes.
24  Q.  Were you reviewing all charts, or only the charts that
25      you were responsible for closing and billing?

Page 134

1  A.  I reviewed all charts.
2  Q.  I have an email from Pavlina on March 9 to Julia
3      saying -- you're cc'd on this, at least at your Yahoo.
4      Julia, you will be the billing provider on Wednesdays,
5      and when the doctors are out of town. Does that sound
6      familiar to you?
7  A.  Yes.
8  Q.  Okay.  Was Julia the billing provider on Wednesdays?
9  A.  That was -- that email, she wrote that without
10     discussing it with anybody.
11 Q.  Okay.  So I'll hand it to you. This is Bates, this
12     might help you, 65 through 67. I'm on the first page
13     though, doctor. If you go to March 9th, 2023 at 11:06
14     a.m., Pavlina writes, Hi, Julia.  You will be the
15     billing providers on Wednesdays. So I'll stop right
16     there. Is that accurate or not accurate?  I mean, I
17     know it's on the piece of paper, but was that your
18     understanding of what was going to happen?
19 A.  No. On this sheet, nothing was discussed with me.
20 Q.  So you did not agree with this statement that Julia
21     would be the billing provider on Wednesdays, correct?
22 A.  No.
23 Q.  How about when the doctors are out of town?  That's the
24     next part of the sentence.
25 A.  I didn't write the email, so I can't speak to it.

Page 135

1  Q.  I know, but this is your employee.  I'm just asking if
2      she's correct or incorrect.  How about is she correct,
3      is Pavlina correct when she says you will be the
4      billing provider when the doctors are out of town?  Is
5      that accurate or not?
6  A.  Yes.
7  Q.  Okay.  And did that happen?
8  A.  We were preparing for COVID rules.  In some
9      circumstances, yes.
10 Q.  So for some circumstances when you were out of town on
11     vacation, you were able to bill you're saying?
12 A.  Yes.
13 Q.  And then she says, On the other days if they are local
14     and available by phone, we'll still bill under them.
15     Was that accurate if you were available by phone?
16 A.  Yes.
17 Q.  Is that legal if you're available by phone?
18 A.  Yes.
19 Q.  Can you point me to any regulation that you can think
20     of right now that allows you to bill if you're
21     available by phone for anybody that's in your office?
22 A.  Yes.
23 Q.  What is it?  What's the regulation?
24 A.  All private insurers for sure.  And then during COVID
25     rules --

Page 136

1  Q.  Hang on a second.
2  A.  Yeah.
3  Q.  I'm not talking about private insurance today.
4  A.  Okay.
5  Q.  I'm talking strictly about Medicare and Medicaid.
6  A.  Well, that's not what's said here, so that's not what
7      Pavlina meant, I don't think.
8  Q.  I'm asking you.
9  A.  I didn't write that email, but there was discussion.
10     There was issues she had with both Medicare, and
11     Medicaid, and private insurers. So these were not just
12     Medicare that she was talking about.
13 Q.  Okay.  So if during COVID you were out of town -- I'm
14     sorry. If you were local and available by phone, could
15     the patient being seen by Julia Zimmerman be billed
16     under your name as a provider?
17 A.  Yes.
18 Q.  Okay.  And I'm asking you for what authority you know
19     of for that, legal authority?
20 A.  CMS.
21 Q.  Well CMS is a huge heading.  Can you be any more
22     specific?
23 A.  No.
24 Q.  Okay.  Another email. This is now April 13th, 2023.
25     Again, to you, to Dr. Hill, to Pavlina, to Simrath, to

Page 137

1      Melissa.
2  A.  I don't have this email.
3  Q.  I'm going to hand it to you in just a second. I just
4      wanted to identify it for the record. So in this email
5      Julia Zimmerman is saying, Good morning. I wanted to
6      follow up as I continue to be concerned about the
7      process of billing in the physician's name, regardless
8      of insurance carrier or servicing provider, and my
9      personal professional liability. As we weren't able to
10     meet the incident to criteria, I'd like to continue to
11     discuss what we should do when a patient is seen by me.
12     I appreciate everyone's consideration. Thanks, Julia
13     Zimmerman. Do you remember that?  Sound familiar?
14 A.  Um-hmm, yes.
15 Q.  Did you review that in order to get ready for your dep
16     today?
17 A.  Yes.
18 Q.  Okay.  So Julia was seeking more information and input,
19     correct?
20 A.  Yes.
21 Q.  Did you respond?
22 A.  No.
23 Q.  Did anybody respond?
24 A.  No.
25 Q.  Okay. Do you remember getting a text message, or

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com

Page 138

1    learning about the text message involving Pavlina?
2    I'll hand this to you. This is Bates 154. What is this,
3    as you understand it?
4  A.  That she didn't want to put the billing codes in.
5  Q.  But what is this I'm looking at? It's text messages
6    between who?
7  A.  I don't know.
8  Q.  Well, take a look at the document. It looks like PG
9    and EP.
10  A.  Oh, that's me.
11  Q.  Okay. So this is Pavlina Goodman and you; is that
12    correct?
13  A.  Yeah.
14  Q.  Okay. And do you remember looking at this in
15    preparation for your deposition?
16  A.  No.
17  Q.  Okay. I'll start at the bottom of page 154. Pavlina
18    says, Sim sent an email to NextGen. What's NextGen?
19  A.  That's the billing service for Epic.
20  Q.  I'm sorry?
21  A.  Billing service for Epic.
22  Q.  This says, We are not able to bill anything under her
23    because of NextGen. What does that mean?
24  A.  I don't know.
25  Q.  Okay. And then it says, To pull this out today is

Page 139

1    really bad form. Can't wait to have another physician
2    on-site. What is that referring to?
3  A.  She's not in NextGen.
4  Q.  What's the term can't wait to have another physician
5    on-site referring to?
6  A.  We were looking at replacing her with another
7    physician.
8  Q.  Okay. And this is dated April; is that correct?
9  A.  Um-hmm.
10  Q.  So why were you not able to bill anything under her
11    because of NextGen as of April 17th, 2023?
12  A.  I don't know, and I'm not even sure that's accurate.
13  Q.  Well, this is from Pavlina to you.
14  A.  I know. Pavlina's not a biller. I'm unclear if that is
15    even an accurate statement.
16  Q.  Well, when you became aware of this, did you look in
17    wouldn't it be important to have your physicians
18    assistant be able to bill under a number?
19  A.  Yes.
20  Q.  It'd be very important, wouldn't it?
21  A.  Yes.
22  Q.  Okay. So now Pavlina is telling you Sim sent an email
23    to NextGen, and they are not able to bill anything
24    under her. That we have not been able to bill
25    anything. So is that true you were not able to bill

Page 140

1    under Julia's number?
2  A.  Again, I'm unclear if that is true. I don't know.
3  Q.  Okay. Did you ever look into Julia getting a billing
4    code or number?
5  A.  Yes.
6  Q.  Did she tell you about it herself?
7  A.  No.
8  Q.  What was her concern?
9  A.  With what?
10  Q.  Not having a billing number.
11  A.  Well, I'm unclear if she did or didn't have a billing
12    number.
13  Q.  Wouldn't that be important for you to know? No answer?
14  A.  Yes.
15  Q.  Okay. So on May 8, I think this is the day before my
16    client was terminated, she writes to everybody again,
17    same names, including you at yahoo. Good morning,
18    following up on my email below. As I've not heard a
19    response, it's my understanding that we are now able to
20    indicate the PA as the servicing provider in Epic via
21    the appointment itself by changing the provider and/or
22    in the charge capture when applicable. Moving forward
23    in order to ensure that I'm in compliance with the
24    proper billing, with proper billing, and to be able to
25    continue with my position, I will be modifying this

Page 141

1    when appropriate. We will need to review this with
2    staff as well. Do you recall that?
3  A.  Um-hmm.
4  Q.  That's a yes?
5  A.  Yes.
6  Q.  What is the issue here, as you understood it?
7  A.  That she's making a statement. But, again, it wasn't
8    necessarily accurate.
9  Q.  Okay. What's your statement that you're referring to?
10  A.  She's saying that the way it should be done in the
11    computer, and she wasn't accurate.
12  Q.  Okay. What was the way she said it should be done in
13    the computer?
14  A.  I believe she wanted the schedule to be under her, and
15    that's not how that worked.
16  Q.  The schedule?
17  A.  Yeah.
18  Q.  What schedule?
19  A.  The schedule of patients.
20  Q.  Okay. Did she reference the schedule here?
21  A.  No, but that's what she had mentioned before.
22  Q.  When?
23  A.  To me when I had spoken to her about it.
24  Q.  You mean for like times when you weren't in, you were
25    swimming, or somewhere else, and the patient was

36 (Pages 138 - 141)

Page 142

1    scheduled to come in at eight, and everybody knew that
2    Julia would be seeing the patient at eight because you
3    were definitely not going to be there, is that when she
4    wanted to be on the schedule?
5  A.  I don't remember exactly when, but something like that.
6  Q.  Okay.  Because you did -- your office did book patients
7    to see you at 8 a.m. 8:15, 8:30, 9, 9:30, but they all
8    knew you were not going to actually be in, and the PA
9    would be seeing the patient, correct?
10 A.  Yes.
11 Q.  Okay.  And the patients were not told Dr. Pensler will
12   not be available at that time, but we have a PA here
13   that can see you at 8:30, so let's book it?
14 A.  No.
15 Q.  You didn't tell patients that?
16 A.  No.
17 Q.  The patients thought they were booking with you?
18 A.  No. They, they knew they weren't seeing me.
19 Q.  How did they know?
20 A.  They would tell them. There were some Pensler only
21   patients, and people who --
22 Q.  Who would tell them?
23 A.  The front desk.
24 Q.  They'd say -- well, you just said that didn't happen. I
25   call.  I say I want to get in to see Dr. Pensler.  And

Page 143

1    the scheduler says, okay, we've got an opening at 8:30?
2  A.  Yeah.
3  Q.  But the scheduler doesn't say Dr. Pensler will not be
4    here.  You'll be seeing the PA?
5  A.  No, they did say that.
6  Q.  Are you changing your testimony now?
7  A.  No, you're confusing me. No, they do tell the patient.
8  Q.  Okay.  So if the PA does see the patient, should the PA
9    be billing under her own name because you're not in the
10   building or available by phone?
11 A.  If that's true.
12 Q.  She should be billing under her own name?
13 A.  At that time it was COVID rules. But now, yes.
14 Q.  No. Even during COVID rules, if you're swimming in a
15   pool, and not available by phone, and not televideoing
16   with the patient, and the PA sees the patient, the PA
17   should bill under her name, correct?
18 A.  If she could not get ahold of me at all, yes.
19 Q.  Okay.  Well, if you're swimming in a pool presumably --
20 A.  I have a watch that rings, and I can answer the phone.
21 Q.  But in any event, that's the concept is that she's
22   concerned that she wants to be -- she uses the word
23   compliance. I want to be in compliance with proper
24   billing, correct?
25 A.  Yes.

Page 144

1  Q.  Did anybody respond to her?
2  A.  No.
3  Q.  And Pavlina wrote her.  And if she's not the billing
4    provider, she should be listed as the servicing
5    provider if you're in the pool with the phone, correct?
6  A.  I don't know exactly all the rules on it, as I told
7    you.
8  Q.  Okay.  And then this ends up with Pavlina saying let's
9    meet about this tomorrow at noon in the doctor's
10   office.  And that's to Julia, correct?
11 A.  Yes.
12 Q.  And when was a decision to fire Julia made?  Because
13   this is now on Monday the 8th, May 8th at 4:33 p.m. in
14   the afternoon.  People are talking about a meeting the
15   next day.  When was the decision to actually fire Julia
16   Zimmerman made?
17 A.  Sunday.
18 Q.  Was that before Julia was told to come into the
19   meeting?
20 A.  Yes.
21 Q.  And where is that reflected that that decision was made
22   on Sunday?
23 A.  It was between me and my husband.
24 Q.  Okay. And when did you first discuss that with your
25   husband?

Page 145

1  A.  We discussed firing her for a couple months before that
2    time.
3  Q.  So this would be May. So March?
4  A.  March, yeah.
5  Q.  Here's another one that's out of chronological order,
6    but you and Sim received an email from Julia on
7    February 23 where Julia says, Hi, Sim.  This was the
8    document I was referencing. See paragraph about office
9    based services regarding PA billing and Medicare
10   stipulations for "incident to" billing (billing a PA
11   service under a physician) versus billing under the PA
12   themselves.  And then there's a link.  And the link is
13   www.aapa.org/thirdpartypayment. Do you remember that?
14 A.  I think I've read this.
15 Q.  Okay.  And so here Julia was attaching some
16   information. This was during the COVID procedures being
17   in effect, and Julia is sending information out to you
18   and to others, including Pavlina and Sim, about what
19   the procedures are. Do you remember getting this?
20 A.  Yes.
21 Q.  Okay.  Did anybody respond to Julia as to this?
22 A.  Not me.
23 Q.  Okay.  Now, I'm going to hand you -- that was Bates
24   189. And I'm going to hand you -- I guess I'm going to
25   mark this.  That doesn't have a Bates number. So when

37 (Pages 142 - 145)

Page 146

1    did you alert Sim that my client was being fired?
2  A.  I'm not sure if we alerted her.
3  Q.  Who did you alert?
4  A.  Pavlina.
5  Q.  Did you tell Derek?
6  A.  Yeah, the group discussion.
7  Q.  Okay.  When did you tell Derek?
8  A.  Sunday.
9  Q.  Okay.  So let's just get -- the Sunday before the
10     termination?
11  A.  Um-hmm.
12  Q.  So the termination was on Monday, May 9; is that
13     correct?
14  A.  Yes.
15  Q.  So you're talking about May 8th. That's when you and
16     your husband decided, that's a Sunday?
17  A.  That's a Sunday, or the weekend, that weekend.
18  Q.  Fair enough.
19  A.  Actually, that weekend.
20  Q.  Okay.  You had already had ideas about terminating
21     Julia earlier than that, hadn't you?
22  A.  Yes.
23  Q.  Because you didn't like the issues she was raising,
24     correct?
25  A.  No.

Page 147

1  Q.  Well, there's nothing that exists in writing where you
2     have any reason for terminating Julia; is that correct?
3  A.  No.
4  Q.  What do you have in writing?
5  A.  Her poor performance at the Med Spa.
6  Q.  Where's that?
7  A.  We have it. It's commission.
8  Q.  Where is documentation from you telling her that she
9     did not do a good job at Med Spa?
10  A.  There's no documentation.
11  Q.  That's what I said.  There's no documentation of any
12     kind of Julia having any performance issue as of the
13     date you terminated her, correct?
14  A.  No.
15  Q.  Okay.  I am correct, that's a yes to my question?
16     There's no record.  You agree with me?
17  A.  No formal record, yes.
18  Q.  Right. So you just mentioned commissions at Med Spa?
19  A.  Yes.
20  Q.  What are commissions at Med Spa?
21  A.  So based on sales.
22  Q.  Okay.  Did she have a quota?
23  A.  No.
24  Q.  Did she have a base she had to meet?
25  A.  No.

Page 148

1  Q.  In her offer letter, is she told that she has to -- let
2     me restate. Is this sales essentially selling
3     procedures?
4  A.  Yes.
5  Q.  Is there anything in her offer letter about her having
6     to sell a certain number of procedures just to succeed
7     at her job?
8  A.  No.
9  Q.  Were other employees required to sell a certain number
10     of procedures in Med Spa?
11  A.  No.
12  Q.  Okay.  Is this the reason you're offering me for why
13     Julia was terminated?
14  A.  One of the reasons.
15  Q.  So who kept track of Julia's numbers in the Med Spa?
16  A.  Jennifer.
17  Q.  Okay.  But you've told me earlier today that you did
18     not like people hanging around -- PAs hanging around in
19     the Med Spa.  Do you remember that?
20  A.  She was in the Med Spa.
21  Q.  I said do you recall telling me that earlier today?
22  A.  Out of context.  You're taking my comment out of
23     context.
24  Q.  I just asked you if you remember saying that you said
25     they all -- they would -- they would go.  You didn't

Page 149

1     mention Julia. But you said they would go sit in the
2     Med Spa.
3  A.  We were talking about Jamie, but I also agree Julia did
4     the same thing.
5  Q.  So in order to sell procedures under your concept here,
6     in order to sell procedures you would have to be
7     working in the Med Spa?
8  A.  Nope.
9  Q.  So if somebody comes in because they have a horrible
10     vein in their leg, and they need it removed, you're
11     supposed to sell injections and fillers while they're
12     in there?  That was happening?
13  A.  Where?
14  Q.  At your office.
15  A.  At the Med Spa, a big part of the Med Spa is like
16     posting, social media, coming to events.  That's a big
17     part of it.
18  Q.  Events going to people's homes?
19  A.  Events are like we did bridal events. We had a mothers
20     and mimosas event.
21  Q.  Where are these events?
22  A.  Instagram.  We had them at the facility.  And then we
23     went to an actual, I think it was Ford Field, and did
24     it. And we did it at Equinox.
25  Q.  I get it. I get it. Thank you. So what employees were

Page 150

1   assigned to the Med Spa?
2   A.  It was Christine, Julia, Gabby.  I think there was a
3       massage therapist.  It did roll over some.  We did end up
4       losing employees.
5   Q.  Was Daryl assigned to the Med Spa?
6   A.  No.
7   Q.  Why not?
8   A.  Because we never talked about it when he was hired.
9   Q.  Well, you didn't talk to Julia about it either when she
10      was hired.
11  A.  Yeah, we did.  It's in her offer letter.  It says she
12      will spend time at the Med Spa.
13  Q.  Okay.  To do what though?  To sell product, or just to
14      be there to service people?
15  A.  We told her that she was supposed to be in there to
16      service people, to sell things.
17  Q.  Well, give us an example of her servicing somebody.  Do
18      you have to make an appointment to go to this Med Spa?
19  A.  Of course.
20  Q.  So hypothetically, what's an appointment?
21  A.  So somebody books, let's say, a Botox appointment.
22  Q.  Who's going to insert the Botox, inject the Botox?
23  A.  Well, she was still training, so it was her and Jenny.
24  Q.  Okay.  So you don't need to have a doctor in your world
25      to do injections, correct?

Page 151

1   A.  No.
2   Q.  Okay.  So you would have various people go in to do
3       these injections?
4   A.  Not various people.  Either Julia or Jenny.
5   Q.  Did you do any of the Botox injections?
6   A.  No.
7   Q.  Okay.  So how did the Botox patients get in there?
8       Patients isn't the right word, I guess.
9   A.  They make an appointment.
10  Q.  And they make an appointment just to see who's ever
11      there that day?
12  A.  Yeah.  They can pick online.  If they book online, they
13      can pick who they want to be with.
14  Q.  So what records exist as to how many patients are
15      serviced in the Med Spa by your employees?
16  A.  On Invizion we have an electronic medical record for
17      the Med Spa.
18  Q.  Okay.  And it shows each employee?
19  A.  Yes.
20  Q.  And who is there for each procedure?
21  A.  Absolutely, yes.
22  Q.  Okay.  And are those numbers distributed to the staff?
23  A.  Yes.  We go over them in meetings.
24  Q.  Because that's a moneymaker for you, right?
25  A.  Of course, seeing patients.

Page 152

1   Q.  It's a cash, business isn't it?
2   A.  Um-hmm.
3   Q.  That's a yes?
4   A.  Yes.
5   Q.  So did you ever sit down with Julia, and tell her you
6       were disappointed she wasn't giving enough Botox?
7   A.  Not to her directly.
8   Q.  Okay.  And in May, who was the other PA?
9   A.  Oh, in the Med Spa, or just in general?
10  Q.  Well, you didn't have a PA assigned to the Med Spa?
11  A.  Yes, we did.
12  Q.  Who was that?
13  A.  Julia was the PA assigned to the Med Spa.
14  Q.  Okay.  Well, she was also handling your patients and
15      Dr. Hill's patients.
16  A.  Yes.
17  Q.  Okay.  So she wasn't assigned to the Med Spa.  She had a
18      job covering --
19  A.  No.
20  Q.  Hang on a second.
21  A.  Go ahead.
22  Q.  So how much time did she -- what percentage of her time
23      was spent on your practice?
24  A.  The breakdown was approximately was like 30 percent of
25      the time was supposed to be the Med Spa, then it was

Page 153

1       like the other part of the time was supposed to be me,
2       and then part of the time she was supposed to help
3       cover Derek.
4   Q.  And was it the same for the other PA?
5   A.  Daryl covered both practices, just not the Med Spa.
6   Q.  But there was another PA there, correct?
7   A.  No. Just them two.
8   Q.  Okay.  All right. So you never put anything in writing
9       to Julia about, hey, get out there.  Sell more, get
10      more?
11  A.  Verbally, but nothing in writing.
12  Q.  Never gave her a warning.  Never said we're going to
13      have to think about letting you go, because we need
14      more action in the Med Spa, nothing like that exists,
15      correct?
16  A.  No.
17  Q.  No warning.  No like, hey, please go over there more
18      often, correct?
19  A.  We had meetings talking about improving sales.
20  Q.  Well, can you give me a date?
21  A.  I'd have to pull.
22  Q.  What would you pull?
23  A.  We usually had at least once a month meetings.
24  Q.  And what are the names of those meetings?
25  A.  They were our Med Spa meetings.

Page 154

1  Q.  And what did you cover at the Med Spa?  Who was there?
2  A.  The aesthetician.
3  Q.  Who was there?
4  A.  The aesthetician.
5  Q.  Okay.
6  A.  And Jenny, and then Julia.
7  Q.  Okay.  And what would you talk about?
8  A.  We talk about upcoming advertising events we're going
9      to do, posting, and we talk about sales.
10  Q.  Okay.
11  A.  And and how to improve the business.
12  Q.  Did Julia go to these events you were holding?
13  A.  She didn't go to all of them.
14  Q.  Nobody went to all of them, correct?
15  A.  People went to -- Jenny did.
16  Q.  Okay.  And you knew Julia had children, correct?
17  A.  Yes.
18  Q.  I didn't ask you, by the way, do you have children?
19  A.  Yes.
20  Q.  Are they older, or are they elementary?
21  A.  Both, elementary and high school.
22  Q.  Okay.  So the concept was you were just going to tell
23      Julia she was a bad fit, correct?
24  A.  Yeah.
25  Q.  And that you came up with actually in April, correct?

Page 155

1  A.  We came up with that before, yes.
2  Q.  Okay.  And you were going to give Daryl a raise,
3      correct?
4  A.  Yes.
5  Q.  So Julia would be gone, Daryl would get a raise, but he
6      wouldn't be working in the Med Spa, correct?
7  A.  No.
8  Q.  Okay.  So who would be working in the Med Spa?
9  A.  Jenny.
10  Q.  And you said we'll give Daryl a raise, and he'll cover
11      my office from eight to 10 Monday and Thursday.  Do you
12      remember that?
13  A.  No.
14  Q.  Does that sound right?
15  A.  Vaguely, yes.
16  Q.  That was the concept in April?
17  A.  I don't recall exactly what the concept was in April.
18  Q.  And the eight to 10 is because you're busy with your
19      swimming activities, and so on, and you didn't really
20      get in until 10?
21  A.  Yes.
22  Q.  So, again, he would be the PA.  With Julia gone, he
23      would be the PA that would service the patients?
24  A.  Just in the morning.  And then I would cover my own
25      patients.

Page 156

1  Q.  I get it.  Do you have records somewhere of who brought
2      in how much money at the Med Spa?
3  A.  Yes.
4  Q.  And where do those exist?
5  A.  They're in Invizion.  We have a chart.
6  Q.  Okay.
7  A.  We have a chart.
8  Q.  Now, you weren't looking -- at this time were you
9      looking for a PA to replace Julia, somebody that could
10      work in the Med Spa in April?
11  A.  We were figuring out what would be the best option.
12  Q.  And you actually in April, mid April had an idea for
13      bringing in a doctor, correct?
14  A.  Possibly, yes.
15  Q.  Because a doctor can bill under his own provider
16      number, and get full payment for Medicaid and Medicare
17      instead of a reduced amount that a PA gets, correct?
18  A.  Yes.
19  Q.  Okay.  So you were anxious to have somebody there that
20      could bill at the highest possible rate as compared to
21      Julia who was saying I need to bill at the lower rate
22      because I'm a PA, correct?
23  A.  What's the question?
24  Q.  You were bringing in a doctor to replace Julia, but the
25      doesn't wasn't going to be working in the Med Spa you

Page 157

1      already agreed.  And in addition, the doctor could bill
2      100 percent of the doctor's rate as compared to Julia
3      who was now insisting in some circumstances where you
4      weren't there to bill at her PA rate, which was lower,
5      correct?
6  A.  Yes.  When COVID was over.
7  Q.  And this would generate more money for you.  The doctor
8      would do the same things Julia had been doing on
9      Wednesdays from eight to 10, or Derek had been doing --
10      or Daryl had been doing.  The doctor would do those
11      things, but he'd bill under his own number, his own
12      provider number, correct?
13  A.  Yes.
14  Q.  You were also thinking you could just reach out to
15      physicians, and they could just -- you could just pay
16      them hourly, and they would bill at the higher rate,
17      correct?
18  A.  Yes.
19  Q.  So at this point you must have realized Julia's going
20      to be billing at her lower rate.  She's insisting on
21      doing that, and that's what she's going to do, and we
22      can't stop her, because it's legit.  That's what you
23      were thinking, correct?
24  A.  No.
25  Q.  Well, you never told Julia, I mean, you expected her to

40 (Pages 154 - 157)

Page 158

1 bill at your rate, and all the documents I'm going to
2 get are going to show you were billing at your rate for
3 times you weren't in, and didn't meet other
4 requirements?
5   MR. BREAUGH: Object to speculation.
6   MS. GORDON: Yeah. Well, give us the
7 documents, and I won't have to speculate.
8   MR. BREAUGH: Well, that's why the objection
9 remains.
10   MS. GORDON: Okay. Well, that's what
11 they're going to show, unless they're changed. But
12 they're going to show that you were billing at your
13 rate, and not at Julia's rate --
14   MR. BREAUGH: Object to speculation.
15 BY MS. GORDON:
16 Q. For visits. Let's say assume they do. Assuming they
17   show this that you were always the provider that
18   billed, even when Julia was doing the services, she was
19   billing at her rate, and she insisted on that, and that
20   was not working out for you because you wanted the
21   higher rate, correct?
22 A. No.
23 Q. Well, then why didn't you just let her bill at her
24   lower rate, and not have to hire a doctor?
25 A. She could not understand any of the rules. She wanted

Page 159

1 to bill it as her even when I was in the facility.
2 Q. Oh, really?
3 A. Yes.
4 Q. Do you have an email telling her that?
5 A. No.
6 Q. Julia, I'm in the facility?
7 A. I'm standing right next to her, and she refused to --
8 Q. Where is the documentation, doctor?
9 A. I don't understand.
10 Q. Julia, I don't know what you're doing. I'm here. I'm
11   down the hall. I'm happy to come in and help you. Use
12   my number, regulation number 2.003. Here it is, Julia.
13   Go ahead. You didn't do that, did you?
14 A. What's a regulation number?
15 Q. I'm asking you. You're telling me my client shouldn't
16   have been using her provider number, because you were
17   in the building. Why didn't you just send her the
18   regulation saying, hey, here it is. Stop bugging me
19   about this.
20 A. We tried. I tried.
21 Q. What did you show her?
22 A. We showed her about the private billing.
23 Q. What governmental regulations did you ever give to
24   Julia Zimmerman? I don't have anything in my record.
25 A. Right.

Page 160

1 Q. Where you --
2 A. Go ahead.
3 Q. Hang on. You got to let me finish.
4 A. Yeah.
5 Q. I have zero that's been produced to me where you, Dr.
6   Pensler, or your husband, or anybody sent my client a
7   clear answer pointing her directly to why she was
8   wrong, and here's the language from the government.
9   That never happened, did it?
10 A. No.
11 Q. Okay. And then in April you were saying I'll give
12   Julia three weeks severance, and then she can go. Do
13   you remember that?
14 A. No.
15 Q. You don't deny it, do you?
16 A. If you have a note, probably.
17 Q. Well, did you read these text messages to get ready to
18   come in here today?
19 A. Some of them.
20 Q. Okay. And then you say, I don't want her in the office
21   monitoring. Do you remember saying that?
22 A. Yes.
23 Q. And she was monitoring the billing?
24 A. No.
25 Q. As we know. Well, what was she monitoring?

Page 161

1 A. My clinical judgment.
2 Q. She was monitoring your clinical judgment?
3 A. Yes.
4 Q. Where is your evidence of that? Your clinical judgment
5   to misbill the government. Is that what you mean?
6 A. No.
7 Q. Well, what are you referring to then?
8 A. We had a meeting about semaglutide in the Med Spa, and
9   she screamed at me in front of the rest of the staff
10   and said that she was going to lose her license. And I
11   didn't even understand what she was talking about. And
12   it was really inappropriate, and I should have fired
13   her right after that.
14 Q. Well, what was the date of that?
15 A. It was 3/16.
16 Q. Okay. What are you reading from there?
17 A. Not 3/16. Oh, well, I sent out -- the reason I remember
18   it is I sent out a consent form we are going to start
19   doing semaglutide. So I sent a consent form the night
20   before, and then we were discussing it. And she became
21   very irate during the meeting standing up, yelling at
22   me, telling me she's going to lose her license. Saying
23   things that didn't make any sense. And when I tried to
24   calm her down and explain you are working under me,
25   that you're covered under my malpractice, she did not

41 (Pages 158 - 161)

Carroll Reporting & Video
A Veritext Company
www.veritext.com   586-468-2411   www.veritext.com

Page 162

1 accept it. She was very disrespectful in front of other
2 staff members. And ever since then, even so, she would
3 give me filthy looks in my own office.
4 Q. What were you just reading from on your iPhone which
5 has a pink case? I'm identifying it for the record.
6 A. It was just a date my husband sent me.
7 Q. Tell me what it says, because you just refreshed your
8 recollection about something here in this deposition
9 from your phone and I --
10 A. 3/15, sent note about semaglutide.
11 Q. Can I see it, please? You're refreshing your
12 recollection at a dep.
13    MR. BREAUGH: Don't touch the screen with
14 anything.
15 BY MS. GORDON:
16 Q. All right. So this is Saturday?
17 A. It's just recent. We were just talking about our
18 deposition, so I was trying to remember from my
19 Q. Fair enough. So you say, Where, where were you at?
20 This is Saturday. Is this recently?
21 A. Yeah. This is my personal text.
22 Q. I don't want to touch your text.
23 A. It's my personal text messages to my husband.
24 Q. Okay. Fair enough.
25 A. That have nothing to do with this case.

Page 163

1 Q. Is this recent?
2 A. Yeah.
3 Q. Well, some of them do. I don't know if this is from
4 him or you. I guess this is from him. He writes,
5 3/15/23, Sent note about semaglutide consent form. And
6 then he writes 11/18/2022 first day. Do you know what
7 that's referring to?
8 A. 11/18, the first day she came to the office.
9 Q. Okay. So he sent a note about the semaglutide on
10 3/15/2023. And then he writes 5/9/2023 termination.
11 Then he writes, She worked 24 and a half weeks with us.
12 She was therefore expected to show up for 10/12
13 Saturdays during that time. What's that referring to?
14 A. The fact that in the offer letter it said that the
15 person would work at least one Saturday a month, and
16 she didn't work them.
17 Q. Okay. So this goes back to -- so he's referencing
18 March 15th, 2023 for -- is it that he sent the note
19 out, doctor, about semaglutide?
20 A. No, I sent the note out.
21 Q. Okay. And there was a consent form?
22 A. There was a consent form.
23 Q. Okay. I'm not going to touch your phone further. All
24 right. What is semaglutide?
25 A. It's a weight loss injection.

Page 164

1 Q. Where is it injected into?
2 A. Different subcutaneous.
3 Q. What particular part of the body?
4 A. Can be the arms, top of the legs, stomach.
5 Q. How does it make people lose weight just from a
6 layman's term?
7 A. It's a natural chemical that makes people basically
8 think they just ate, so it increases your metabolism,
9 slows down emptying of the stomach. Decreases they
10 call it food noise.
11 Q. Is this FDA approved?
12 A. Yes.
13 Q. Okay. So what was the semaglutide concern that Julia
14 raised?
15 A. About who we were giving it to.
16 Q. What was her concern, as you understood it?
17 A. That we were going to give it to underweight people.
18 Q. Okay. And was there a response from you to her?
19 A. Yeah. I tried to talk to her about it, but she
20 became -- you couldn't talk to someone who became
21 belligerent.
22 Q. Well, what did you say to her?
23 A. I said that we're -- it's going to be evaluated on the
24 patient, like based on the patient.
25 Q. So when she said underweight, did you know what she was

Page 165

1 talking about?
2 A. Not really. I assume she was talking about someone who
3 was anorexic, or something, or slight. You know, it was
4 hard, because we were just starting it out.
5 Q. I see. So semaglutide, is it counter indicated for
6 people that do not have a weight problem?
7 A. We are -- no. Yes, I mean, people coming to us have
8 weight problems.
9 Q. So Julia raised an issue that she was concerned it was
10 being sold and provided to people that did not have a
11 weight problem, as I understand what you're telling me?
12 A. Yes.
13 Q. Okay. That's a legitimate concern; isn't it?
14 A. It's not appropriate to stand up and scream at someone.
15 Q. That may be, and we'll get to that.
16 A. Okay.
17 Q. That's a legitimate concern?
18 A. Sure. I appreciated it, yes.
19 Q. And did you answer her question from a medical point of
20 view?
21 A. Yes.
22 Q. And what did you say? Did you say you're correct, or
23 what did you say?
24 A. I said we would not be giving it to people who were
25 underweight.

Page 166

1  Q.  Had she already been asked to use semaglutide on a
2      patient?
3  A.  No.
4  Q.  Okay.  Was this a training?  What was this?
5  A.  We were just bringing it up. It was a group discussion
6      about bringing semaglutide into the Med Spa.
7  Q.  Okay. And there were other people there?
8  A.  Yes.
9  Q.  Okay. And were you sort of the speaker at the event at
10     the meeting about this is what we're thinking of, or
11     we're going to do this?
12 A.  I think Jenny was the main person, but I was there.
13 Q.  Are you using semaglutide today?
14 A.  Yes.
15 Q.  Okay.  And what's the price for a semaglutide injection
16     roughly?
17 A.  It's $599 a month for four weeks.
18 Q.  $599 a month for four weeks?
19 A.  Yes.
20 Q.  So this was a new product on the market you're saying?
21 A.  Yes.
22 Q.  So what did you understand Julia's concern was from
23     what she said to you at that meeting?
24 A.  That we were going to give it to anorexic people.
25 Q.  Okay.  So you said what back to her?

Page 167

1  A.  I said to her that we would give it to healthy people,
2      and we were going to do it, and talk to them before to
3      make sure they had no medical issues.  And then she
4      proceeds to say she's going to lose her medical -- like
5      it was just out of this kind of context I'm going to
6      lose my medical license.  I can't do this. Like it was
7      very hysterical, and it was very rude.  And she stood
8      up, and she yelled and me.  Me and my manager walked
9      out of that meaning and we were like whoa.
10 Q.  I'm just trying to understand why she got, according to
11     you, upset as you understood it.  From what you've
12     described, it sounds like she had strong feelings about
13     doing something that might not be correct for the
14     patient.  It could potentially be harmful.
15 A.  Of course.
16 Q.  What was her concern?  So when you said to her we are
17     not using it for people that are --
18 A.  Underweight.
19 Q.  -- underweight.
20 A.  Yeah.
21 Q.  What were her literal words back to you?
22 A.  I'm going to lose my license.
23 Q.  Why would she think that?
24 A.  I have no idea.
25 Q.  You didn't listen to what she said?

Page 168

1  A.  She just started screaming, I'm going to lose my
2      license.
3  Q.  Do you agree Julia's a very intelligent person?
4  A.  No.
5  Q.  Do you agree she has an excellent background and track
6      record?
7  A.  No.
8  Q.  Do you know what her background and track record are?
9  A.  With me it's bad.
10 Q.  No.  I don't mean with you.
11 A.  Okay. I don't know.
12 Q.  Yeah, it was bad with you for a lot of reasons we've
13     discussed here today.
14 A.  Sure.
15 Q.  I'm talking before she came to you, how long had she
16     been in the field?  How long had she been working as a
17     PA?
18 A.  Seven years.
19 Q.  And did you get references about her?
20 A.  Yes.
21 Q.  Okay. Were they good references?
22 A.  Yes.
23 Q.  She'd been a licensed PA for 14 years; is that correct?
24 A.  Yes.
25 Q.  Okay. She had all kinds of skill sets. Do you remember

Page 169

1      reading those, all the things she had been trained in?
2  A.  Yes.
3  Q.  Okay.  And she was the sole practitioner in the SALTA
4      Direct Primary Care Clinic in Auburn Hills. Did you
5      know that?
6  A.  Yes.
7  Q.  And she had several other positions before she came to
8      you.  Were you aware of that?
9  A.  Yes.
10 Q.  Okay.  So it's your opinion that Julia Zimmerman was
11     not intelligent?  Is that what you're telling me here
12     today?
13 A.  About some things.
14 Q.  What?
15 A.  She doesn't understand how some things are.
16 Q.  Like what, fake billing?  Is that what she didn't
17     understand?  Is that why you had a problem with her?
18         MR. BREAUGH:  Objection to form.
19 A.  No.
20 BY MS. GORDON:
21 Q.  Okay. So the semaglutide would have been an easy thing
22     to fix, because you could have simply sent her some
23     medical literature and an assurance that it was not
24     going to be used off label. You could have done that,
25     couldn't you?

Carroll Reporting & Video
A Veritext Company

586-468-2411

www.veritext.com                                                    www.veritext.com

Page 170

1   A.  She knew about it.
2   Q.  You know what, that wasn't my question at all.
3   A.  Sorry.
4   Q.  Obviously, she knew about it. She's the one that told
5       you, hey, you can't be doing this with underweight
6       people. This is a danger to patients. I know she knew
7       about it. So my question to you is, and that you
8       apparently think she was wrong, or she was off base
9       with her concerns, why didn't you just give her
10      something in writing saying, hey, I get it. No problem.
11      We're not going to do this?
12  A.  We just had one meeting about it. There was no time to
13      give anybody -- it was a general meeting.
14  Q.  And who's your witness to Julia screaming?
15  A.  Pavlina.
16  Q.  Have you talked to her lately about that?
17  A.  No.
18  Q.  Okay.  When's the last time you talked to Pavlina?
19  A.  A year ago.
20  Q.  About a year ago, okay. All right. So semaglutide
21      meeting March. You put nothing in writing. You've got
22      this employee that you've just sat here and told me I
23      should have fired her right at the time. And you also
24      told me that you like to coach and counsel employees.
25      You work with people to correct their errors. But I

Page 171

1       have no record here of you ever putting anything in
2       writing to my client about what you just described to
3       me about the semaglutide meeting, correct?
4   A.  Correct.
5   Q.  Okay.  Nor do you sit here and tell me, well, I had a
6       meeting with her later, and we went over the whole
7       thing, and it was all resolved.  You're not saying that
8       either, are you?
9   A.  No.
10  Q.  Okay.  Now, what happened after March?  Did your
11      practice use semaglutide, if I'm pronouncing it
12      correctly?
13  A.  Yeah. We ended up using it.
14  Q.  Okay.  And was Julia one of the people in there using
15      it?
16  A.  Yes.
17  Q.  Okay.  All right. So now you say back to 4/14, I'll
18      give Julia three weeks severance, and then she can go.
19      You said I don't want her in the office monitoring. So
20      I read this as you're going to give her the severance
21      in lieu of having her work for three weeks. Did you
22      just as soon she leave the office, correct?
23  A.  Yes.
24  Q.  Okay.  Because you didn't want her monitoring what was
25      happening in the office, correct?

Page 172

1   A.  Yes.
2   Q.  And then you say you follow up on that, and you say,
3       Unless we let her work until she finds a new job, but
4       she's going to be monitoring. That was a concern,
5       right?
6   A.  Yes.
7   Q.  And then you were saying you were going to reach out
8       to -- this is also still on April 14th, doctor.  I'll
9       reach out to -- you're referring to Daryl. He doesn't
10      even have to do injections. Do you remember that?
11  A.  Uh-uh.
12  Q.  You say, I'll reach out to him now.  He doesn't have to
13      do injections. Daryl can do all the work. He can just
14      be there to oversee. Who are you talking about there?
15  A.  A physician.
16  Q.  The new potential physician?
17  A.  Yeah.
18  Q.  Why wouldn't he do injections?
19  A.  Well, he'd have to be trained.
20  Q.  Did Daryl do -- I thought he didn't do injections in
21      the Med Spa?
22  A.  This was my vascular practice.
23  Q.  What are the injections Daryl was doing in the
24      vascular?
25  A.  They were the Varithenas, or MFTs in order to treat

Page 173

1       veins.
2   Q.  And you write about Julia, She's biting off her nose to
3       spite her face. This is a cush job, K-U-S-H, C-U-S-H,
4       and she's being crazy. Do you remember that?
5   A.  Yes.
6   Q.  And then, well, Pavlina said to you, She's very by the
7       book. Do you remember that?
8   A.  Sounds familiar.
9   Q.  And Pavlina says there's no clear guidelines except
10      Medicare. Do you remember that?
11  A.  That you're reading it. I didn't look at it before.
12          MR. BREAUGH:  I'm going to object as to form
13      as well for when you said Pavlina next said.  There is
14      words in between where you said it.
15          MS. GORDON:  Just for the record, what I'm
16      reading from was produced by defendants, so we've all
17      got the record. It's pages Bates 162, 163 and 164.
18          MR. BREAUGH: Correct.
19  BY MS. GORDON:
20  Q.  I think it can all be -- the record is going to be
21      accurate, because we all have the document. And then
22      you add, She's nuts. That's why her husband can't stand
23      her. What are you referring to there?
24  A.  What I said.
25  Q.  I don't know.  You said a lot of things today. What are

Page 174

1    you referring to?
2   A.  That it seemed like her husband thought she was crazy.
3        I don't remember the exact reason.
4   Q.  When did you first meet her husband?
5   A.  At a grand opening party.
6   Q.  Did you ever see him thereafter?
7   A.  Yeah.
8   Q.  How many times?
9   A.  Three times.
10  Q.  And what were the circumstances?
11  A.  He was coming to pick her up.
12  Q.  Did he come into the practice?
13  A.  Yes.
14  Q.  Did you talk to him?
15  A.  Briefly.
16  Q.  Like what, hi, how's it going?
17  A.  Um-hmm.
18  Q.  So where do you come up with telling me her husband
19       thought she was nuts?  What is that based on from him?
20       What's his name, by the way?
21  A.  I don't know.
22  Q.  Okay.  Well, who this unnamed spouse of hers is, what
23       words did he use where you say to another person, She's
24       nuts.  That's why her husband can't stand her, as if
25       you know, A, that her husband can't stand her and, B,

Page 175

1    it's because she's nuts?  What words were said to you
2    that caused you to form that impression?
3   A.  It was stuff he had said to me, but I can't remember.
4   Q.  So this didn't come from her husband?
5   A.  No.
6   Q.  Well, you write, She's nuts.  That's why her husband
7        can't stand her.  Did she come into you one day and say,
8        I'm nuts, and that's why my husband can't stand me?
9        Did she ever say that to you?
10  A.  No.
11  Q.  Okay.  And then Pavlina says, She's spending her energy
12       poking around a nonissue.  What did you understand that
13       was referring to?
14  A.  The fact that we told her about private billing does
15       not relate to that insight -- what's it called,
16       incident to, that it didn't relate to that.  And that
17       the other things we explained to her about COVID law.
18       Like anything you said to her she could not understand.
19  Q.  Well, you never gave her anything to support your
20       position you were taking.  We already know that.  You
21       never said, hey, I'm the doctor.  My husband's a doctor.
22       We've looked into all this.  Here?
23  A.  We did say that to her verbally.
24  Q.  I said you never handed -- listen.  Sitting here today,
25       doctor, you cannot tell me when I asked you what you

Page 176

1    read, how you got this information about COVID, you
2    said CMS, which is an incredibly huge category.  You
3    can't cite me a single thing here today, so yet you
4    tell me I heard.  I know all about this.
5   A.  Um-hmm.
6   Q.  But you can't articulate.  You're here for your dep in
7        a case against you in federal court.  You don't have
8        anything to offer me.  Did you have something to offer
9        Julia?  No.  You didn't give her anything, any actual
10       regulations, standards, laws.  You didn't give her any
11       of that, did you?
12  A.  No.
13  Q.  And then on 4/24, Derek Hill writes to you, Is Julia
14       fired?  Do you remember that?
15  A.  No.
16  Q.  You kept her on for another about three weeks or so,
17       sounds like.  This is on 4/24/23?
18  A.  We fired her in March.
19  Q.  No, May, May.  You fired her May 9th.
20  A.  March, April, May.  It's before we fired her.
21  Q.  So Derek is asking you, Derek Hill is asking you on
22       4/24, is Julia fired?
23  A.  We talked about it.
24  Q.  I know.  So he thought you were going to fire her right
25       then, so apparently you decided not to.  You decided to

Page 177

1    wait a bit, correct?
2   A.  Yeah.
3   Q.  Then on 5/8 Pavlina writes, I think this is a text.
4        It's got a little Apple at the top.
5            MR. BREAUGH:  I believe those should all
6        be -- that's how the software pulled the texts out.
7            MS. GORDON:  Thank you for that.
8   BY MS. GORDON:
9   Q.  Okay.  So I've got Pavlina saying, She's in the office.
10       Did you check your email?  Another message about
11       billing.  This is to Derek Hill.  Were you made aware of
12       that?
13  A.  No.
14  Q.  Okay.  Then on May 8, on May 8, 2023, Derek Hill writes
15       to you, In light -- this is Bates 158.  In light of
16       today's email, we're going to have to take procedures
17       away from Julia when Elizabeth is not in the building.
18       We can't afford to take the 20 percent loss on
19       procedure when she does them.  I'm stopping right there.
20       Does that sound familiar?
21  A.  Yes.
22  Q.  Did you read this in preparation for your deposition
23       today?
24  A.  I did read it.
25  Q.  Okay.  So today's email would have been an email that

Page 178

1    Julia would have sent; is that correct?
2  A.  I'm not sure.
3  Q.  Okay.  But he says, In light of today's email, we're
4    going to have to take procedures away from Julia when
5    Elizabeth is not in the building.  Why was that?
6  A.  Because she didn't -- it didn't matter if it was
7    private.  Even the private patients she was claiming
8    needed to have incident to. So it was just a gross
9    misunderstanding.
10 Q.  Okay.  So the point was you didn't want her billing
11   under her own provider number, correct?
12 A.  We didn't have to.
13 Q.  Well, it doesn't matter whether you -- the point is she
14   was -- Julia was making statements that she believed
15   that the way -- to bill under your provider number was
16   not correct, right?  That's what caused this Derek Hill
17   email.  In light of today's email, we're going to have
18   to take procedures away from Julia?
19        MR. BREAUGH:  Object to speculation on what
20   caused Derek Hill to send that email.
21 BY MS. GORDON:
22 Q.  Well, you were in communication with Derek Hill quite a
23   bit at this time, weren't you?
24 A.  He's my husband.
25 Q.  Exactly. So this is the same date he had written to you

Page 179

1    at 1:37 in the afternoon and said, Did Julia show up?
2    Pavlina wrote back and said, She's in the office.  Did
3    you check your email?  Another message about billing.
4    So, again, on the 8th, Julia's talking about billing
5    concerns. Derek Hill writes back, Good Lord. And then
6    Pavlina writes back, Elizabeth has another lead on a PA
7    in Ferndale. We need to get her in ASAP.
8        Okay. Now I'm onto the next chain.  It's the
9    same day. Still 5/8, five minutes later. Derek has told
10   you that -- not you, Derek has told -- I'm sorry. Julia
11   has sent an email, and Derek Hill has received it, as
12   had Pavlina, that Julia's raising concerns about
13   billing. And then Derek says, In light of today's
14   email, we're going to have to how to take procedures away from
15   Julia. Okay. What was the reason for taking procedures
16   away from Julia specifically?
17 A.  Because she didn't understand the billing rules.
18 Q.  Well, what did she want to do that you didn't want her
19   to do?
20 A.  She didn't understand incident to.
21 Q.  That I want to know what she was -- are you telling me
22   that Julia was saying, I need to have my provider
23   number as the biller?  Is that what she was saying?
24 A.  No.
25 Q.  What was she saying?

Page 180

1  A.  She was saying she needs her own patients, her own
2    schedule, as if it was her practice, and it wasn't. It
3    was my practice.
4  Q.  Do you have something from her in writing saying that?
5  A.  No. But that's what she said.
6  Q.  Okay.  So let's look back and see what she said. But
7    what did you feel the reason was that she could not do
8    procedures?  It's obvious that she was insisting on
9    something.
10 A.  Because I didn't want -- I didn't want her to feel
11   uncomfortable, and she was -- didn't know what she was
12   talking about.
13 Q.  So on May 8th she's -- in the morning she's saying to
14   you, Dr. Hill and others, I wanted to follow up as I
15   continue to be concerned about the process of billing
16   in the physician's name regardless of insurance carrier
17   or servicing provider, and my personal professional
18   liability. Do you remember that?  We discussed that
19   earlier.
20 A.  Um-hmm, yes.
21 Q.  I'd like to continue to discuss what we should do when
22   a patient is seen by me. Do you remember that?
23 A.  Yes.
24 Q.  Okay.  And what's your answer to that, I'd like to know
25   what to do when a patient is seen by me?  What did you

Page 181

1    want her to do, bill in your name, under your name?
2  A.  No.
3  Q.  What did you want her to -- who did you want her to
4    bill under when a patient is seen by her?
5  A.  Whatever the correct answer was.
6  Q.  Okay.  Could it be her name?
7  A.  It could be her name.
8  Q.  Okay.  And then she writes back on May 8th at 9:07
9    a.m., I've not heard a response on this. She had been
10   asking the day before about how to bill under her name.
11   And hang on. And then she writes -- that was -- and
12   then she writes back.  I'm sorry.  That was April 13th
13   she wrote that email looking for guidance. On May 8th
14   she says I'm not gotten a response to how I'm supposed
15   to bill under my name as compared to Dr. Pensler's
16   name. Okay?
17 A.  Okay, yes.
18 Q.  It's my understanding we are now able to indicate the
19   PA is the servicing provider in Epic via the
20   appointment itself by changing the provider.  For
21   example, I'm not reading any more but, for example,
22   you're not in on Monday morning. Somebody comes in, say
23   it's a first appointment, and she's seeing the person.
24   She wants to know what to do. You never responded, did
25   you?

Page 182

1  A.  Not in writing.
2  Q.  No. Did you tell her anything verbally?
3  A.  We've talked -- we had talked to her several times.
4  Q.  Well, what did you tell her?  What did you tell her
5     after April 13th?
6  A.  I'm not sure. I don't --
7  Q.  You don't know what you told her, correct?
8  A.  I know the gist of what I told her.
9  Q.  What was it?
10  A.  That we were taking care of it. That we were doing it
11     correctly. That we were figuring it out.
12  Q.  Okay.  So why does Derek Hill say on May 8th, In light
13     of today's -- so in the morning of May 8th, Julia's
14     telling people since I've not heard from anybody,
15     moving forward, in order to ensure I'm in compliance
16     with proper billing, and be able to continue with my
17     position, I will be modifying this when appropriate.
18     She's saying when appropriate I'm going to put my name
19     on there.
20  A.  She didn't know what was appropriate.
21  Q.  Hang on. Because I haven't heard back from anybody.
22     That's what she's saying.
23  A.  She wasn't a biller.
24  Q.  Of course a PA can be a biller. They can bill. They can
25     bill on their number under their number, correct?

Page 183

1  A.  If they have their own office.
2  Q.  You're not aware that PAs bill when they work for
3     somebody else under their own number?
4  A.  Yes.
5  Q.  Okay.  Thank you. They don't have to have their own
6     office, do they?
7  A.  No.
8  Q.  Do they?
9  A.  No.
10  Q.  Okay.  So Julia, never having gotten a response is now
11     saying, hey, hi, good morning. I haven't heard anything
12     from you guys. I don't want to be in trouble legally.
13     Here's what I'm going to do. You don't respond to that
14     either, right?
15  A.  Um-hmm.
16  Q.  Correct?  Instead, Derek says, Okay. In light of
17     today's email, we're going to have to take procedures
18     away from Julia. Is that your decision?
19  A.  I don't know what Derek was thinking.
20  Q.  Was that your decision to take procedures away from
21     Julia when Elizabeth is not in the building?  Is that
22     your idea?
23  A.  No.
24  Q.  You didn't tell him no, correct?
25  A.  I can't speculate. It was too far away.

Page 184

1  Q.  You have nothing in writing for me today telling me you
2     wrote Derek don't do that. We're going to work this out
3     with her.  You didn't do that, did you?
4  A.  I don't know what I did.
5  Q.  Okay.  Well, we know what you did, because the
6     following -- we know what you said because a half an
7     hour later you said she has to go. So we do know what
8     you did, correct?  Do you remember saying back to
9     Derek -- he says -- let me just get your head in this.
10     This is Derek speaking now. I don't care what she says.
11     We should not change the appointment to her unless 100
12     percent Elizabeth is not there. I'm not sure why she
13     wants the appointment under her name when Elizabeth is
14     there. Agreed?  And you write back, Yes, she has to go.
15     Do you remember that?
16  A.  Yes.
17  Q.  Okay.  And then you say, I'll see if that PA I met can
18     come in. Derek says, What about Tyler as a replacement?
19     If that one doesn't bite, Derek says, he'll be cheap,
20     hustle, won't bitch, and won't cause problems. Do you
21     remember that?
22  A.  Yes.
23  Q.  And then you say, Okay.  Let's get rid of her today,
24     referring to Julia, obviously, correct?
25  A.  Yes.

Page 185

1  Q.  Now, as of this date when you say, Okay, let's get rid
2     of her today, again, I'm sorry if I'm repeating myself,
3     there's nothing in Julia's record or anything written
4     to her about any job problems, correct?
5  A.  No.
6  Q.  Okay. And then a decision is made is you're going to
7     wait -- you're going to wait until the next day. You're
8     not going fire her that day. We'll wait until tomorrow.
9     We'll give Daryl a 5K raise, do you remember?
10  A.  That's written.
11  Q.  Yeah. And your husband says, I just told Daryl 5K.
12     It'll be a little less fishy if not the same day. Do
13     you remember that?
14  A.  No.
15  Q.  What does that mean?  You decided to wait a day to fire
16     my client, and you were going to give Daryl a raise in
17     advance, and Derek Hill says, It'll be a little less
18     fishy?
19  A.  We didn't want to hurt their feelings.
20  Q.  That didn't work, because you and I are meeting each
21     other here today. Okay. That's it on that. Let's move
22     to the termination date. Okay. What happens with -- I'm
23     sorry.  On the date of the termination, what happens
24     that day?
25  A.  She came to work, and I came, and then we had a

Page 186

1    meeting.
2  Q.  Who had a meeting?
3  A.  Me, Pavlina, and Derek and Julia.
4  Q.  You, Pavlina, Eric?
5  A.  Derek, my husband.
6  Q.  Derek.
7  A.  And Julia.
8  Q.  And Julia. So it was four of you?
9  A.  Um-hmm.
10  Q.  Where was the meeting held?
11  A.  In our office.
12  Q.  How long did it last?
13  A.  20 minutes.  20 minutes to 30 minutes.
14  Q.  Who did the talking?
15  A.  Derek mostly, then Pavlina, and I said a few words.
16  Q.  What did Derek say?
17  A.  He said that he -- if I can recall, I'm speaking out of
18    him, that he felt badly it wasn't working out, or we're
19    going in a different direction.
20  Q.  Okay.  So that sounds like a fairly succinct thing to
21    say. What was the rest of the 20 minutes about?  You
22    offered her a severance I saw; is that correct?
23  A.  Yes.
24  Q.  Was that talked about at that meeting?
25  A.  Yes.

Page 187

1  Q.  And as I recall, it had a nondisclosure agreement and
2    so on?
3  A.  That's standard practice.
4  Q.  I just wanted to know.
5  A.  Yes.
6  Q.  Okay.  Anything else that was said in the meeting that
7    you can recall?
8  A.  Yeah.  I said I can't have somebody who won't even see
9    patients when I'm in the office.
10  Q.  Okay. What was the occasion when my client wouldn't
11    see patients when you were in the office?  What were
12    the circumstances?
13  A.  It didn't matter. I couldn't --
14  Q.  It matters to me today.
15  A.  Sure.  I couldn't figure it out. I couldn't figure it
16    out.
17  Q.  Well, I want to know the particulars.  What occurred
18    that day that you're referring to?
19  A.  Sure. Several days --
20  Q.  What time period are we in?
21  A.  Maybe six weeks before she's fired.
22  Q.  Okay. Okay. What happened?
23  A.  I'd be in the office with her, and she wouldn't see
24    patients with me or without me.
25  Q.  What did she say?

Page 188

1  A.  Nothing.
2  Q.  I'm not grasping your point here.
3  A.  She was sitting at like -- she'd sit at the MA station.
4    She'd look like she was --
5  Q.  What's the MA station?
6  A.  Medical assistant station.  It's like in the middle of
7    the office.  And she looked like she's documenting
8    something.  And then instead of her going in with me,
9    or going by herself, she'd just sit there.
10  Q.  Okay.  What did you understand her reason was if you
11    were going in to see the patient that she wasn't going
12    in with you?
13  A.  I assumed she thought it was some billing issue.
14  Q.  Well, didn't you ask why are you not coming in with me?
15    I don't understand.
16  A.  At this point, she was giving me dirty looks and not
17    speaking to me in my own office.
18  Q.  I didn't ask you that.
19  A.  Well, that's why I didn't ask her, because she was
20    being aggressive towards me.
21  Q.  So you don't know what her -- if this even happened, if
22    what you're telling me is actually what was in Julia's
23    mind, you cannot offer me up a reason that Julia would
24    not go in to see a patient with you?
25  A.  I gave my reason which is --

Page 189

1  Q.  You didn't give a reason.
2  A.  Which is what I believe is that it had something to do
3    with billing.
4  Q.  But you must have wanted to know then what is it with
5    billing that's the problem here?  I'm paying somebody.
6    I wonder what her point is?
7  A.  Right.
8  Q.  So what was her point, as you understood it, or if you
9    didn't?
10  A.  She could not understand the rules of it.
11  Q.  What's the rule she couldn't understand about going
12    into an office with you?
13  A.  Exactly. I didn't know. I don't know.
14  Q.  And you still don't know sitting here today, and she
15    never explained it to you?
16  A.  She never explained it to me.
17  Q.  I see Julia's very good at writing emails. She's
18    documenting a lot of things, and she's putting like
19    citations to government documents in them. And I see
20    her telling all these things.  And then I see her
21    saying, I'm not getting a response. So I see that Julia
22    documents what's going on on her end. But you're here
23    today to tell us that you just didn't understand her
24    point?
25  A.  Yes.

Page 190

1  Q.  And at the termination meeting, Julia said her actions
2      were in accordance with the CMS guidelines, didn't she?
3  A.  I don't remember.
4  Q.  When all this came up. You don't deny that?
5  A.  I don't remember if she said that.
6  Q.  Okay.  Well, wasn't she being told at this time that --
7      well, I guess you already told me what your husband
8      told her. Was there anything else that you said to her
9      about why she was being fired?
10 A.  What I just said.
11 Q.  Okay.  So did she respond to you and say, I'm just
12     doing what I'm required to do under CMS guidelines?
13 A.  No. She started -- stood up, started getting loud, and
14     saying that she wasn't going to fraudulently bill, and
15     then started running around the room.
16 Q.  Did she literally run around the room?
17 A.  Yes.
18 Q.  Was she going fast?
19 A.  She was going to go get stuff to give us.
20 Q.  Like CMS documents?
21 A.  No, no.  Like her badges and other stuff that she had.
22     She didn't give us anything.
23 Q.  And you also made the comment to her at the meeting
24     that she had changed herself. She had put herself under
25     a possible billing code, which she's allowed to do by

Page 191

1      law, and should do, correct?
2  A.  I don't remember.
3  Q.  You didn't want her to use a billing code as the
4      provider and the biller, correct?
5  A.  No, I didn't -- it's not that I didn't want her to. I
6      didn't want her to make up her own rules about it.
7  Q.  But, again, you gave her no written rules, nor did you
8      have an office policy on any of this to hand her and
9      say, look right here. Here's our policy. You didn't
10     have that, did you?  You had no policies, correct?
11 A.  No.
12 Q.  Okay.  Neither did you have policies for your biller,
13     correct, nothing in writing?
14 A.  Nope.
15 Q.  Okay.  And at that termination meeting, one of you that
16     was there stated, again, that the practice was going to
17     be losing money if Julia billed for her services as a
18     physician assistant.  That that would be a loss of
19     money, correct?
20 A.  When it wasn't indicated, yes.
21 Q.  Right. Because you're going to lose money by getting
22     that lower rate, correct?
23 A.  Yes.
24 Q.  And then do you remember Julia telling you that she
25     would not have accepted employment with you if she'd

Page 192

1      known that she was going to be expected to do the
2      things that you were telling her to do?
3          MR. BREAUGH: I'm going to object to the form
4      on that one.  It's just wildly vague.
5  BY MS. GORDON:
6  Q.  Do you remember her making a comment I would never have
7      taken this job if I knew I was supposed to be handling
8      billing this way?
9  A.  I just heard her say fraudulent billing.
10 Q.  Okay.  Okay. So the meeting lasted about 20 minutes you
11     said?
12 A.  Um-hmm.
13 Q.  That's a yes?
14 A.  Yes.
15 Q.  Okay.  And then what's the next thing that happened
16     with you hiring somebody?
17 A.  Well, we started doing interviews.
18 Q.  Okay.  And when did those start?
19 A.  After, after she was fired. I can't remember.
20 Q.  Roughly, how long?
21 A.  Maybe two weeks. We put an ad in, and then maybe it was
22     two weeks to a month before we started interviewing.
23 Q.  Where did you advertise?
24 A.  Indeed.
25 Q.  Okay.  And what were you advertising for?

Page 193

1  A.  Just to cover the two practices.
2  Q.  Were you advertising for a PA?
3  A.  Yes.
4  Q.  Okay.  And did you get much of a response?
5  A.  I guess. I don't know. We maybe had 15 people respond.
6  Q.  Okay.  How many did you end up interviewing?
7  A.  10, 10 or 13 people.
8  Q.  Okay.  Did you personally do the interviews?
9  A.  Yes.
10 Q.  All of them?
11 A.  All of them.
12 Q.  Okay.  And were some just obviously not qualified?
13 A.  Some people were not qualified.
14 Q.  Okay.  And what were the requirements on Indeed for
15     this job?
16 A.  That the person was hard working, and could cover both
17     practices.
18 Q.  Okay.
19 A.  And we wanted, I believe, at least five years of
20     experience.
21 Q.  Okay. So when did you end up hiring somebody as a
22     replacement?
23 A.  It had to have been -- I think it was three, three
24     weeks later, I believe.
25 Q.  Okay.  And who was it you hired?

49 (Pages 190 - 193)

Page 194

1  A.  I hired a nurse practitioner that I had met from one of
2      the OBLs I go to.
3  Q.  Okay. And who was that?
4  A.  Andrea.
5  Q.  I'm sorry?
6  A.  Andrea.
7  Q.  How long was she there?
8  A.  She's still there.
9  Q.  Okay. Does she have a provider number?
10  A.  Yes.
11  Q.  Does she use it?
12  A.  Yes.
13  Q.  Are you sure of that?
14  A.  Yes.
15  Q.  Does she bill for anything in her name? If I get your
16      records, am I going to see --
17  A.  Yes.
18  Q.  -- that she's being paid at the physician assistant
19      rate?
20  A.  Yes.
21  Q.  How many times has that happened?
22  A.  I don't know.
23          MR. BREAUGH: I'm going to object to the
24      form that she gets paid at the physician assistant
25      rate.

Page 195

1          MS. GORDON: The practice group.
2          MR. BREAUGH: Thank you.
3  A.  Yes.
4  BY MS. GORDON:
5  Q.  Okay. And have you hired anybody else in?
6  A.  Yeah. We hired -- at that time we hired Kyle. He was a
7      new PA.
8  Q.  Okay.
9  A.  And he was there while we were still interviewing for
10      other people.
11  Q.  Okay. Anybody else that you've hired?
12  A.  Kendall, and then Julia since Kyle left.
13  Q.  Did you have mandatory training sessions? I'm sorry.
14      Were there mandatory training sessions that would have
15      involved PAs?
16  A.  Yes.
17  Q.  What would those have been?
18  A.  For the RFs.
19  Q.  What's that?
20  A.  Radiofrequency ablation.
21  Q.  Okay. How many of those were there?
22  A.  Maybe three. Three maybe.
23  Q.  During the time Julia was there or not?
24  A.  Yes.
25  Q.  Or altogether?

Page 196

1  A.  No.
2  Q.  Did she attend, as far as you know?
3  A.  I believe yes.
4  Q.  Okay. Any other mandatory training for physicians
5      assistants?
6  A.  No.
7  Q.  Okay. Were there -- as far as I know, there were not
8      any disciplinary incidents with Julia; is that correct?
9      I mean, you've said some things you didn't like. But I
10      don't know of any discipline that occurred, correct?
11  A.  No.
12  Q.  And you've said she raised her voice at a meeting; is
13      that correct?
14  A.  Yes.
15  Q.  Was that once or twice?
16  A.  It was once.
17  Q.  Day in and day out she had a pleasant demeanor; is that
18      correct?
19  A.  No.
20  Q.  What was unpleasant about it?
21  A.  She became where she wouldn't talk to me. She gave me
22      dirty looks in my own office.
23  Q.  Her emails are extraordinarily polite.
24  A.  She's two faced.
25  Q.  Oh, really. Are you two faced? Are other people in the

Page 197

1      office two faced?
2  A.  Some.
3  Q.  Okay. Like who?
4  A.  Probably Pavlina.
5  Q.  Okay. Is it two faced for you to say, or certainly
6      unprofessional for you to be talking to people about
7      Julia's husband thinking she's nuts? That's not
8      appropriate, is it?
9  A.  Pavlina and I had a personal relationship, so it wasn't
10      necessarily a professional discussion.
11  Q.  Well, she was an employee.
12  A.  I know, sure.
13  Q.  And you were talking about another employee, correct,
14      correct?
15  A.  Yes.
16  Q.  Did you do that with her about other employees as well?
17      If I get your other emails and texts, am I going to see
18      you and Pavlina sort of going back and forth about
19      other employees, how you feel about them, problems
20      you're seeing, their attitudes?
21  A.  Yes.
22  Q.  That's kind of day-to-day what you're seeing, and
23      you're just kind of venting; is that fair?
24  A.  Yes.
25  Q.  And that would include a lot of other people that work

Page 198

1   for you, correct?
2   A.  Yes.
3   Q.  Sure. Did you guys have something called all staff
4        meetings, or did you ever -- I've heard of different
5        meetings you've had.  But was there ever a time when
6        you all got together for an all staff meeting?
7   A.  Yes.
8   Q.  What would that be about?  What would be a topic at one
9        of those meetings?
10  A.  We'd cover, you know, people showing up on time.  That
11       was a big issue. People calling in. People leaving
12       early. We discussed people -- that one of the meetings
13       was that the PAs were going to -- or everybody was
14       going to start punching in and out.
15  Q.  Did that happen?
16  A.  No.
17  Q.  Okay.  And what was the reason there?  You were just
18       having people not get in on time?
19  A.  No.  We felt that Julia was not leaving very early, and
20       so we wanted to be able to see how many hours she
21       actually was working.
22  Q.  So it was really just about Julia?
23  A.  Or Julia, and we had other people. They wanted to also
24       see how often Pavlina was there, how often Daryl was
25       there.

Page 199

1   Q.  You had a concern about Daryl as well?
2   A.  Just to see how much he was working in comparison to
3        how much she was working.
4   Q.  What was the goal there?
5   A.  It appeared he was -- or he was working a lot more in
6        the office than her.
7   Q.  What do you mean by in the office?
8   A.  Meaning that when physically -- because he would cover
9        cases in the operating room.  So when he didn't have
10       cases, he would come back and always cover Pensler Vein
11       and Vascular to help. Whereas, in the alternative, if
12       she didn't have patients in the Med Spa, she wouldn't
13       come back and help him.
14  Q.  Again, I have no record of that. You're just telling me
15       this here today.
16  A.  Yes.
17  Q.  Okay.  And why did you never get the time clock?
18  A.  We had a hard time enforcing it.  We are very busy.  Me
19       and my husband cover all those practices, take calls,
20       see patients, emergency surgeries, so we rely on the
21       managers to enforce those things. And Pavlina, you
22       know, we didn't -- we didn't follow up enough.
23  Q.  Has anybody there been disciplined for attendance
24       issues?
25  A.  Yes.

Page 200

1   Q.  Who would those people be?
2   A.  The medical assistants.
3   Q.  Okay.  And how many people have you disciplined?  Did
4        you actually discipline them, or just counsel them, or
5        neither?
6   A.  We've counseled.
7           MS. GORDON:  Okay. Okay. That's all the
8        questions I have for you, doctor. Thank you for your
9        time.
10          MR. BREAUGH:  I have just a couple.
11          EXAMINATION
12  BY MR. BREAUGH:
13  Q.  I'll do my best given nothing was introduced as an
14       exhibit, so we're citing off of pure memory. But kind
15       of going back to a certain point, Dr. Pensler, that you
16       were asked about particularly Julia, but then as
17       well to all staff about confirming that they got no
18       training to "billing the government."  Can you explain
19       why, or I guess we'll start with who was responsible
20       for billing?  Was every employee responsible for
21       billing for their services?
22  A.  No. No employee was responsible except for Simrath.
23       And prior to that, we had a third party biller.
24  Q.  Okay.  So other PAs were not responsible for completing
25       their own billing?

Page 201

1   A.  No. Nobody was responsible for billing in the office.
2   Q.  Additionally at one point we were going over the
3        complaint, and I believe specifically paragraph 12,
4        which in accordance the paragraph above said that
5        Julia was hired as a physician assistant.  And then on
6        12, I guess are you familiar, yes or no, with the
7        general duties of Julia's position within the Vein and
8        Vascular Center, Hill Orthopedics, and the Med Spa?
9   A.  Yes.
10  Q.  Are you familiar with every possible service any PA in
11       any field, are you familiar with every single
12       obligation --
13  A.  No.
14  Q.  -- that they would have?
15  A.  No.
16  Q.  And, finally, were there any employees -- we'll just go
17       back very recent with the time clock email and
18       regulations.  Were there employees who did follow it
19       and actually punched in using the clock?
20  A.  Yes.
21          MR. BREAUGH:  Okay.  That's it for me on my
22       end.
23          MS. GORDON:  Thank you, doctor, for your
24       time. Thank you.
25          (The Deposition was concluded at 3:43 p.m.)

Page 202

1        CERTIFICATE OF NOTARY

2  STATE OF MICHIGAN  )

3         ) SS

4  COUNTY OF WAYNE   )

5

6       I, JOANNE MARIE BUGG, certify that this

7  deposition was taken before me on the date hereinbefore

8  set forth; that the foregoing questions and answers

9  were reported by me stenographically and reduced to

10  computer transcription; that this is a true, full and

11  correct transcript of my stenographic notes so taken;

12  and that I am not related to, nor of counsel to, either

13  party nor interested in the event of this cause.

14

15

16

17

18

19

20



21      JOANNE MARIE BUGG, CSR-2592

22      Notary Public

23      Wayne County, Michigan

24      My Commission expires: 2-26-2025

25

Carroll Reporting & Video      586-468-2411
www.veritext.com    A Veritext Company    www.veritext.com

| **1** | 27:14,17 41:4 | 48:1,1 85:3 | **2024**   2:4 5:2 |
|---|---|---|---|
| | 71:7,8,12 85:2 | 177:18 186:13 | 67:3 94:5 |
| **1**   51:22 | 193:5 | 186:13,21 | 111:2 |
| **10**   13:2 25:21 | **15,000**   34:12,21 | 192:10 | **21**   47:25 |
| 31:1 49:13 | **154**   138:2,17 | **200**   4:7 104:24 | 129:18 |
| 85:2 155:11,18 | **158**   177:15 | **2007**   116:9 | **22**   47:25 93:23 |
| 155:20 157:9 | **15th**   163:18 | **2012**   6:10 | **220**   2:1,18 |
| 193:7,7 | **16**   71:21 | **2015**   6:10,25 | **23**   1:7 93:21,22 |
| **10/12**   163:12 | **162**   173:17 | 9:10,11 33:5 | 145:7 |
| **100**   157:2 | **163**   173:17 | 54:9,11 85:22 | **24**   163:11 |
| 184:11 | **164**   173:17 | 85:23 | **240**   3:4 |
| **100,000**   35:7 | **17**   70:2 72:1,17 | **2018**   34:15 | **248.258.2500** |
| **11**   2:4 5:2 | **17th**   139:11 | **2019**   21:3,3,11 | 2:20 |
| 83:12,19 84:6 | **18**   70:1 73:9,10 | 32:4 86:1 | **248.996.8510** |
| **11/18**   163:8 | 74:4 75:15,16 | 90:24 103:8 | 3:6 |
| **11/18/2022** | 75:20 76:5 | **2020**   10:1 21:4 | **25**   24:14,16 |
| 163:6 | **183**   131:19 | 32:4,4 90:24 | 28:24 85:3,4 |
| **115**   19:11 | **184**   131:20 | 90:24 93:24 | **2592**   2:6 |
| **11634**   1:7 | 132:12 | 103:23,24 | 202:21 |
| **11:09**   2:3 5:3 | **185**   121:19 | **2021**   10:2 46:6 | **26742**   202:20 |
| **12**   62:11,14,19 | 126:4 | 46:6 47:25 | **27**   129:22 |
| 63:2 64:14,17 | **186**   121:19 | **2022**   24:3,7 | **2:00**   128:15 |
| 64:19,20 66:12 | **187.1**   131:16 | 27:20 46:7 | **2:06**   128:16 |
| 66:14,25 67:3 | 132:13 | 47:7 51:22,22 | |
| 67:7 68:17,19 | **187.1.**   131:19 | 81:23 103:4,5 | **3** |
| 69:1,16 201:3 | **189**   145:24 | 104:6,23 | |
| 201:6 | **1:04**   81:11 | **2023**   19:14 | **3**   132:23 |
| **12:41**   81:10 | **1:37**   179:1 | 21:7,11 24:3,7 | **3/15**   162:10 |
| **13**   193:7 | | 27:20 42:18 | **3/15/2023** |
| **13th**   136:24 | **2** | 81:23 93:7,25 | 163:10 |
| 181:12 182:5 | | 103:23 111:15 | **3/15/23**   163:5 |
| **14**   168:23 | **2**   94:10 | 111:15 129:18 | **3/16**   161:15,17 |
| **14th**   172:8 | **2-26-2025** | 132:23 134:13 | **30**   24:11,16 |
| **15**   14:17,18,19 | 202:24 | 136:24 139:11 | 25:6,16,25 |
| 14:21 15:3,15 | **2.003.**   159:12 | 163:18 177:14 | 27:18,25 28:5 |
| 26:20 27:1,3,5 | **20**   14:19 25:16 | | 28:13,18,22 |
| | 28:24 31:1 | | 31:3 41:4 |

| | | | |
|---|---|---|---|
| 45:17 152:24 186:13 | **6** | **9th** 134:13 176:19 | 33:13 35:2 42:4,5 46:21 |
| **32000** 3:3 | **65** 134:12 | **a** | 46:22,24 51:9 |
| **33** 2:1,17 | **67** 134:12 | **a.m.** 2:3 5:3 | 71:17 106:25 |
| **35** 8:16 24:14 | **6705** 6:17 | 83:4,6,7,7 84:7 | 111:21,22,22 |
| **3:43** 201:25 | **6958535** 2:8 | 134:14 142:7 | 111:23 119:4,5 |
| **3rd** 67:3 | **7** | 181:9 | 119:18,19,20 |
| **4** | **7/19/2023** 66:12 | **ability** 102:3 | 119:22,23 |
| **4/14** 171:17 | **70** 25:11 | **ablation** 195:20 | **acclimated** 51:6 |
| **4/24** 176:13,22 | **7:30** 13:1 | **able** 28:19 | **accordance** 190:2 201:4 |
| **4/24/23** 176:17 | **8** | 29:11 41:2 | **account** 129:23 133:13 |
| **40** 24:11 25:6 | **8** 82:21 83:3,6 | 46:20 52:12 | **accounts** 11:15 35:2 |
| 25:25 27:18,25 | 140:15 142:7 | 59:18 77:4 | **accurate** 49:4 |
| 28:5,14,18,22 | 177:14,14 | 94:7 99:5,10 | 61:18,24 64:11 |
| 31:4 85:4 | **80** 25:11 | 99:11 105:2 | 66:17 68:13 |
| **400,000** 93:20 | **85** 73:13 74:20 | 112:18 120:25 | 69:14,17 70:6 |
| **401ks** 8:14 | 75:10 104:17 | 133:21 135:11 | 71:18,24 72:4 |
| **48301** 6:17 | **8:15** 142:7 | 137:9 138:22 | 73:6,14,22 |
| **48304** 2:19 | **8:30** 83:7 142:7 | 139:10,18,23 | 74:4 75:10,12 |
| **48334** 3:5 | 142:13 143:1 | 139:24,25 | 75:24 76:1,15 |
| **4:33** 144:13 | **8th** 144:13,13 | 140:19,24 | 77:21 82:3 |
| **5** | 146:15 179:4 | 181:18 182:16 | 96:11 99:2 |
| **5** 4:6 | 180:13 181:8 | 198:20 | 117:24 127:12 |
| **5/8** 177:3 179:9 | 181:13 182:12 | **above** 12:6,7 | 129:11 134:16 |
| **5/9/2023** 163:10 | 182:13 | 70:4,8 72:2,18 | 134:16 135:5 |
| **50** 45:17 93:1 | **9** | 201:4 | 135:15 139:12 |
| **500** 132:9 | **9** 82:21 83:7 | **absolutely** 89:20 97:22 | 139:15 141:8 |
| **500,000** 94:14 | 134:2 142:7 | 123:20,20 | 141:11 173:21 |
| **599** 166:17,18 | 146:12 | 151:21 | **accurately** |
| **5k** 185:9,11 | **90** 81:19 | **accept** 162:1 | 59:25 73:25 |
| | **928** 10:10,19 | **accepted** 191:25 | 80:13 |
| | **99** 72:13 | **access** 26:7 | |
| | **9:30** 142:7 | 32:12,23 33:12 | |

[act - answer]                                                                          Page 3

**act**  56:11 101:5
**acting**  101:3
**action**  153:14
**actions**  190:1
**activities**  59:22
  155:19
**actual**  149:23
  176:9
**actually**  28:19
  28:22 29:14
  41:2 46:21
  47:2 49:19
  59:23 60:1
  64:19 65:23
  82:6 86:15
  89:23 100:23
  117:14 122:16
  126:6,9 129:8
  142:8 144:15
  146:19 154:25
  156:12 188:22
  198:21 200:4
  201:19
**ad**  192:21
**add**  173:22
**adding**  126:10
**addition**  13:18
  58:4 157:1
**additional**
  18:15
**additionally**
  201:2
**address**  6:16,16
  6:18 31:24
  120:1,14,20

121:2,7,10,11
**administrative**
  16:3
**admit**  35:12
**advance**  23:16
  185:17
**advantage**
  104:19
**advertise**
  192:23
**advertising**
  154:8 192:25
  193:2
**aesthetician**
  33:22 154:2,4
**aestheticians**
  118:17
**afford**  177:18
**aflac**  8:14
**afternoon**
  144:14 179:1
**afterward**
  115:15
**aggressive**
  188:20
**ago**  13:19
  18:10,17,25
  29:7,15 42:17
  45:1 68:14
  93:25 96:1
  97:8 100:16
  123:17 124:1
  125:1 170:19
  170:20

**agree**  134:20
  147:16 149:3
  168:3,5
**agreed**  157:1
  184:14
**agreement**
  187:1
**ahead**  33:21
  61:5 72:8 81:7
  89:2 99:21
  124:7,13
  127:19,21
  128:14 152:21
  159:13 160:2
**ahold**  98:6,13
  98:16,24
  143:18
**alert**  146:1,3
**alerted**  146:2
**alerting**  131:4
**allegation**
  68:21 73:4
**allegations**
  62:14 63:2
  73:21
**allegedly**
  116:19
**allotment**
  26:18
**allotted**  27:5
**allowed**  29:23
  30:1 43:14
  127:8,9 130:16
  190:25

**allows**  13:5
  94:22 135:20
**allure**  89:11
**alrighty**  5:25
**alternative**
  199:11
**altogether**  87:5
  195:25
**amount**  27:9,12
  27:13,15 73:14
  126:15 156:17
**amy**  16:12,25
  17:2
**analysis**  99:7
**andrea**  194:4,6
**aneurysm**
  71:14
**angiogram**
  49:13
**angry**  86:19
**anorexic**  165:3
  166:24
**answer**  62:1,3
  62:11,21 64:4
  64:7,13 66:19
  67:1,8,15 68:8
  68:11,16,24
  69:1,3,13,16
  71:7 72:22,24
  108:2,4,5
  124:19 140:13
  143:20 160:7
  165:19 180:24
  181:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

answered   62:2
  67:18,19
answering   5:18
answers   202:8
anthony   1:9
anxious   156:19
anybody   16:25
  17:21 23:3
  34:8 35:24
  37:17,17 77:8
  98:14 111:10
  111:19 113:4
  115:24 119:21
  129:3,20
  132:17,21
  134:10 135:21
  137:23 144:1
  145:21 160:6
  170:13 182:14
  182:21 195:5
  195:11 199:23
aortic   71:14
apart   81:16
apologize   25:4
apparently
  112:4 120:5
  170:8 176:25
appearances
  2:12
appeared   199:5
appearing   2:23
  3:8
apple   32:12,23
  33:4 177:4

applicable
  140:22
apply   129:3
  133:12
appointment
  56:21 57:21
  58:15,20 59:22
  79:9 92:13
  140:21 150:18
  150:20,21
  151:9,10
  181:20,23
  184:11,13
appointments
  26:25 34:5
appreciate
  137:12
appreciated
  165:18
appropriate
  141:1 165:14
  182:17,18,20
  197:8
appropriately
  58:16 89:4
approved
  35:18 164:11
approves
  131:12
approximately
  42:17 152:24
april   136:24
  139:8,11
  154:25 155:16
  155:17 156:10

  156:12,12
  160:11 172:8
  176:20 181:12
  182:5
ar   17:24
area   10:16
areas   48:12
argument
  69:10 86:10
arms   102:24
  164:4
arrange   50:5,7
artery   71:15
articulate
  176:6
asap   179:7
ascension   11:4
ashley   15:20
  16:7
aside   15:14
asked   68:9 70:2
  86:14,18 91:2
  105:16 107:14
  107:22 108:19
  109:22 110:1
  113:13 123:17
  130:22 131:14
  148:24 166:1
  175:25 200:16
asking   27:7
  62:16,17,18
  63:3 67:5,8,11
  67:12 68:16
  69:5,5,7,8,8
  75:15 77:16,20

  90:14,14 93:25
  95:15,17,19
  97:10 107:21
  109:15 113:9
  113:12 126:23
  126:23,25,25
  127:2,6 132:13
  132:18 133:1
  135:1 136:8,18
  159:15 176:21
  176:21 181:10
aspect   80:25
assessment
  56:11 59:2
assigned   14:20
  23:6 150:1,5
  152:10,13,17
assist   8:7 16:17
  53:9
assistant   16:14
  17:1 18:6,13
  18:22 20:15
  39:16,17 43:22
  44:2 54:1,2,4
  54:13,14,16,20
  54:25 55:2,7
  55:15,21 56:12
  56:20,23 57:12
  57:16,17,21,24
  58:20 60:25
  61:5,16,17
  62:18 65:3
  66:18 67:23,24
  68:5,18 75:4
  76:14 79:1

[assistant - belief]                                                                    Page 5

85:8 97:17
101:23 139:18
188:6 191:18
194:18,24
201:5
**assistant's**
56:13,22 61:20
62:20
**assistants**  11:1
11:2 17:8,11
17:16 19:12,19
20:3,8,22,24
21:12,14,19
22:13,17 30:20
39:20 55:19
73:12 74:8,19
74:23 75:9
85:11 105:23
196:5 200:2
**assume**  14:3,13
26:1 27:19
29:1 39:10
72:13,13 81:18
81:23 82:5
90:7 102:21
110:7 121:11
158:16 165:2
**assumed**
188:13
**assuming**
158:16
**assurance**
169:23
**ate**  164:8

**attaching**
145:15
**attend**  196:2
**attendance**
199:23
**attitudes**
197:20
**attorney**  67:20
67:22 69:6
**attorneys**  67:20
107:19 126:2
**auburn**  169:4
**audit**  118:5
121:16
**audited**  117:20
117:23 121:14
122:17,25
123:19,21
124:19 126:7
**auditing**  118:4
124:3
**authenticity**
130:18
**authority**
136:18,19
**authorization**
78:6,8
**authorizations**
49:7,8,8 78:11
**auths**  50:3
**available**  76:16
76:21,23,25
77:2 78:17,22
79:7,8,19 80:2
80:18 105:2

114:8 135:14
135:15,17,21
136:14 142:12
143:10,15
**aware**  5:13
27:8 50:15
62:1,5 95:19
99:10,14
100:10,13
127:9 139:16
169:8 177:11
183:2

**b**

**b**  1:10,16 9:5
174:25
**back**  7:10 14:1
15:14 23:24
47:19 49:3
59:16 64:22,25
75:7 76:3,5
77:5 81:11
91:1,10 94:4
110:22 124:23
126:3 128:16
163:17 166:25
167:21 171:17
179:2,5,6
180:6 181:8,12
182:21 184:8
184:14 197:18
199:10,13
200:15 201:17
**background**
168:5,8

**bad**  34:7 139:1
154:23 168:9
168:12
**badges**  190:21
**badly**  186:18
**balance**  21:16
**bank**  35:2
**barren**  132:24
133:6
**base**  147:24
170:8
**based**  12:21
13:7,10 80:5
85:19 88:7
99:6 145:9
147:21 164:24
174:19
**basically**  53:15
66:8 164:7
**basics**  23:9
**basis**  82:10,18
99:14
**bates**  121:17,19
126:4 131:19
134:11 138:2
145:23,25
173:17 177:15
**beaumont**  11:5
11:6
**behalf**  2:23 3:8
88:6 123:24
**behavior**  41:23
**belding**  133:2
**belief**  62:13
63:1 68:20

73:3
**believe** 6:12
8:16 9:10
35:21 40:11
42:3 43:21
75:6 77:18,20
100:7 108:17
109:21 110:11
126:17 141:14
177:5 189:2
193:19,24
196:3 201:3
**believed** 178:14
**belligerent**
164:21
**benefit** 77:6,9
77:17
**best** 32:21 40:2
57:12,14,15
58:11 59:3
156:11 200:13
**better** 21:22
95:2
**beyond** 74:16
**big** 20:7 28:10
41:20 43:11
49:7 149:15,16
198:11
**biggest** 49:11
**bill** 27:9,10,13
27:15,17 46:18
49:9 50:25
52:4,18,19,22
52:24 53:8
69:20 70:3,12

70:13,14,16,18
70:24 72:1,4
72:10,17,25
78:14,18 80:23
85:19 94:20
95:22 98:25
99:5,11,11
102:4 104:17
104:20 115:5
127:23 135:11
135:14,20
138:22 139:10
139:18,23,24
139:25 143:17
156:15,20,21
157:1,4,11,16
158:1,23 159:1
178:15 181:1,4
181:10,15
182:24,25
183:2 190:14
194:15
**billed** 48:13
52:7 71:3 72:6
76:16 89:3,22
89:23 92:7
95:21 96:17
97:3,5 105:5
105:11 136:15
158:18 191:17
**biller** 16:10,11
45:22 46:2,3
47:16,21,22
48:2 50:9
53:15 60:22

65:20 77:10,15
77:16 78:20,22
78:24,25 79:4
79:6,12,14,14
79:18,25 80:22
88:21 95:1,13
95:13,24,25
96:1,20,21
97:9,16 139:14
179:23 182:23
182:24 191:4
191:12 200:23
**billers** 49:11
52:10,11 80:17
**billing** 45:22,22
45:24,25 47:12
47:17 48:6,22
49:3,5 50:2,3
51:23 52:1,15
53:14 57:3
65:1 71:4 75:4
78:5 81:1
85:14,18,21
88:13,14 89:19
90:3,4,16
91:11,13,14,25
92:1 97:10,18
97:18 100:22
101:6 103:4
104:5,7,7,15
113:5 114:20
115:1,5,6
116:7 117:13
117:25 122:17
126:8,24 127:7

128:20,25
129:10,13
133:3,13,17,25
134:4,8,15,21
135:4 137:7
138:4,19,21
140:3,10,11,24
140:24 143:9
143:12,24
144:3 145:9,10
145:10,11
157:20 158:2
158:12,19
159:22 160:23
169:16 175:14
177:11 178:10
179:3,4,13,17
180:15 182:16
188:13 189:3,5
190:25 191:3
192:8,9 200:18
200:20,21,25
201:1
**billion** 123:8
**bills** 16:4 46:10
48:17,19 84:18
**bit** 47:5 114:4
177:1 178:23
**bitch** 184:20
**bite** 184:19
**biting** 173:2
**blood** 71:15
**bloomfield** 2:1
2:2,17,19 5:1
6:17

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**boca** 32:2
**body** 1:12 8:25
   9:22 15:6,12
   164:3
**book** 142:6,13
   151:12 173:7
**booking** 142:17
**bookkeeper**
   34:22
**books** 150:21
**botox** 150:21
   150:22,22
   151:5,7 152:6
**botsford** 11:6
**bottom** 138:17
**box** 111:7
**break** 81:5,7,10
   93:11 128:8,12
   128:15
**breakdown**
   152:24
**breaugh** 3:1
   4:7 5:18 15:4
   61:2 62:23
   63:5,9 64:18
   67:4,6 68:2,23
   70:7 72:5
   73:16,21,25
   74:10,14 75:1
   81:3,8 93:8
   102:8,15
   123:23 125:2
   128:8,12
   130:10,15,17
   130:20 158:5,8

158:14 162:13
169:18 173:12
173:18 177:5
178:19 192:3
194:23 195:2
200:10,12
201:21
**bridal** 149:19
**brief** 81:5
**briefly** 174:15
**bring** 48:15
   64:14 94:7
**bringing**
   156:13,24
   166:5,6
**broadly** 130:11
**broke** 90:12
**brought** 109:18
   156:1
**bugg** 2:6 202:6
   202:21
**bugging** 159:18
**building** 10:20
   10:21,23 34:15
   76:22,24 78:22
   80:1 92:10
   95:6 143:10
   159:17 177:17
   178:5 183:21
**business** 11:13
   90:6,9 120:14
   152:1 154:11
**businesses** 8:8
   8:23 120:18

**busy** 14:2,2,4
   24:10 34:25
   103:1,3 155:18
   199:18

### c

**c** 90:12 173:3
**cabinet** 111:7
**cabinets** 107:23
   107:25 111:23
**calendar** 32:7
   32:10,11,20,23
   33:4,6,8,12
   83:1,13 101:13
**calendars**
   81:23 82:3
   84:23 85:10
**call** 6:14 9:19
   12:7,13,15,16
   14:8 32:21
   35:25 41:22
   43:14 49:18
   55:11 76:25
   103:4 108:18
   142:25 164:10
**called** 5:5 26:6
   56:24 79:8
   175:15 198:3
**calling** 198:11
**calls** 16:17
   33:11 58:12
   199:19
**calm** 161:24
**capacities** 1:20
**capacity** 6:2
   18:4

**capture** 140:22
**care** 30:18
   87:18 94:24,25
   169:4 182:10
   184:10
**carotid** 71:15
**carrier** 122:8
   137:8 180:16
**carriers** 51:17
**case** 1:7 14:21
   39:2 99:6,7,14
   99:14 103:16
   103:18 117:20
   125:16 162:5
   162:25 176:7
**cases** 6:11,13
   14:14 199:9,10
**cash** 152:1
**catching** 24:24
**category** 176:2
**cath** 13:7
**cause** 184:20
   202:13
**caused** 175:2
   178:16,20
**cc** 34:23 122:6
**cc'd** 123:6
   134:3
**center** 24:8
   29:25 45:10
   201:8
**certain** 8:11
   39:19 41:6
   52:16 62:4
   75:25 88:17

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
                                                     www.veritext.com

91:21 101:11
102:1 118:1
127:8,8 148:6
148:9 200:15
**certainly** 88:23
197:5
**certificate**
202:1
**certification**
54:20 55:9,20
**certify** 202:6
**chain** 121:21
179:8
**chance** 40:23
**change** 30:5
34:24 114:16
133:1 184:11
**changed** 85:19
85:21 109:16
158:11 190:24
**changes** 16:15
30:18 57:7
59:14 119:18
**changing**
140:21 143:6
181:20
**charge** 35:24
39:19 45:25
88:17 140:22
**chart** 53:15,19
56:25 57:1,3
57:13,18,19,20
58:17,19 60:5
60:7,11,17,18
60:21,22 78:21

78:25,25 79:4
79:7,8,9,19,20
79:23,25 80:1
80:2,6 117:13
156:5,7
**charts** 53:13
58:5 79:10
117:19 133:24
133:24 134:1
**cheap** 184:19
**check** 15:4
53:17 101:15
118:17,21,23
119:16 177:10
179:3
**chemical** 164:7
**children**
154:16,18
**christine** 33:22
33:23,25 150:2
**chronic** 128:5
**chronological**
145:5
**cincinnati**
19:17
**circle** 64:15
**circled** 67:3
**circumstance**
98:5 105:1
**circumstances**
75:25 92:6
98:4 101:11,12
102:1 118:1
135:9,10 157:3
174:10 187:12

**citations** 63:6
189:19
**cite** 176:3
**citing** 75:13
200:14
**claiming** 96:5,6
178:7
**claims** 97:2
**clear** 54:11
124:4 160:7
173:9
**client** 33:15
42:8 43:6 47:6
68:18 105:5,8
109:4 112:5
114:24 120:5
121:13 122:11
122:24 123:18
124:9,18 126:4
130:12 131:4
131:14 140:16
146:1 159:15
160:6 171:2
185:16 187:10
**client's** 63:13
64:16 68:21
69:15 96:10
97:1 105:12
107:6 121:8
129:6 132:13
**clinic** 11:8
169:4
**clinical** 161:1,2
161:4

**clock** 199:17
201:17,19
**closing** 133:25
**clot** 71:15
**cms** 45:9,20
52:1 73:11,13
98:8,10,11,19
98:21,22 100:5
112:25 136:20
136:21 176:2
190:2,12,20
**coach** 170:24
**code** 49:24
91:13 128:20
128:25 140:4
190:25 191:3
**coded** 65:5,25
**coder** 48:23
**codes** 49:15
53:16 57:11
59:13 65:10,15
65:16 91:20
95:3 138:4
**coding** 46:10
46:12 65:11,12
65:14
**college** 16:24
54:22
**come** 11:12
12:13 15:14
23:24 30:7,17
30:17 36:16
48:4 55:21
59:16 61:13
64:23,25 72:15

103:9 119:13
142:1 144:18
159:11 160:18
174:12,18
175:4,7 184:18
199:10,13
**comes** 43:22
52:15 54:12,14
94:15 98:15
149:9 181:22
**coming** 23:16
25:24,25 30:14
30:15 31:18
85:6 87:16
94:6 99:7
111:4 123:14
149:16 165:7
174:11 188:14
**commencing**
2:3
**comment**
148:22 190:23
192:6
**commission**
112:17,19,20
147:7 202:24
**commissions**
147:18,20
**communicate**
39:10
**communication**
121:13 132:24
178:22
**communicati...**
120:7

**companies** 50:6
**company** 1:13
1:16,18
**compared**
104:7 156:20
157:2 181:15
**comparison**
199:2
**compensated**
49:25
**complained**
62:14
**complaint**
61:16 62:2,3
62:11,19 64:4
64:8 65:10
66:11,12,24
67:2,14,18
68:9,10,11
69:14 70:1
73:10,20 74:12
75:7 115:16
201:3
**complaints**
56:2 86:8
87:23 96:10
**complete** 59:20
60:12 72:9
**completed**
40:19 42:15,16
42:17 43:5,8
**completely**
16:21 97:9
**completing**
200:24

**compliance**
36:13,18,19
49:3 140:23
143:23,23
182:15
**compliant**
45:20,21
**complicated**
49:17
**component**
59:9
**computer**
23:15 54:5
56:22 89:7
112:17 119:5,9
119:14 141:11
141:13 202:10
**concept** 109:18
119:24 143:21
149:5 154:22
155:16,17
**concern** 117:18
123:18 124:18
140:8 164:13
164:16 165:13
165:17 166:22
167:16 172:4
199:1
**concerned**
117:15 127:11
137:6 143:22
165:9 180:15
**concerns** 115:4
117:10,12
121:8 170:9

179:5,12
**concluded**
201:25
**conditions**
61:23 63:25
**conduct** 88:7
**conducting**
61:22 63:23
**confirm** 131:16
132:13,13,18
132:21
**confirmation**
132:18
**confirming**
113:8 200:17
**confirms**
124:17
**confusing**
143:7
**conjunction**
53:13
**consent** 161:18
161:19 163:5
163:21,22
**consideration**
137:12
**constantly**
123:9
**consulting**
61:21 63:19
**consults** 14:9
**contacted**
121:5
**contacts** 119:21

**[contain - covered]**                                    Page 10

| | | | |
|---|---|---|---|
| **contain**  117:13 | 49:24 50:12,13 | 143:24 144:5 | **counseling**  39:6 |
| **contained** | 50:15 51:19 | 144:10 146:13 | **counter**  165:5 |
| 74:16 | 52:16 53:12,16 | 146:24 147:2 | **county**  7:8 |
| **contents**  4:1 | 53:19 60:2,15 | 147:13,15 | 202:4,23 |
| **context**  131:9 | 60:18 62:8 | 150:25 153:6 | **couple**  9:5 12:1 |
| 148:22,23 | 65:8 66:1 69:4 | 153:15,18 | 18:12 30:23 |
| 167:5 | 69:19 71:2 | 154:14,16,23 | 52:23 66:13 |
| **continue**  137:6 | 72:14,19 75:6 | 154:25 155:3,6 | 78:4 112:22 |
| 137:10 140:25 | 77:19 79:2,20 | 156:13,17,22 | 115:21 145:1 |
| 180:15,21 | 80:2 82:7 83:4 | 157:5,12,17,23 | 200:10 |
| 182:16 | 83:9 84:19 | 158:21 165:22 | **course**  54:17 |
| **continues** | 88:12 91:13 | 167:13 168:23 | 94:25 105:13 |
| 128:1 | 92:8,11,14 | 170:25 171:3,4 | 125:8 150:19 |
| **control**  70:18 | 94:16 96:12 | 171:22,25 | 151:25 167:15 |
| 70:20 71:24 | 100:19,24 | 173:18 177:1 | 182:24 |
| **conversation** | 101:7 102:4 | 178:1,11,16 | **coursework** |
| 35:17 77:14 | 104:20 107:1,3 | 181:5 182:7,25 | 54:24 |
| **converted** | 107:6 108:7,9 | 183:16,24 | **court**  1:1 5:21 |
| 48:19 | 109:5,24 110:8 | 184:8,24 185:4 | 6:13 7:7 64:5 |
| **coordinator** | 113:5 115:1,8 | 186:22 191:1,4 | 67:14,15 73:7 |
| 16:8 20:18 | 115:10,12,19 | 191:10,13,19 | 73:20 124:11 |
| **copies**  105:19 | 116:3,4,20,24 | 191:22 196:8 | 176:7 |
| **copy**  38:7,9 | 116:25 117:5 | 196:10,13,18 | **courts**  6:11 |
| 42:2,6 64:14 | 117:20 118:11 | 197:13,14 | **cover**  17:9,20 |
| 66:11 105:12 | 118:18,20 | 198:1 202:11 | 21:17,18 22:4 |
| 105:14,16 | 119:20 122:1,8 | **correctly**  57:7 | 22:7,18 23:22 |
| **corewell**  11:6,7 | 124:25 127:13 | 57:8 65:5 95:1 | 23:25 41:15 |
| **corporate**  7:19 | 127:14 128:20 | 95:22 171:12 | 59:7 153:3 |
| 8:6 9:19,23 | 128:22,22,23 | 182:11 | 154:1 155:10 |
| 10:11 11:19 | 129:8,15 | **correlates**  41:8 | 155:24 193:1 |
| 88:23 93:3 | 132:19 133:22 | **cosmetic**  86:12 | 193:16 198:10 |
| 94:7 | 134:21 135:2,2 | **counsel**  170:24 | 199:8,10,19 |
| **correct**  8:18 | 135:3 137:19 | 200:4 202:12 | **covered**  22:21 |
| 20:14 21:16 | 138:12 139:8 | **counseled** | 44:6 45:14 |
| 27:11 45:14 | 142:9 143:17 | 200:6 | 49:6 85:11 |

131:5,7,16
132:14,16
153:5 161:25
**covering** 22:23
22:24 152:18
**covers** 41:16
**covid** 46:6 48:1
85:17,19,24
90:11,12,24,25
98:1,2,22,23
99:6,12,17,23
100:18,22
101:9,17,21
102:17,20,21
102:23 103:1,7
103:8,10,11,15
103:21 112:22
112:25 113:4
113:13,15,19
113:25 114:17
116:8,12,15,16
135:8,24
136:13 143:13
143:14 145:16
157:6 175:17
176:1
**crazy** 173:4
174:2
**create** 46:18
88:5
**created** 8:1,2
88:12
**credentials**
34:24

**criteria** 54:15
137:10
**critical** 88:10
**crr** 2:6
**csr** 2:6 202:21
**cure** 128:4
**current** 6:16
**currently** 7:17
9:21 14:15
**cush** 173:3
**cut** 102:23
**cv** 1:7

**d**

**d** 1:10,16 9:5
**d.o.** 1:10,14,16
1:18
**danger** 170:6
**daryl** 18:19,22
18:24 22:22
23:2,3,6,22
53:8 133:2
150:5 153:5
155:2,5,10
157:10 172:9
172:13,20,23
185:9,11,16
198:24 199:1
**date** 28:5 38:16
113:23 147:13
153:20 161:14
162:6,18
178:25 185:1
185:22,23
202:7

**dated** 66:12
67:2 139:8
**dates** 6:9
**day** 24:2,9
25:25 28:6,14
30:11,13 31:4
35:5 58:3,3
80:24 82:23
83:8 85:12
109:2 140:15
144:15 151:11
163:6,8 175:7
179:9 181:10
185:7,8,12,15
185:24 187:18
196:17,17
197:22,22
**days** 12:17
13:13,23 14:11
14:12 24:10,15
25:7,17 30:6
30:13,21,25
31:3,21 41:21
81:13 82:24
83:11,23,24,25
84:3 85:7,9,11
85:15 87:12
135:13 187:19
**deals** 106:18
**deb** 5:11
**deborah** 2:14
2:16
**deborahgord...**
2:21,22

**decide** 26:21
**decided** 21:22
31:3 146:16
176:25,25
185:15
**decipher** 5:22
**decision** 16:19
31:4,10,10
110:15 144:12
144:15,21
183:18,20
185:6
**decreases**
164:9
**defendant**
66:21 67:21
**defendants**
1:21 3:8 62:12
62:21 68:19
70:3 72:1,17
72:23,24,25
73:2 173:16
**definite** 94:15
**definitely**
115:18 142:3
**definition**
73:17 77:3
**degree** 54:22
**delete** 119:10
**demand** 13:21
**demeanor**
196:17
**denied** 66:20
68:17 69:15,19

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**deny** 62:15
72:22 73:4
160:15 190:4
**denying** 73:5,6
**dep** 130:8
132:3 137:15
162:12 176:6
**department**
45:23,24,25
**depends** 12:19
12:19,24 13:2
23:18 28:23
74:24 76:9
131:7,9
**deposed** 5:25
6:2
**deposition** 1:25
123:15 125:7
138:15 162:8
162:18 177:22
201:25 202:7
**depositions** 6:7
**dequindre** 11:5
**derek** 1:16,18
6:23,24 17:10
23:23 24:13
33:5 47:2 53:7
146:5,7 153:3
157:9 176:13
176:21,21
177:11,14
178:16,20,22
179:5,9,10,11
179:13 182:12
183:16,19

184:2,9,10,18
184:19 185:17
186:3,5,6,15,16
**derek's** 22:4
23:22
**described**
167:12 171:2
**description**
58:7
**desk** 11:1 15:19
15:20,21 51:12
51:13 142:23
**detail** 75:14
**details** 89:6
**dgordon** 2:21
**diagnose**
127:16
**diagnosed**
127:25 128:19
128:24 129:1,2
**diagnoses** 59:1
59:13 117:13
117:15,19
122:15 126:5
126:22,23,25
127:1,2,6,12
129:7
**diagnosing**
61:23 63:25
**diagnosis** 57:11
117:14,25
122:15 126:6
126:11 128:1
129:7 131:5,7
131:10,13,16

132:14,16
**diagnostic**
61:24 64:2
**diaz** 110:21
**different** 16:21
17:3,4 26:19
36:15 45:4,5
46:22 48:18
49:13 57:11
63:6 65:7 78:6
87:24 88:18
91:22,22,24,25
97:11,11 103:2
106:14 116:8
164:2 186:19
198:4
**direct** 9:16
169:4
**direction**
186:19
**directly** 34:19
50:6 115:8,10
115:14 152:7
160:7
**director** 9:8
**dirty** 188:16
196:22
**disability** 8:14
36:14,15
**disappointed**
152:6
**disciplinary**
196:8
**discipline**
196:10 200:4

**disciplined**
199:23 200:3
**discuss** 39:21
137:11 144:24
180:21
**discussed** 78:16
134:19 145:1
168:13 180:18
198:12
**discussing**
134:10 161:20
**discussion**
44:11 52:9
86:9 130:4
136:9 146:6
166:5 197:10
**disease** 45:5
71:17 128:5
130:5,23 131:1
**disrespectful**
34:4 162:1
**distinction** 92:3
**distributed**
114:15 151:22
**district** 1:1,2
**division** 1:3
**divorce** 7:9
**dmc** 9:12,14,17
**doctor** 5:11,25
15:10 19:17
57:24 66:13
67:13 71:10
73:15 75:16
77:15 78:14
81:13 89:16

91:14 92:6
102:6 121:21
127:4 134:13
150:24 156:13
156:15,24
157:1,7,10
158:24 159:8
163:19 172:8
175:21,21,25
200:8 201:23
**doctor's** 92:8
144:9 157:2
**doctors** 19:22
19:25 20:1
32:18,20,25
52:11 104:20
114:18 129:4
134:5,23 135:4
**document**
29:11,14 46:15
66:25 67:13
123:14 124:8
124:16 126:3
127:7 138:8
145:8 173:21
**documentation**
58:11 88:12
147:8,10,11
159:8
**documented**
39:22 57:6,8
59:10,15,25
60:13
**documenting**
60:4 188:7

189:18
**documents**
40:13,18 50:4
50:4 120:24
132:9 158:1,7
189:19,22
190:20
**doing** 12:21
13:7,9,24 19:4
22:9,9 24:22
25:20 39:13
40:2,6,7 44:12
44:17 65:17
76:11 86:17
87:15,21 88:3
90:11 95:11
96:7,11 116:24
157:8,9,10,21
158:18 159:10
161:19 167:13
170:5 172:23
182:10 190:12
192:17
**domestic** 1:17
**doppler** 132:14
**double** 15:4
53:17
**dr** 7:8 8:5,6,20
10:14 11:3,11
14:3 17:21
19:23 20:4,9
25:6,16 31:21
32:25 34:19
44:2,19 45:13
70:16 79:8,12

89:8 112:24
120:16 133:2,3
133:11 136:25
142:11,25
143:3 152:15
160:5 180:14
181:15 200:15
**dressing** 16:15
30:4,18 57:7,8
59:14
**drhill** 120:19
120:20
**drhill.com**
122:6
**dropped** 7:15
**duly** 5:6
**duties** 21:20
60:24 61:6,16
61:20 62:20
63:9,11,14
64:16 68:17,21
69:15 201:7

### e

**e** 131:8
**earlier** 78:24
146:21 148:17
148:21 180:19
**early** 198:12,19
**earning** 19:10
**east** 10:10,19
**eastern** 1:2
**easy** 10:15
169:21
**edmunds** 1:8

**education**
50:14
**effect** 103:9
145:17
**eight** 6:19
13:13 142:1,2
155:11,18
157:9
**either** 14:7 58:3
61:10 84:1
108:11 126:19
132:1 150:9
151:4 171:8
183:14 202:12
**electronic** 38:8
151:16
**elementary**
154:20,21
**elizabeth** 1:10
1:12,13,14,25
2:15 4:4 5:4
8:25 9:22 15:6
15:12 118:13
119:2,12 120:1
120:11 121:25
122:7 177:17
178:5 179:6
183:21 184:12
184:13
**elizabethmed...**
119:2 120:1,11
**elizabethmed...**
121:25 122:6,7
**email** 34:22
111:22 116:11

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[email - everybody]**

116:15 117:6
118:9,14
119:21 120:1,3
120:4,11,12,20
121:10,21
123:2,12
124:10 125:18
125:19 126:17
129:17,22
131:15 134:2,9
134:25 136:9
136:24 137:2,4
138:18 139:22
140:18 145:6
159:4 177:10
177:16,25,25
178:3,17,17,20
179:3,11,14
181:13 183:17
201:17
**emailed** 115:9
115:9,17 117:4
117:4,8 121:9
**emails** 16:4
115:11,12
119:6 120:2,22
121:6 122:13
123:8 125:10
125:15,15,20
125:21,21,23
125:25 130:11
132:6,10
189:17 196:23
197:17

**emarzottotay...**
2:22
**emergencies**
12:8
**emergency**
13:25 14:9
32:21 82:12,12
199:20
**emphatic** 124:2
**emphatically**
124:22
**employed** 7:17
8:19 9:12
19:22 114:25
**employee** 7:19
9:16,18 34:7,9
35:6 36:13,17
38:10,15,19
40:5,23 41:14
109:24 111:8
135:1 151:18
170:22 197:11
197:13 200:20
200:22
**employees** 8:13
8:15 14:15,20
16:3 17:24
19:25 20:1
32:24 33:15
39:6 40:10
41:1 42:4
43:15,20,21
51:13 87:23
108:21 114:15
120:19,22

148:9 149:25
150:4 151:15
170:24 197:16
197:19 201:16
201:18
**employer** 7:21
8:17
**employment**
105:13 115:2
191:25
**emptying** 164:9
**emr** 26:10
33:10 48:16
**emrs** 46:22,24
**ended** 98:1
171:13
**ends** 144:8
**energy** 175:11
**enforce** 199:21
**enforcing**
199:18
**ensure** 65:4
133:16 140:23
182:15
**entails** 44:13
**entities** 8:3
9:19 10:11
11:9,19 15:5
**entity** 7:19 8:2
8:6 9:9,20,23
88:23 93:3,9
94:7 113:1
**ep** 138:9
**epensler**
120:13,21

121:4,11 122:1
**epic** 26:8,11
33:8,13 37:11
37:15 46:22
47:18 48:15,16
48:19,20 51:9
133:12 138:19
138:21 140:20
181:19
**equinox** 84:10
149:24
**er** 12:13
**eric** 186:4
**erin** 18:2
**errors** 170:25
**especially** 59:9
**essentially**
11:16 148:2
**established**
9:25 26:16,19
**europe** 81:22
**evaluated**
164:23
**evaluation** 56:7
**evaluations**
37:24
**event** 143:21
149:20 166:9
202:13
**events** 149:16
149:18,19,19
149:21 154:8
154:12
**everybody**
32:24 33:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

39:25 42:6
43:12,15
116:11 140:16
142:1 198:13
**everybody's**
37:12
**everyone's**
137:12
**evidence**  161:4
**ex**  34:9,9
**exact**  174:3
**exactly**  41:19
67:9 100:16,21
142:5 144:6
155:17 178:25
189:13
**exam**  56:9,10
57:5 58:24
59:9
**examination**
4:6,7 5:9
200:11
**examinations**
30:4
**examine**  30:2
44:15 58:10
61:9
**examined**  5:8
**examining**
61:22 63:19
**example**  36:21
44:5 49:12
78:7 92:10
150:17 181:21
181:21

**examples**  52:24
78:4
**excellent**  168:5
**except**  36:9
111:9 126:14
173:9 200:22
**excuse**  65:10
71:7 84:18
99:11
**exercise**  84:14
**exhibit**  4:11
200:14
**exhibits**  4:9,12
**exist**  43:9
108:16 122:16
126:6 129:8,10
151:14 156:4
**existed**  129:9
**existence**  9:9
**existent**  117:14
128:3
**exists**  112:23
116:22 147:1
153:14
**expectation**
23:24
**expected**
157:25 163:12
192:1
**experience**  36:8
193:20
**expert**  67:22
119:4
**expertise**  10:16
20:13 48:12

65:24
**expires**  202:24
**explain**  37:2
44:13 88:16
97:13 116:6
161:24 200:18
**explained**  52:4
52:6 175:17
189:15,16
**explaining**
116:19
**expose**  102:6
**extra**  61:13
66:10 87:11
**extraordinarily**
196:23

## f

**face**  1:12 8:25
9:22 15:6,12
80:1 173:3
**faced**  196:24,25
197:1,5
**facials**  10:5,5
**facilities**  13:9
**facility**  78:17
78:18 149:22
159:1,6
**fact**  124:9,16
163:14 175:14
**facts**  62:4
**fair**  61:3 74:2
121:5 146:18
162:19,24
197:23

**fairly**  186:20
**fake**  169:16
**familiar**  29:22
52:1 77:5,8,11
77:17,22,25
78:1,10,13
134:6 137:13
173:8 177:20
201:6,10,11
**far**  5:18 36:4
45:21 50:25
52:14 67:19
88:4 95:3,4
106:2 183:25
196:2,7
**farmington**  3:5
11:7
**fast**  190:18
**fault**  111:12
**fbi**  90:20,22
**fda**  164:11
**february**  145:7
**federal**  64:5
69:21 70:5
72:3,19 73:7
73:20 176:7
**fee**  73:13
**feel**  27:11 39:3
180:7,10
197:19
**feelings**  167:12
185:19
**feels**  87:2
**felt**  19:4 133:21
186:18 198:19

**ferndale** 7:22
7:23 8:4,10,15
8:18,22 10:10
10:19 179:7
**field** 36:8
149:23 168:16
201:11
**fights** 87:22
**figure** 29:14
46:21 49:18
65:8 116:3,4
187:15,15
**figuring** 49:9
49:14 66:9
156:11 182:11
**file** 7:9,10 38:7
38:12,16,22
39:1 73:19
105:12,17
107:6,10,13,15
107:18,21,22
107:23 108:2
108:12,15,16
109:15,20
110:18 111:20
111:23 112:5
**filed** 6:11 7:8
62:2,3 64:5
67:18 94:1,5
**files** 105:19
106:22,25
108:6 111:8
**filing** 107:24
**fill** 51:7 57:13
57:22 91:18

**filled** 37:12
58:24 59:17
65:7
**fillers** 10:7
149:11
**filling** 80:12
**fills** 97:14
**filthy** 162:3
**final** 57:18
**finally** 201:16
**financial**
104:19
**find** 35:4 49:24
92:20 100:2,4
103:15 107:15
108:15 111:5,6
125:24
**finding** 117:15
122:16 126:6
127:16,22
129:8
**finds** 172:3
**fine** 81:6 120:8
128:7
**finish** 79:16
127:18 128:9
128:18 160:3
**finished** 42:10
42:12,13
**fire** 144:12,15
176:24 185:8
185:15
**fired** 96:6
111:17,18
146:1 161:12

170:23 176:14
176:18,19,20
176:22 187:21
190:9 192:19
**firing** 96:9
145:1
**firm** 67:25
**first** 5:6 26:14
28:4 53:8 59:6
63:9 85:25
92:13 134:12
144:24 163:6,8
174:4 181:23
**fish** 118:22
**fishy** 185:12,18
**fit** 154:23
**five** 12:25 13:2
13:14 19:22
28:12,13 44:25
82:24 83:23,24
112:20 179:9
193:19
**fix** 169:22
**florida** 81:20
81:21
**folder** 60:23
**follow** 31:17
59:15 109:22
116:7 137:6
172:2 180:14
199:22 201:18
**following**
140:18 184:6
**follows** 5:8

**food** 164:10
**ford** 11:24,24
133:7 149:23
**foregoing**
202:8
**forever** 128:1
**form** 37:12
42:2 59:3 61:2
62:13,23 63:1
63:5 64:19
67:7 68:20,23
70:7 72:5 73:3
73:16,18 74:10
75:1 93:8
123:23 125:2
130:10 139:1
161:18,19
163:5,21,22
169:18 173:12
175:2 192:3
194:24
**formal** 50:11
147:17
**format** 40:4
100:10
**formed** 63:10
120:18
**forth** 62:3
197:18 202:8
**forward** 140:22
182:15
**found** 21:18
100:21
**four** 13:2,19,23
17:25 18:10

**[four - going]** Page 17

166:17,18
186:8
**fraud** 89:19
95:8,9,19
**fraudulent**
89:24 192:9
**fraudulently**
190:14
**friday** 24:15
30:10 31:22
**front** 11:1
15:19,20,21
51:12,13 66:24
67:13 79:20
80:6 126:3
130:11 142:23
161:9 162:1
**ft** 133:12
**full** 156:16
202:10
**fun** 5:21,21
**funds** 11:12
**further** 163:23

**g**

**g** 1:8 17:5
**gabby** 150:2
**general** 29:20
59:24 62:18
66:22,23,23
67:7 118:14
152:9 170:13
201:7
**generate** 157:7
**getting** 21:20
40:18 48:18

78:10 83:8
104:14 121:7
130:23 137:25
140:3 145:19
189:21 190:13
191:21
**girlfriend**
19:17
**gist** 182:8
**give** 5:19 10:3
28:11 34:21
36:21 40:3
41:18 49:12
52:23 67:1
70:22 78:3,7
91:6 105:21
116:16 118:7
120:3,25
123:15 125:6
125:23 130:1
150:17 153:20
155:2,10 158:6
159:23 160:11
162:3 164:17
166:24 167:1
170:9,13
171:18,20
176:9,10 185:9
185:16 189:1
190:19,22
**given** 12:1
19:20 24:8
30:10 33:3
37:23 41:5
113:23 114:17

125:25 200:13
**giving** 95:16
152:6 164:15
165:24 188:16
**go** 9:1 11:14,14
12:25 14:8
15:15 16:21
19:1 20:21
22:5,8 28:19
29:4,18 31:5
31:17 33:21
39:13 41:9
44:16,20 45:3
45:5 47:19
51:6 53:8
54:17 56:13
58:8,9,10
60:16 61:5
66:13 71:21
72:1,8 75:7
76:3,5 80:9,17
81:7,21,21
89:2 91:1,10
94:4,4,4 99:21
107:24 116:2
118:15 124:7
124:13 125:24
126:3 127:19
127:21 128:5
128:11,14
132:12 134:13
148:25 149:1
150:18 151:2
151:23 152:21
153:13,17

154:12,13
159:13 160:2
160:12 171:18
184:7,14
188:24 190:19
194:2 201:16
**goal** 41:20
199:4
**god** 126:17
**goes** 44:18 50:2
79:4 83:23
93:5 118:16
163:17
**going** 7:9 13:19
13:22 20:7
21:20 22:1
23:17 29:10,14
31:5,11 35:25
44:14,14 57:9
59:7 61:15
64:13,14,15,18
64:22,25,25
65:1 66:10,11
67:1,4,6 69:10
70:1,3 72:23
81:24 82:6
83:18 84:6,23
85:3,15 91:1
91:10 104:5,10
111:12 119:4,5
120:24 121:17
127:12 128:11
134:18 137:3
142:3,8 145:23
145:24,24

149:18 150:22
153:12 154:8
154:22 155:2
156:25 157:19
157:21 158:1,2
158:11,12
161:10,18,22
163:23 164:17
164:23 166:11
166:24 167:2,4
167:5,22 168:1
169:24 170:11
171:20 172:4,7
173:12,20
174:16 176:24
177:16 178:4
178:17 179:14
182:18 183:13
183:17 184:2
185:6,7,8,16
186:19 188:8,9
188:11,11
189:11,22
190:14,18,19
191:16,21
192:1,3 194:16
194:23 197:17
197:18 198:13
198:14 200:15
201:2
**good** 50:17
81:8 87:7,9
94:11 137:5
140:17 147:9
168:21 179:5

183:11 189:17
**goodman**
138:11
**gordon** 2:14,16
4:6 5:10,11,24
15:8,9 61:3,4
62:24,25 63:8
63:12 64:21,24
67:10 68:3,25
70:9 72:7
73:18,23 74:2
74:3,11,17,18
75:2 81:6,9,12
93:10 102:10
102:16 123:25
125:5 128:10
128:14,17
130:13,16,19
130:22,25
158:6,10,15
162:15 169:20
173:15,19
177:7,8 178:21
192:5 195:1,4
200:7 201:23
**gotten** 42:8
98:6,13,16,24
119:16 181:14
183:10
**government**
51:15,24 52:15
52:25 88:13
90:8,10,18
92:1,23 94:16
94:21 95:21

113:24 127:7
127:11 160:8
161:5 189:19
200:18
**governmental**
27:4,6 159:23
**graduate** 16:24
**grand** 174:5
**grasping** 188:2
**grew** 13:21
87:12
**gross** 178:8
**grossly** 89:24
102:24
**group** 7:24
9:16 146:6
166:5 195:1
**groups** 15:11
39:5
**guess** 18:19
26:14 29:7
32:16 35:15
37:23 53:7
60:22 62:17
69:16 89:11
90:22 115:2
145:24 151:8
163:4 190:7
193:5 200:19
201:6
**guessing**
100:15 105:10
110:12
**guidance**
181:13

**guidelines** 52:1
73:11 173:9
190:2,12
**gunny** 17:2
**guys** 48:24 81:6
183:12 198:3

**h**

**h** 131:8 173:3,3
**ha** 40:20
**hair** 10:6
**half** 9:13 18:25
27:14 45:3
163:11 184:6
**hall** 159:11
**hand** 64:13
66:11 70:1
121:17 124:16
131:19 134:11
137:3 138:2
145:23,24
191:8
**handbook**
36:13 41:12,13
41:14,25 42:11
42:22 43:7
**handed** 124:8
132:6 175:24
**handing** 67:1
73:10
**handle** 31:20
36:11,19 37:6
37:9 39:4
**handled** 39:17
52:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**handles** 30:19
**handling** 12:11
 48:19 56:21
 152:14 192:7
**hang** 15:23
 79:13 99:4
 101:21 114:24
 122:22 123:5
 124:2,6,11
 136:1 152:20
 160:3 181:11
 182:21
**hanging** 148:18
 148:18
**hanna** 33:20,23
**happen** 60:15
 60:15 119:24
 134:18 135:7
 142:24 198:15
**happened**
 18:24 19:16
 34:11 47:10
 58:15 62:4
 80:24 86:4
 90:5 97:23
 105:15 107:8
 107:17 160:9
 171:10 187:22
 188:21 192:15
 194:21
**happening**
 21:18 101:22
 149:12 171:25
**happens** 56:8
 56:24 57:2

 60:6,20 97:24
 185:22,23
**happy** 159:11
**hard** 38:7,9
 42:2,6 94:12
 105:12,14,16
 105:19 165:4
 193:16 199:18
**harmful** 167:14
**harper** 9:15
**he'll** 14:8,9
 155:10 184:19
**head** 184:9
**heading** 122:5
 136:21
**health** 3:2 8:13
 133:7
**healthy** 167:1
**heard** 51:16
 82:16 118:8
 121:16 123:21
 124:2 140:18
 176:4 181:9
 182:14,21
 183:11 192:9
 198:4
**held** 186:10
**help** 16:16,16
 16:19 22:6
 23:24 39:7
 50:7 51:13
 58:11,12 87:2
 87:20 95:2
 134:12 153:2
 159:11 199:11

 199:13
**helping** 106:17
**helps** 16:3,3,4
 53:11
**henry** 11:24,24
 133:6
**hereinbefore**
 202:7
**hey** 153:9,17
 159:18 170:5
 170:10 175:21
 183:11
**hfhs** 133:6
**hi** 5:11,12
 122:13 134:14
 145:7 174:16
 183:11
**hide** 22:12
**hiding** 21:19
 87:20
**high** 154:21
**higher** 13:21
 20:6 22:22
 31:15 157:16
 158:21
**highest** 35:6
 156:20
**highway** 3:3
**hill** 1:16,16,18
 6:23,24 7:8 8:5
 8:6,20 10:14
 10:15 11:3
 14:3 19:23
 20:4,9 22:19
 25:6,16 33:1

 34:19 44:2,19
 45:13 70:16
 71:21 120:16
 136:25 176:13
 176:21 177:11
 177:14 178:16
 178:20,22
 179:5,11
 180:14 182:12
 185:17 201:8
**hill's** 11:11
 17:21 31:21
 112:24 133:2
 152:15
**hills** 2:1,2,17
 2:19 3:5 5:1
 6:17 169:4
**hip** 10:17 70:17
 70:21,23 71:23
**hipaa** 37:11
**hire** 16:3 18:6
 44:11,16 47:24
 51:2,5 158:24
**hired** 18:10
 37:22 42:9
 44:24,25 47:25
 48:5 51:11
 55:8 68:1
 85:25 90:9
 97:16 150:8,10
 193:25 194:1
 195:5,6,6,11
 201:5
**hiring** 20:2
 55:2 192:16

193:21
**histories** 61:21
63:17
**history** 59:5
**hit** 122:13
**hmm** 7:6 11:20
21:8 25:8,13
28:7,15 38:23
53:20 69:23
75:17,21 76:19
81:25 82:8,23
83:17,20 92:2
93:15 94:17
108:10 114:12
122:9,12,19
133:8 137:14
139:9 141:3
146:11 152:2
174:17 176:5
180:20 183:15
186:9 192:12
**hmms** 5:20
**hold** 64:21 77:1
77:4 89:1
**holding** 154:12
**home** 6:16
31:23 32:3
81:20,21
**homes** 32:5
149:18
**hon** 1:8
**hope** 59:17
**hopefully** 59:18
**horrible** 149:9

**hospital** 11:3,8
12:2,3,18,22,23
13:5,18,24
14:1,8,11
24:23 46:24
48:5,9,11 52:8
52:8 66:4
72:16 82:14
102:21 103:3
**hospitals** 11:23
12:15,16 99:24
**hour** 13:1
27:10,14 45:3
45:3 184:7
**hourly** 157:16
**hours** 13:3
14:13 24:13
198:20
**how's** 174:16
**hpi** 59:5
**huge** 136:21
176:2
**human** 35:25
36:5,8,11
**hundred**
104:11,12,22
104:24
**huron** 25:21
**hurt** 185:19
**husband** 21:22
35:5 67:25
81:17 86:9,18
94:13 110:7,16
144:23,25
146:16 160:6

162:6,23
173:22 174:2,4
174:18,24,25
175:4,6,8
178:24 185:11
186:5 190:7
197:7 199:19
**husband's**
34:23 93:18
175:21
**hustle** 184:20
**hutzel** 9:15
**hydro** 10:5
**hypothetically**
56:20 150:20
**hysterical**
167:7

**i**

**idea** 14:5 22:6
55:1 88:24
89:3,4 90:7
94:25 156:12
167:24 183:22
**ideas** 146:20
**identify** 137:4
**identifying**
162:5
**important** 82:5
94:20 125:14
139:17,20
140:13
**impression**
175:2
**improper**
117:18 130:13

130:14,24
**improve** 39:8
154:11
**improving**
153:19
**inaccurate** 74:6
96:13
**inappropriate**
41:23 161:12
**incident** 76:18
77:3 116:7
137:10 145:10
175:16 178:8
179:20
**incidents** 196:8
**include** 63:10
63:16 197:25
**included** 39:15
41:18 61:20
129:23
**including** 69:21
70:4,16 71:14
71:22 72:2,18
140:17 145:18
**income** 92:23
93:1
**incorrect** 69:1
116:19 135:2
**increase** 87:15
**increases** 164:8
**incredibly**
176:2
**increment**
27:14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**increments** 27:14

**indicate** 140:20 181:18

**indicated** 99:13 99:16 165:5 191:20

**individual** 1:14 1:19,20

**information** 46:11,17 58:1 62:12,22 68:19 72:23 73:2 98:7,18 116:11 137:18 145:16 145:17 176:1

**initial** 56:5,6

**initially** 87:9 87:25

**inject** 150:22

**injectables** 18:4 21:25

**injected** 164:1

**injection** 61:10 163:25 166:15

**injections** 30:3 30:3 149:11 150:25 151:3,5 172:10,13,18 172:20,23

**injector** 18:3

**input** 64:7,10 137:18

**inputted** 58:1 78:25

**insert** 150:22

**insight** 175:15

**insisted** 158:19

**insisting** 157:3 157:20 180:8

**instagram** 149:22

**instance** 88:22

**instances** 97:12

**institute** 1:11 8:25 9:3,7 71:13

**instructing** 112:24

**insufficiency** 126:9,10,11,12 127:15,23,23 128:3,4,18,19 129:14

**insurance** 8:13 50:5,24 51:17 51:18 69:20 70:3,12,13 72:2,10,12,14 72:17,25 85:20 136:3 137:8 180:16

**insurers** 116:6 135:24 136:11

**intelligent** 168:3 169:11

**intentionally** 108:12

**interest** 8:23 20:7

**interested** 202:13

**interrupt** 55:5 57:10 88:5 127:4

**interventional** 13:8

**interview** 91:8

**interviewing** 192:22 193:6 195:9

**interviews** 192:17 193:8

**introduced** 200:13

**investigate** 96:16 97:1

**investigation** 90:10,20 96:14 96:18,23

**invite** 32:13

**invizion** 151:16 156:5

**involved** 6:13 9:21 10:11 13:17 62:7 80:25 102:25 195:15

**involves** 49:3,5

**involving** 7:8 138:1

**iphone** 162:4

**irate** 161:21

**issue** 40:16 50:3 89:21

120:10 122:25 141:6 147:12 165:9 188:13 198:11

**issued** 112:25 113:24

**issues** 31:15,15 36:14,16 37:24 39:16 43:11 45:22 56:3 58:13 59:8 115:8 116:2 117:20 122:17 126:7 136:10 146:23 167:3 199:24

**it'd** 139:20

**it'll** 185:12,17

**j**

**j** 133:11

**jamie** 86:3,4 149:3

**january** 51:22 129:18,22

**jcaho** 36:20,22 36:23,24

**jennifer** 34:4 106:13,17 107:21 110:21 118:16 148:16

**jenny** 109:21 123:13 150:23 151:4 154:6,15 155:9 166:12

**joanne** 2:6
202:6,21
**job** 2:8 14:25
18:1 44:7,8
54:19 58:7
60:24 61:20
62:20 63:9,11
63:14 68:21
69:15 80:12,16
87:7,9 89:12
89:17 147:9
148:7 152:18
172:3 173:3
185:4 192:7
193:15
**jobs** 22:25
**join** 18:16
**joined** 47:7
**jointly** 1:19
**judge** 1:9
**judgment**
161:1,2,4
**julia** 1:5 3:11
17:12 18:6,7,8
18:9 19:15
21:4,5 23:1,4,6
44:24,24
109:23 110:7
110:14 111:17
112:14,15
115:8 116:23
117:4 122:4,6
125:21 129:17
129:23 132:17
133:2,16 134:2

134:4,8,14,20
136:15 137:5
137:12,18
140:3 142:2
144:10,12,15
144:18 145:6,7
145:15,17,21
146:21 147:2
147:12 148:13
149:1,3 150:2
150:9 151:4
152:5,13 153:9
154:6,12,16,23
155:5,22 156:9
156:21,24
157:2,8,25
158:18 159:6
159:10,12,24
160:12 164:13
165:9 169:10
170:14 171:14
171:18 173:2
176:9,13,22
177:17 178:1,4
178:14,18
179:1,10,15,16
179:22 183:10
183:18,21
184:24 186:3,7
186:8 188:23
189:21 190:1
191:17,24
195:12,23
196:8 198:19
198:22,23

200:16 201:5
**julia's** 140:1
148:15 157:19
158:13 166:22
168:3 179:4,12
182:13 185:3
188:22 189:17
197:7 201:7
**july** 111:2
**june** 111:15,15

## k

**k** 173:3
**katie** 15:20
16:7
**keep** 23:14 32:7
38:11 57:9
64:22,25 65:1
**keeping** 37:18
38:2
**kendall** 17:14
18:14,15 19:15
105:9 195:12
**kept** 33:7 87:10
105:19 106:22
148:15 176:16
**kettle** 118:22
**kind** 7:7 10:4
13:20,24 14:5
14:10 16:18
18:19 20:19
21:20 22:12,20
26:20,22 32:7
36:11,13,20
37:22 39:19
44:7 45:5,7

48:8,21,24
49:16 55:15
59:1 61:10
66:3 72:14
75:5,14 91:2,3
91:4 147:12
167:5 197:22
197:23 200:14
**kinds** 82:9
168:25
**knee** 10:17
70:17 71:22
**knew** 29:10
35:13 100:25
101:4 103:12
133:21 142:1,8
142:18 154:16
170:1,4,6
192:7
**know** 5:15,16
5:21 7:25
12:25 13:1
14:1,8,10,25
18:5,15,20
19:1 20:6 22:9
22:24,25 23:16
26:3,24 27:6,8
28:19 29:13
32:12 33:10
34:3,23 35:1
36:14 37:6
39:6 40:1
41:11,16,19,21
43:11,12,14,15
43:15,16 44:13

44:15 45:4,7
45:19 49:6,14
50:8,13,17,24
51:24 52:12,13
54:17,18 56:11
58:11 60:9,14
60:24 61:5,7
63:13 68:12,24
69:2,3,5,17,17
69:18 70:11,11
70:20,20 73:7
73:8 75:3,18
76:18 77:11,20
77:23 78:20,22
79:6,12,18,21
79:25 80:4
83:15,16 84:4
85:10 87:11,11
87:24 88:21
89:5,6 91:3,24
92:15 94:20
95:8,10,10,11
95:12,13,23
96:3,12 97:5,8
97:14 101:3,5
102:9 105:11
105:15,21
107:17,18
108:4,20
111:11 113:7
113:21,22,25
114:2 115:7,20
118:24 119:7
119:17 120:3
120:15 126:16

126:18,20,21
126:21,22
127:3 129:19
130:20 131:14
132:22,25
133:20 134:17
135:1 136:18
138:7,24
139:12,14
140:2,13
142:19 144:6
159:10 160:25
163:3,6 164:25
165:3 168:8,11
169:5 170:2,6
173:25 174:21
174:25 175:20
176:4,24
179:21 180:11
180:24 181:24
182:7,8,20
183:19 184:4,5
184:6,7 187:4
187:17 188:21
189:4,13,13,14
193:5 194:22
196:2,7,10
197:12 198:10
199:22
**knowing** 49:5
**knowledge**
62:13,22 65:23
66:2 68:20
73:2 124:24,25

**knowledgeable**
58:14
**known** 80:8
192:1
**knows** 67:23
68:4,5 79:14
79:14 82:6
88:22
**kyle** 18:13,20
19:15,15,16
105:9 195:6,12

**l**

**l** 1:16,18 2:14
2:16
**lab** 13:24
**label** 169:24
**labs** 12:21 13:4
13:7,10,17
24:23
**lake** 6:17
**language** 160:8
**large** 48:13
87:14
**laser** 10:6,6
18:5 78:8
**lasted** 192:10
**late** 34:3 41:23
42:18 87:11
**lately** 170:16
**law** 2:16 3:2
67:16,25 80:18
102:6,13 131:6
175:17 191:1
**laws** 176:10

**lawsuit** 67:21
96:3
**lawyer's**
121:18
**lawyers** 68:6
123:10,12
**layman's** 164:6
**lead** 39:18
179:6
**leads** 39:19
**learn** 55:18
65:19 89:18
107:12,13
115:7
**learned** 36:9
**learning** 138:1
**leave** 16:6
18:24 19:3
56:23 111:14
171:22
**leaves** 56:24
**leaving** 198:11
198:19
**left** 18:25 19:18
21:4 60:11
106:15 111:15
195:12
**leg** 149:10
**legal** 8:1 49:3
66:25 67:13
69:9 89:18
92:21 98:16
135:17 136:19
**legally** 78:14
94:22 183:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**legit** 157:22
**legitimate** 165:13,17
**legs** 102:23 164:4
**letter** 37:23 112:16 148:1,5 150:11 163:14
**letting** 153:13
**level** 38:19,21
**lexy** 17:2
**liability** 1:13 1:15,18 137:9 180:18
**license** 133:12 161:10,22 167:6,22 168:2
**licensed** 168:23
**licenses** 112:16
**lied** 86:12
**lieu** 171:21
**light** 177:15,15 178:3,17 179:13 182:12 183:16
**lighter** 85:5
**likely** 109:8
**limited** 1:13,15 1:17
**lindsey** 16:10 17:2,3,4,4,5,6
**line** 81:4 88:13 128:9,10
**link** 145:12,12

**list** 41:18 95:5 133:21
**listed** 32:14,15 117:16 133:17 144:4
**listen** 167:25 175:24
**literal** 167:21
**literally** 190:16
**literature** 169:23
**litigation** 62:7 126:8
**little** 22:21 47:5 65:15,15 177:4 185:12,17
**llc** 9:24
**local** 135:13 136:14
**locate** 108:15
**located** 10:9,18 32:1 105:25
**location** 9:14 81:15
**locations** 13:12
**logging** 117:19
**long** 6:18 7:3 9:9 12:18 13:17 32:3 33:4 34:13 35:3 45:2 54:6 78:17,17 87:5 98:5,12,15,23 125:1 168:15 168:16 186:12

192:20 194:7
**longer** 33:5 47:5 128:3
**lonnie** 17:12 18:9,10 19:15 44:24
**look** 44:15 59:18 64:16 66:15 68:10 71:7,12 73:9 75:16 80:7,9 80:17 88:25 91:19,20,20 107:16 111:5 119:13 121:21 122:10 123:5 138:8 139:16 140:3 173:11 180:6 188:4 191:9
**looked** 68:8,9 110:25 111:5 175:22 188:7
**looking** 35:5,8 55:3,4 58:19 58:21,22 59:21 60:8 62:21 65:4 68:12 79:18 138:5,14 139:6 156:8,9 181:13
**looks** 7:7 60:5 65:3 138:8 162:3 188:16 196:22

**loosened** 99:25 100:1
**lord** 179:5
**lose** 161:10,22 164:5 167:4,6 167:22 168:1 191:21
**losing** 87:17 150:4 191:17
**loss** 10:7 163:25 177:18 191:18
**lot** 12:20,21 27:3 45:6 50:3 54:19 55:14 87:22 92:23 168:12 173:25 189:18 197:25 199:5
**loud** 66:14 190:13
**lower** 39:20 156:21 157:4 157:20 158:24 191:22
**lumps** 72:24
**lying** 86:16

**m**

**m** 17:4,6
**ma** 16:13 51:12 57:11 59:19 188:3,5
**macomb** 6:12 11:4,24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[made - mean]**

**made** 27:13
31:10,10 43:16
67:14 93:5,6,6
107:5 108:11
120:15,18
144:12,16,21
177:11 185:6
190:23
**madison** 15:21
16:7 20:4,11
20:15 43:3
105:22 107:22
112:10,11
122:7
**mag** 1:9
**main** 60:24
63:13 122:14
126:4 166:12
**maintain**
105:12
**maintained**
105:16
**maintenance**
31:15
**make** 5:18 12:5
26:23 31:4
37:4,14 38:15
39:14 44:16
53:16 57:4
59:10,24 60:9
76:25 80:12
87:16 88:2
93:4 150:18
151:9,10
161:23 164:5

167:3 191:6
**makes** 98:11
164:7
**making** 16:19
29:10 65:6
141:7 178:14
192:6
**mal** 6:14
**malpractice** 6:5
161:25
**manage** 95:5
**management**
7:22,23 8:4,10
8:15,18,22
**manager** 15:21
15:22,24 20:17
22:10 34:4,10
34:18 38:21
40:17 41:9
43:1,2 106:11
106:17,21,25
112:2,3,3
167:8
**manager's** 16:2
105:20 106:23
**managers** 11:1
15:25 20:5,5,9
20:10,12 36:3
38:4,5 39:15
39:17 105:24
106:9 108:24
109:1,3,9,11,19
109:23 110:16
199:21

**managing**
20:20
**mandatory**
195:13,14
196:4
**manner** 38:12
**manual** 77:6,9
77:17 78:5,13
**maple** 84:11,12
**march** 132:23
134:2,13 145:3
145:4 163:18
170:21 171:10
176:18,20
**margins** 93:2
**marie** 2:6 202:6
202:21
**mark** 3:1 41:7
145:25
**market** 166:20
**marketer** 20:18
20:19
**marketing**
20:19
**married** 6:20
6:22,24 7:1,14
7:15 11:15,18
**marzotto** 2:15
**mas** 16:11
26:22 87:25
108:25
**massage** 150:3
**material** 45:6
**matter** 5:14 6:5
27:13 67:21

90:2 103:13
178:6,13
187:13
**matters** 6:14
187:14
**mbr** 46:4,5,6,9
46:16 47:1,2,3
47:6,10,13
48:17 65:11
66:8
**mbreaugh** 3:7
**mclaren** 11:24
**mean** 8:19
12:24 13:25
15:23 16:1,13
22:1 23:18
27:22 33:8
35:12 36:18
37:2 42:13
48:10 50:20,22
51:3 52:19,19
56:18 57:9
59:4,24 63:8
65:13 76:20,23
88:5 89:14,25
91:17,24 97:11
99:16 100:12
101:18 104:1
105:21 108:18
126:21 134:16
138:23 141:24
157:25 161:5
165:7 168:10
185:15 196:9
199:7

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**meaning** 87:13
90:1 119:17
167:9 199:8
**means** 7:25
48:11 76:7,8
76:18,21,25
85:3 89:15
**meant** 57:23
99:19,20,21
136:7
**med** 1:12,14
6:14 8:25 9:22
10:4,5 11:11
15:6,12,16
17:24 20:21,24
21:12,14,18
22:5,7 33:25
87:13,17,21
88:4 105:14
106:2,4,7,9,11
106:19,21
111:8 112:20
112:21 147:5,9
147:18,20
148:10,15,19
148:20 149:2,7
149:15,15
150:1,5,12,18
151:15,17
152:9,10,13,17
152:25 153:5
153:14,25
154:1 155:6,8
156:2,10,25
161:8 166:6

172:21 199:12
201:8
**media** 149:16
**medicaid** 45:12
45:14 50:12
51:24 69:22
70:5 72:3,19
73:1 136:5,11
156:16
**medical** 8:11
9:8 11:1 13:5
16:14,18 17:1
20:15,18 21:17
21:23,24 39:16
39:17,20 45:10
51:9 54:1,2,4
54:12,13,14,16
54:20,24 55:2
55:7,15,19,21
56:12,13,20,22
56:23 57:12,20
57:23 58:15,20
61:16,21 63:17
65:3 79:1,4,6
105:23 151:16
165:19 167:3,4
167:6 169:23
188:6 200:2
**medically**
99:13,16
**medicare** 45:12
45:14 50:11
51:24 69:21
70:5 72:3,19
73:1 77:6,9,12

77:13,17 78:5
136:5,10,12
145:9 156:16
173:10
**medication**
70:22
**medications**
56:4
**medicine** 9:11
20:14
**medspa** 119:12
**medspa.com**
118:13
**meet** 5:12
28:20 137:10
144:9 147:24
158:3 174:4
**meeting** 39:14
39:20 144:14
144:19 161:8
161:21 166:10
166:23 170:12
170:13,21
171:3,6 185:20
186:1,2,10,24
187:6 190:1,23
191:15 192:10
196:12 198:6
**meetings**
115:21,22
116:1 151:23
153:19,23,24
153:25 198:4,5
198:9,12

**melissa** 137:1
**member** 120:2
**members** 162:2
**memory** 200:14
**mention** 149:1
**mentioned**
14:23 17:22
41:12 141:21
147:18
**message** 76:25
77:2 108:17,20
118:9 137:25
138:1 177:10
179:3
**messages** 138:5
160:17 162:23
**met** 184:17
194:1
**metabolism**
164:8
**mfts** 172:25
**michigan** 1:2
1:12,15 2:2,19
3:5 5:1 6:17
131:11 202:2
202:23
**mid** 156:12
**middle** 90:25
188:6
**midway** 115:2
**mile** 10:10,19
**million** 93:6,13
94:10
**mimosas**
149:20

mind   188:23
mine   14:14
minute   25:22
  27:14 64:15
  123:17
minutes   26:21
  27:1,3,5,18
  68:14 97:8
  179:9 186:13
  186:13,13,21
  192:10
misbill   161:5
missing   60:12
  60:16,17
  109:20 110:18
mistake   108:12
misunderstan...
  178:9
modifiers
  49:15
modifying
  140:25 182:17
mok   89:8
moment   93:25
  124:1
monday   2:4 5:2
  24:10 25:3,24
  26:12 30:10,21
  144:13 146:12
  155:11 181:22
mondays   82:22
money   87:17
  93:3 156:2
  157:7 191:17
  191:19,21

moneymaker
  151:24
monitoring
  160:21,23,25
  161:2 171:19
  171:24 172:4
month   13:20
  41:7 81:16
  111:16,17
  153:23 163:15
  166:17,18
  192:22
months   18:10
  40:12 45:1
  96:1 111:17
  145:1
morning   137:5
  140:17 155:24
  180:13 181:22
  182:13 183:11
mothers   149:19
mouth   126:17
move   57:15
  87:3 185:21
moved   12:20
moving   140:22
  182:15

**n**

n   131:8
name   9:3 17:12
  18:2 32:11
  33:19 41:13
  56:2 80:23
  85:21 91:16
  92:1,1,8 97:18

104:7,8 105:21
118:18 136:16
137:7 143:9,12
143:17 174:20
180:16 181:1,1
181:6,7,10,15
181:16 182:18
184:13 194:15
named   19:13
  33:22
names   15:3,18
  140:17 153:24
nancy   1:8
nasty   87:4
natural   164:7
nature   8:11
  96:3 99:23
necessarily
  104:1 114:18
  127:17 141:8
  197:10
necessary
  119:13
need   26:24,24
  39:2 45:19,21
  49:7,7,24
  52:12 54:15
  78:6,8 113:7
  141:1 149:10
  150:24 153:13
  156:21 179:7
  179:22
needed   22:7
  30:4 46:17
  61:10,12,13

133:19,21
  178:8
needle   37:5
needs   27:11
  39:15 87:2
  180:1
negative
  126:12
neither   191:12
  200:5
net   93:14
neurotoxins
  10:6
never   43:4 52:9
  65:15 86:15
  87:12 90:4
  102:3 116:15
  117:21,22
  118:5,5,8,10
  120:3 121:12
  121:16 123:21
  124:2,22,23
  126:13,14
  128:19,24,24
  128:25 129:2,9
  132:1,3 150:8
  153:8,12,12
  157:25 160:9
  175:19,21,24
  181:24 183:10
  189:15,16
  192:6 199:17
new   13:4 26:16
  26:18 31:13,13
  34:15 43:22

81:21 92:17
100:13 103:2
103:10 112:24
113:4,13,19,24
114:2,17
166:20 172:3
172:16 195:7
**nextgen** 138:18
138:18,23
139:3,11,23
**nice** 5:12 87:1
**night** 161:19
**noise** 164:10
**nondisclosure**
187:1
**nonissue**
175:12
**noon** 144:9
**nope** 149:8
191:14
**normal** 29:16
29:17
**northwestern**
3:3
**nos** 5:19
**nose** 173:2
**notary** 202:1
202:22
**note** 38:15
46:14,15
160:16 162:10
163:5,9,18,20
**noted** 74:17
133:11

**notes** 16:16
46:13 47:20
53:23,25 54:4
55:16,22,23
56:13 57:24
58:20 65:3
202:11
**nother** 118:22
**november** 2:4
5:2
**nuance** 95:15
95:17
**number** 24:2
28:11 64:14,16
67:3 68:19
69:1,16 70:2
71:7,8 72:17
74:4 84:21
105:6 121:17
133:19 139:18
140:1,4,10,12
145:25 148:6,9
156:16 157:11
157:12 159:12
159:12,14,16
178:11,15
179:23 182:25
182:25 183:3
194:9
**numbers**
148:15 151:22
**nurse** 11:2 17:8
18:3,4 194:1
**nurses** 16:20,21

**nursing** 18:3
**nuts** 173:22
174:19,24
175:1,6,8
197:7

**o**

**o'clock** 82:21
**oakland** 7:8
11:25
**object** 61:2
62:23 64:18
67:6 68:2 70:7
72:5 73:16,18
74:10 75:1
93:8 102:8
123:23 125:2
130:10 158:5
158:14 173:12
178:19 192:3
194:23
**objected** 74:15
**objection** 63:5
68:23 74:17
102:15 130:21
158:8 169:18
**obl** 14:1,7
**obligation**
201:12
**obls** 194:2
**obvious** 180:8
**obviously**
19:23 20:6,13
29:18 35:10
94:15 104:19
106:16 108:11

170:4 184:24
193:12
**occasion**
187:10
**occasions**
115:19,20
**occur** 104:10
105:1
**occurred** 24:8
58:16 59:23,25
95:20 113:24
187:17 196:10
**occurring** 95:8
95:9
**offer** 112:16
148:1,5 150:11
163:14 176:8,8
188:23
**offered** 4:12
10:4 186:22
**offering** 148:12
**office** 12:12,21
13:7,10 14:1
23:14 24:2,13
24:18,19,22,24
26:3,7 27:19
28:6,16 30:7
30:24,25 31:3
31:21,22 32:8
32:9 37:17,18
37:21 41:17
43:23 46:13,14
48:13,14 51:2
51:23 53:1,19
55:8,21 60:25

61:6 67:25
77:8 81:14,24
82:10,13 83:3
83:8,25 84:4
84:13,18,18,19
85:20 86:8
95:8,20 98:15
99:5,8,12
101:7,24 104:1
105:20,22
106:1,7,23
107:5 112:23
112:24 113:4
120:7,12 121:6
121:18,18,18
131:5 133:2,3
135:21 142:6
144:10 145:8
149:14 155:11
160:20 162:3
163:8 171:19
171:22,25
177:9 179:2
183:1,6 186:11
187:9,11,23
188:7,17
189:12 191:8
196:22 197:1
199:6,7 201:1
**offices** 2:16
105:25 106:4,9
**official** 1:20
7:16
**oh** 7:9 47:15
138:10 152:9

159:2 161:17
196:25
**okay** 5:17 6:2,7
6:9,11,13,16,22
7:1,3,14,19,21
7:23 8:6,10,17
8:20,22 9:6,9
9:11,14,19,23
9:25 10:3,8,11
10:18,22 11:3
11:9,23 12:5
12:17 13:4,11
13:15 14:15,25
15:14,15 16:5
16:9,25 17:13
17:15,17,21,24
18:6,14 19:16
19:22 20:2,13
20:21 21:11
24:12 25:6,11
25:16,19 26:3
26:9,18,25
27:17 28:11,18
29:1,6,8,15,19
29:22,25 30:6
30:9 31:2,21
31:23 32:1,18
33:3,6,25 34:6
34:8,11 35:16
35:17 36:2,18
37:7,9,13,17,21
37:25 38:7,10
38:14 39:5,22
39:24 40:3,9
40:13,17,23,23

41:5,12 42:20
42:22 43:6,9
43:22 44:3,5
45:2,9,13,16,19
45:24 46:9,11
46:16,23 47:10
47:17 48:2,4,6
48:12,21,24
50:2,10,19
52:3,15,23
53:6,12 54:6
54:11 55:2,10
55:13,20 56:8
56:13 57:20
58:7,14,19
59:12,21 60:1
60:5,18 61:8
61:15,18,19
62:1,7,10 63:4
63:13 64:4,7
64:10,13,21,25
65:13,17,21,23
66:10,16 67:17
68:4,8,16
69:10,19,19
70:16,25 71:12
71:21 72:1,22
73:9,9 74:2,4,8
74:13,17,22
75:7,19,24
76:1,3,18 77:2
77:5,16,25
78:3,10,13,16
78:20 79:4,6
79:12,17 80:4

80:9,16,22
81:2,17,23
82:5,9,13,16
83:6 84:9,13
84:17 85:3,9
85:14 86:2
88:9,16 89:12
89:21 90:3,5
90:17,20 91:6
91:16 92:5,22
93:18,21 94:15
96:8,18,21,23
97:1,15,25
98:2,18,22
99:1,4 100:2
101:9,12
102:13 103:9
103:20 104:10
105:8,12,23,25
106:2,4,9,20,25
107:5,8,15,17
107:20 108:11
108:14 109:3
109:17,22
110:1,17 111:3
111:10,19
112:4 113:13
114:2,13,22,24
115:3,7,24
116:4,18 117:2
117:12,18
118:10,15
119:9,9,12
120:5,8,12,24
121:10,12,17

**[okay - own]** Page 30

| | | | |
|---|---|---|---|
| 121:20,24 | 164:13,18 | **old** 11:6 116:10 | **orders** 16:16 |
| 122:5,22,23 | 165:13,16 | **older** 154:20 | **ordinarily** |
| 123:3,7 124:22 | 166:4,7,9,15,25 | **onboarding** | 102:18 |
| 125:20 127:4,5 | 168:11,21,25 | 51:1 | **organized** |
| 127:7,11 128:1 | 169:3,10,21 | **once** 31:4 41:10 | 106:18 |
| 128:7,13 129:6 | 170:18,20 | 106:18 109:2 | **organizing** |
| 129:13 130:4 | 171:5,10,14,17 | 153:23 196:15 | 36:15 |
| 131:4,11 | 171:24 174:22 | 196:16 | **originally** |
| 132:12,17,23 | 175:11 177:9 | **ones** 17:10 | 46:19 65:11 |
| 133:1,6 134:8 | 177:14,25 | 19:13 20:11 | **ortho** 19:5 |
| 134:11 135:7 | 178:3,10 179:8 | 22:23 | 22:19,23 |
| 136:4,13,18,24 | 179:15,21 | **online** 42:4,5 | **orthopedic** |
| 137:18,25 | 180:6,24 181:6 | 100:12,14 | 10:17 11:11 |
| 138:11,14,17 | 181:8,16,17 | 151:12,12 | 19:2 93:18 |
| 138:25 139:8 | 182:12 183:5 | **open** 117:19 | **orthopedics** |
| 139:22 140:3 | 183:10,16 | 122:16 126:7 | 1:17 10:15 |
| 140:15 141:9 | 184:5,17,23 | 133:12 | 71:21 201:8 |
| 141:12,20 | 185:1,6,21,22 | **opening** 143:1 | **outline** 44:6 |
| 142:6,11 143:1 | 186:20 187:6 | 174:5 | **outlooks** 119:7 |
| 143:8,19 144:8 | 187:10,22,22 | **opens** 83:3 | **overbilled** |
| 144:24 145:15 | 188:10 190:6 | **operating** | 89:22,23,25 |
| 145:21,23 | 190:11 191:12 | 199:9 | **oversee** 36:5 |
| 146:7,9,20 | 191:15 192:10 | **operative** 60:13 | 172:14 |
| 147:15,22 | 192:10,15,18 | **opinion** 127:24 | **oversees** 95:1 |
| 148:12,17 | 192:25 193:4,6 | 169:10 | **overview** 10:3 |
| 150:13,24 | 193:8,12,14,18 | **ops** 31:17 | **own** 8:23 9:24 |
| 151:2,7,18,22 | 193:21,25 | **option** 156:11 | 21:20 24:24 |
| 152:8,14,17 | 194:3,9 195:5 | **order** 8:7 46:17 | 31:23 32:5 |
| 153:8 154:5,7 | 195:8,11,21 | 49:16 50:25 | 50:14,14 75:4 |
| 154:10,16,22 | 196:4,7 197:3 | 61:12 99:4,10 | 103:14 105:6 |
| 155:2,8 156:6 | 197:5 198:17 | 137:15 140:23 | 125:24 130:15 |
| 156:19 158:10 | 199:17 200:3,7 | 145:5 149:5,6 | 131:13 143:9 |
| 160:11,20 | 200:7,24 | 172:25 182:15 | 143:12 155:24 |
| 161:16 162:24 | 201:21 | **ordering** 61:24 | 156:15 157:11 |
| 163:9,17,21,23 | | 64:2 | 157:11 162:3 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[own - patients]**

178:11 180:1,1
183:1,3,5
188:17 191:6
196:22 200:25
**owned** 32:3
**owner** 9:8
88:23 89:11
**owns** 8:4

**p**

**p** 1:9
**p.m.** 13:2 81:10
81:11 128:15
128:16 144:13
201:25
**pa** 3:11 23:1
29:5,18,20,22
30:1 31:9,16
31:19 44:22
55:17 56:15,16
56:17 57:23
58:2,4,19,21,21
58:22,23 59:17
59:21 60:5
65:3,4 66:23
79:1 85:25
95:6 103:13,24
103:25,25
104:6,14 105:5
133:2,3 140:20
142:8,12 143:4
143:8,8,16,16
145:9,10,11
152:8,10,13
153:4,6 155:22
155:23 156:9

156:17,22
157:4 168:17
168:23 179:6
181:19 182:24
184:17 193:2
195:7 201:10
**pa's** 31:5 65:6
**page** 4:3,11
132:12 134:12
138:17
**pages** 173:17
**paid** 8:17 35:6
35:7 43:13
49:21 50:8
51:8 52:12
94:21,22
194:18,24
**pain** 70:18,20
70:22 71:24
**paper** 40:5
46:19 78:21
100:11 124:14
134:17
**paperwork**
24:25 51:7
**paragraph**
62:11,14,19
63:2 66:12,14
66:25 68:17
70:1 71:21
72:1 73:9,10
75:15,16,20
76:5 122:14
145:8 201:3,4

**paraphrasing**
123:20
**parkway** 2:1,17
**part** 29:16,17
29:18 49:7
59:6 78:13
80:12 134:24
149:15,17
153:1,2 164:3
**partial** 70:17
71:22
**particular**
26:12 32:11
99:7 164:3
**particularly**
200:16
**particulars**
187:17
**partners** 3:2
**parts** 40:6
58:24 60:11
65:7
**party** 46:2,3
174:5 200:23
202:13
**pas** 29:2,3,3,4
29:15 35:7
58:7 67:12
85:23,23
103:21 104:3
108:25 148:18
183:2 195:15
198:13 200:24
**password**
118:25 119:19

**past** 31:7
**patient** 16:15
16:17 23:14,17
24:2,7 27:9,11
27:12 30:2,2
31:9,11,14
33:6,8 34:5
46:15 53:13,18
53:21,22 54:18
54:19 55:17,17
56:3,7,7,25
57:1,3 58:5,12
58:13 59:6,16
61:9,9,14
63:25 86:12,13
86:15,18 92:5
92:6 95:6 99:7
99:18 100:23
100:24 101:3,6
101:7,10,17,23
102:3,7,21
104:5 127:25
136:15 137:11
141:25 142:2,9
143:7,8,16,16
164:24,24
166:2 167:14
180:22,25
181:4 188:11
188:24
**patient's** 56:3,4
61:21,23 63:16
79:19 92:13
**patients** 12:11
12:13 22:5,8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

22:11 23:16,19
23:25 24:11,15
25:1,7,11,21,25
26:1,4,16,17,19
26:19 27:18,25
28:6,14,18,23
28:24 29:1,11
29:16 30:7,14
30:15,22,23
31:4,13,14,15
32:8,14,15
44:16 55:12
58:4,10 59:8
61:22 63:19
72:14,16 83:3
83:6 84:19,21
85:6,12 87:15
87:16,20 88:4
89:15 91:3
92:17 100:25
101:4,14
102:17,23
103:2,14 104:2
104:3,6,25
141:19 142:6
142:11,15,17
142:21 151:7,8
151:14,25
152:14,15
155:23,25
170:6 178:7
180:1 187:9,11
187:24 199:12
199:20

**patti** 1:9
**pavlina** 34:9,11
106:15 111:14
111:15,19
112:1 115:23
125:22 133:1
134:2,14 135:3
136:7,25 138:1
138:11,17
139:13,22
144:3,8 145:18
146:4 170:15
170:18 173:6,9
173:13 175:11
177:3,9 179:2
179:6,12 186:3
186:4,15 197:4
197:9,18
198:24 199:21
**pavlina's** 43:3
111:12,21
139:14
**pay** 16:4
127:12 157:15
**paying** 87:14
189:5
**payment**
156:16
**payments**
94:16
**payroll** 8:13
34:24 35:5
**pc** 3:2
**peer** 50:5

**peers** 50:5
**pensler** 1:10,11
1:14,25 4:4 5:4
8:24 9:2,2,6,20
15:6 22:19
23:25 71:9,12
71:13 79:8,13
133:12 142:11
142:20,25
143:3 160:6
199:10 200:15
**pensler's** 133:3
181:15
**people** 15:13,15
17:19,23 20:6
21:23 22:12
25:24 26:22,24
26:24 27:21
32:12 35:1
36:6 39:19
40:7,8 43:12
44:10 45:12,21
50:4 52:4,6
55:4,18 70:22
84:4 85:4
102:20 108:6
109:10 110:18
119:23,25
142:21 144:14
148:18 150:14
150:16 151:2,4
154:15 164:5,7
164:17 165:6,7
165:10,24
166:7,24 167:1

167:17 170:6
170:25 171:14
182:14 193:5,7
193:13 195:10
196:25 197:6
197:25 198:10
198:11,11,12
198:18,23
200:1,3
**people's** 102:24
149:18
**percent** 41:4
45:16,18 72:13
73:13 74:20
75:10 81:19
93:1 104:17
112:20 152:24
157:2 177:18
184:12
**percentage**
22:23 41:1
152:22
**percentages**
22:22
**performance**
38:11 39:24,25
40:2,3 41:3,11
49:21 88:6
96:9 147:5,12
**performed**
68:18
**performing**
82:14
**performs** 76:14

**period** 66:7
103:18,20,22
109:4 187:20
**person** 15:19
15:20,21 16:2
16:14 18:15
23:20 35:23
36:16 37:22
41:8 53:11
54:12,14 57:18
72:9 76:10
87:10 91:8,8
92:7 99:18
101:15 104:14
163:15 166:12
168:3 174:23
181:23 193:16
**person's** 72:10
**personal** 137:9
162:21,23
180:17 197:9
**personality**
55:14
**personally**
25:12 96:19
99:8 101:8
193:8
**personnel**
37:19,21 38:2
112:4
**peysakhov** 86:3
**pg** 138:8
**phone** 16:17
58:12 76:25
101:25 108:18

135:14,15,17
135:21 136:14
143:10,15,20
144:5 162:9
163:23
**physical** 56:9
56:10 57:5
58:24 59:5,9
**physically** 10:8
82:7 107:24
108:1 199:8
**physician** 6:3
9:8 11:2 17:8
17:16 18:13,22
21:19 22:17
30:20 44:1
50:6,8 52:7
57:16,17 60:24
61:5,17,20
62:18,20 66:18
67:22,24 68:5
68:18 73:12
74:8,22 75:4,5
75:9 76:2,4,12
76:13,14,17,21
77:4 78:19
85:8 97:17
98:3,24 99:6
100:3 101:19
139:1,4,7
145:11 172:15
172:16 191:18
194:18,24
201:5

**physician's**
76:15 101:23
137:7 180:16
**physicians**
16:18 17:7,11
18:6 19:12,19
20:3,8,22,24
21:12,14 22:13
43:22 48:11
52:10 74:19
85:11 90:9
99:24 139:17
157:15 196:4
**pick** 151:12,13
174:11
**picture** 41:20
**piece** 40:5
46:19 78:21
100:11 134:17
**pieces** 42:14,24
59:3,4 60:16
**pieroni** 17:14
**pink** 162:5
**place** 22:12
37:6 59:22
**placed** 59:1
99:24 127:6
**places** 36:10
91:22,25 99:25
**plaintiff** 1:6
2:23 72:24
**plan** 56:11 59:2
61:12
**plane** 105:4

**platform** 48:18
**plc** 2:16
**pleasant** 19:8
55:11,12
196:17
**please** 15:23
89:1,2 99:4
153:17 162:11
**pllc** 1:10,15,16
**plus** 45:3
**point** 8:7 48:15
129:6 135:19
157:19 165:19
178:10,13
188:2,16 189:6
189:8,24
200:15 201:2
**pointing** 160:7
**poking** 175:12
**policies** 45:20
191:10,12
**policy** 77:6,9
77:17 85:21
100:13 191:8,9
**polite** 196:23
**pool** 143:15,19
144:5
**poor** 88:20
96:9 147:5
**pops** 60:23
**port** 25:20
**portion** 94:15
**portions** 60:12
**position** 16:25
51:11 140:25

175:20 182:17
201:7
**positions**   169:7
**possible**   81:3
156:20 190:25
201:10
**possibly**   156:14
**post**   31:17
**posting**   149:16
154:9
**potential**
172:16
**potentially**
123:1,19 126:8
167:14
**practice**   9:16
10:18 11:11,12
12:20 13:21
14:4 15:11,25
16:2 17:20
19:2 20:5,11
20:16 21:23,24
22:4 25:22
28:4 29:16
34:18 36:3
38:5,21 39:5
40:17 45:16
48:8,9,13
51:15 66:6
68:6 69:20
87:13 93:18,19
105:24 106:9
106:23,25
112:2 114:25
152:23 171:11

172:22 174:12
180:2,3 187:3
191:16 195:1
**practices**   7:24
8:11 10:8
14:16,20 21:17
35:24 100:3
153:5 193:1,17
199:19
**practicing**   9:11
**practitioner**
17:9 169:3
194:1
**practitioners**
11:2
**preparation**
130:7 132:3
138:15 177:22
**preparing**
135:8
**prescription**
71:2
**prescriptions**
61:12
**present**   3:10
76:4 82:7 98:3
**presumably**
42:8 143:19
**pretty**   50:7
113:10
**previously**   7:1
48:6 127:25
**price**   166:15
**primarily**
22:15

**primary**   169:4
**prior**   9:11
29:15 31:9
46:1 48:18
50:3 110:14
200:23
**private**   51:18
116:6 135:24
136:3,11
159:22 175:14
178:7,7
**probably**   12:3
12:24 13:13
18:25 36:6
41:4 45:3
49:10 81:16
84:6 87:6
93:13 104:24
108:24 109:2
111:11 123:13
130:9 160:16
197:4
**problem**   5:23
30:18 38:11,18
89:18 165:6,11
169:17 170:10
189:5
**problems**   39:7
39:11 40:24
88:6 165:8
184:20 185:4
197:19
**procedure**
12:23 13:24
48:14 57:6

60:10,13 65:16
78:9 89:24
151:20 177:19
**procedure's**
57:6
**procedures**
12:7,22 13:6
14:7 30:17
41:17 44:14
45:20 49:5,6
49:14 51:1
53:3,4,5 61:23
63:23 65:10,24
89:15 100:22
112:25 113:5
113:14,15,19
113:25 114:2
114:17 145:16
145:19 148:3,6
148:10 149:5,6
177:16 178:4
178:18 179:14
179:15 180:8
183:17,20
**proceeded**
34:22 107:16
**proceeding**   7:7
**proceeds**   11:10
167:4
**process**   41:16
51:5 54:7
56:14 137:7
180:15
**processes**   45:5
91:4 97:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

produce 110:1
110:3,5,10
produced
160:5 173:16
product 150:13
166:20
professional
1:13,15,17
137:9 180:17
197:10
profit 93:2,6,14
94:8
profits 11:18
programs
69:22 70:5
72:3,19
progressive
128:5
project 112:2,3
promoted
20:16
pronouncing
171:11
proper 140:24
140:24 143:23
182:16
properly 94:20
protected
102:2
protocol 37:5
101:22 112:22
protocols
100:18 103:9
103:10,15,22

provide 29:23
30:1 45:13
46:9 52:20,22
52:24 71:13,18
71:22 72:4
90:17
provided 50:16
71:5 73:11
75:8,8 113:3
165:10
provider 85:15
85:16,18,21
88:14,14 89:13
91:11,12,21
97:10,11,19
105:6 115:5,6
133:14,17,22
134:4,8,21
135:4 136:16
137:8 140:20
140:21 144:4,5
156:15 157:12
158:17 159:16
178:11,15
179:22 180:17
181:19,20
191:4 194:9
providers
10:22,25 69:20
70:4,12,13
72:2,18,25
133:4 134:15
provides 71:1,1
71:1

providing
61:22 63:21
prp 10:7
public 202:22
pull 26:11
112:18 138:25
153:21,22
pulled 177:6
punched
201:19
punching
198:14
pure 200:14
purpose 102:6
102:13 116:1
purposes 127:7
pursue 7:11
put 32:16 33:10
35:20 38:12,16
49:16 51:8
53:17 56:9
57:12 58:24
65:15 86:22
88:18,22 89:6
90:2 91:17
95:7 97:4,6
98:13 101:14
108:14 112:4
116:18 123:11
131:13 138:4
153:8 170:21
182:18 190:24
192:21
puts 95:13

putting 38:22
42:25 88:17
95:3 171:1
189:18

**q**

qualified
193:12,13
qualifies 77:2
question 29:13
62:1,24 63:10
70:2 73:23
74:11,13 79:16
79:24,24 91:10
102:11 109:16
109:18,22
114:13 122:22
123:17 127:20
131:15 147:15
156:23 165:19
170:2,7
questioned
80:22 86:19
90:18
questioning
128:9,10
questions 5:14
59:18 91:2
112:22 114:25
115:3,19 200:8
202:8
quick 67:6
quit 86:5,20,21
86:23
quite 13:15
178:22

[quota - reference]

Page 36

| | | | |
|---|---|---|---|
| **quota** 147:22 | **rays** 44:15 | **really** 35:10 | **recipient** |
| **r** | **reach** 111:19 | 88:20 124:2 | 119:25 |
| **r** 131:8,8 | 157:14 172:7,9 | 139:1 155:19 | **recognize** |
| **rachel** 15:21 | 172:12 | 159:2 161:12 | 121:22 |
| 16:7 20:4,11 | **reached** 101:25 | 165:2 196:25 | **recognized** |
| 43:3 112:12 | **read** 42:23 | 198:22 | 34:25 |
| **rachel's** 105:22 | 44:15 61:15 | **reason** 99:14 | **recollection** |
| **radiofrequency** | 62:10,19 63:6 | 147:2 148:12 | 122:20,24 |
| 195:20 | 64:13,16,17 | 161:17 174:3 | 131:20,22 |
| **radiology** 13:8 | 66:12,13,14 | 179:15 180:7 | 162:8,12 |
| **raise** 34:12,21 | 67:7 70:3 | 188:10,23,25 | **record** 9:1 10:3 |
| 41:8,9,10 | 72:17,23 73:5 | 189:1 198:17 | 36:22 37:21 |
| 122:25 124:18 | 73:25 75:15,16 | **reasons** 148:14 | 38:18 40:21 |
| 155:2,5,10 | 98:11,22 | 168:12 | 64:17 66:15 |
| 185:9,16 | 100:20 103:19 | **recall** 100:18 | 67:15 69:24 |
| **raised** 35:9 | 123:2,7,8,14 | 115:20 121:7 | 81:11 88:2,3,6 |
| 114:25 115:8 | 130:1,7 131:24 | 129:24 141:2 | 121:15 128:16 |
| 115:10 123:18 | 132:1,3,6 | 148:21 155:17 | 137:4 147:16 |
| 164:14 165:9 | 160:17 171:20 | 186:17 187:1,7 | 147:17 151:16 |
| 196:12 | 176:1 177:22 | **receive** 41:2 | 159:24 162:5 |
| **raising** 115:19 | 177:24 | 124:17 | 168:6,8 171:1 |
| 146:23 179:12 | **reading** 70:25 | **received** 55:22 | 173:15,17,20 |
| **rate** 73:13 | 73:19,24 74:12 | 121:13 123:7 | 185:3 199:14 |
| 74:20 75:9 | 100:18 161:16 | 129:22 145:6 | **records** 37:19 |
| 104:15,20 | 162:4 169:1 | 179:11 | 38:3 51:9 |
| 156:20,21 | 173:11,16 | **receiving** 9:15 | 85:14 104:5 |
| 157:2,4,16,20 | 181:21 | 121:6 | 151:14 156:1 |
| 158:1,2,13,13 | **ready** 125:6 | **recent** 55:20 | 194:16 |
| 158:19,21,24 | 130:1 137:15 | 56:4 94:1 | **reduced** 73:13 |
| 191:22 194:19 | 160:17 | 162:17 163:1 | 156:17 202:9 |
| 194:25 | **real** 67:6 | 201:17 | **reduction** |
| **rate's** 104:18 | **realize** 36:5 | **recently** 42:11 | 74:22,24,25 |
| **raton** 32:2 | 118:22 | 42:13 47:2 | **reference** 8:2 |
| **raynaud's** | **realized** 22:11 | 162:20 | 49:19 116:10 |
| 71:17 | 157:19 | | 141:20 |

**referenced**  78:3
  78:4 114:4
  116:8 130:23
**references**
  77:24 78:2
  168:19,21
**referencing**
  145:8 163:17
**referring**  36:19
  36:23 50:23
  70:11 93:9
  96:21 99:21
  100:2 113:11
  117:6,7 130:3
  131:21 139:2,5
  141:9 161:7
  163:7,13 172:9
  173:23 174:1
  175:13 184:24
  187:18
**refers**  70:8
**reflect**  80:2
  81:24
**reflected**
  144:21
**refresh**  122:20
  122:24 131:20
  131:22
**refreshed**
  162:7
**refreshing**
  162:11
**refused**  159:7
**regard**  11:10
  11:12 27:20

30:6 31:2,11
32:8 33:6
47:12 48:22
49:1 51:14,23
55:16 57:2,3
62:10 66:6
89:18 95:20
96:10 113:4,5
**regarding**
  75:11,13 145:9
**regardless**
  137:7 180:16
**regular**  82:10
  82:11,11,18
**regulation**
  135:19,23
  159:12,14,18
**regulations**
  159:23 176:10
  201:18
**reimbursed**
  49:25 73:12
  74:9,20 75:9
**reimbursing**
  51:15
**relate**  175:15
  175:16
**related**  202:12
**relationship**
  197:9
**relevant**  116:10
**rely**  34:25
  199:20
**relying**  98:14
  103:16,17,18

103:21
**remain**  7:14
**remains**  158:9
**remember**
  35:21 37:1
  47:4 68:13
  100:16,21
  103:19 115:11
  115:11 117:12
  117:16 118:2,3
  121:14 123:21
  124:4 130:5
  131:4,17
  132:20 133:14
  133:16 137:13
  137:25 138:14
  142:5 145:13
  145:19 148:19
  148:24 155:12
  160:13,21
  161:17 162:18
  168:25 172:10
  173:4,7,10
  174:3 175:3
  176:14 180:18
  180:22 184:8
  184:15,21
  185:9,13 190:3
  190:5 191:2,24
  192:6,19
**remembered**
  130:22
**remote**  101:24
  110:25 111:4
  114:6

**removal**  10:6
  71:16
**removed**
  149:10
**render**  99:10
**rendered**  49:22
  60:1
**rendering**  60:3
**repeat**  5:15
**repeating**
  185:2
**rephrase**  5:15
**replace**  18:11
  18:18 156:9,24
**replaced**  18:12
  18:19
**replacement**
  70:17,17 71:23
  71:23 184:18
  193:22
**replacements**
  70:21,23
**replacing**  139:6
**report**  23:12
  34:19 60:13
  96:24
**reported**  2:5
  202:9
**reporter**  5:22
  124:12
**represent**  5:13
**represents**  7:24
**reps**  36:15
**request**  107:5
  107:18 133:1

| | | | |
|---|---|---|---|
| **required**  80:9 | 29:9 37:18 | 133:24 | 159:25 161:13 |
| 148:9 190:12 | 38:2,22 40:18 | **reviews**  39:24 | 162:16 163:24 |
| **requirement** | 42:25 69:13 | 39:25 40:2,3 | 170:20,23 |
| 80:20 | 100:3 108:6 | 53:16 56:16 | 171:17 172:5 |
| **requirements** | 133:25 200:19 | 57:18 | 176:24 177:19 |
| 29:19 55:7 | 200:20,22,24 | **rfs**  195:18 | 178:16 183:14 |
| 80:16 158:4 | 201:1 | **rid**  31:7 47:1,2 | 189:7 191:9,21 |
| 193:14 | **rest**  161:9 | 47:3,14 184:23 | **rings**  143:20 |
| **resign**  19:7 | 186:21 | 185:1 | **rises**  38:19,21 |
| **resigned**  19:8 | **restate**  107:12 | **right**  5:16 7:17 | **rmr**  2:6 |
| **resolved**  171:7 | 148:2 | 8:20 9:4 10:14 | **road**  6:17 |
| **resource**  36:11 | **result**  96:23 | 14:25 15:8 | 10:10,19 |
| **resources** | **retro**  49:8 | 17:11 19:12 | **role**  9:6 |
| 35:25 36:5,8 | **revenue**  22:11 | 20:8,21 24:24 | **roll**  150:3 |
| **respectful** | **review**  41:3,11 | 28:20 31:2 | **room**  16:15 |
| 55:12 | 45:8 46:7 | 32:7 33:9 | 29:12 31:12 |
| **respond**  120:4 | 56:15,16,17 | 34:16 41:12,12 | 53:22 54:18 |
| 129:20 132:17 | 57:5,17 58:25 | 43:6 45:1 47:1 | 56:20,21,23,24 |
| 137:21,23 | 59:7 60:7 | 47:8,9 49:20 | 57:17 58:22 |
| 144:1 145:21 | 61:11 64:4 | 50:1 51:1,14 | 59:19 76:13 |
| 183:13 190:11 | 124:23 125:11 | 53:21 57:22 | 109:6,13 |
| 193:5 | 125:12,18,19 | 59:24 60:10 | 190:15,16 |
| **responded**  62:5 | 125:20,23 | 63:13 65:1 | 199:9 |
| 181:24 | 132:7 137:15 | 67:1 68:16 | **rooms**  26:22 |
| **response** | 141:1 | 91:10 97:13 | 58:4 |
| 129:17 140:19 | **reviewed**  57:4 | 101:22 106:22 | **roughly**  6:9,18 |
| 164:18 181:9 | 57:20 58:2 | 106:24 110:17 | 7:3 12:18 |
| 181:14 183:10 | 64:12 79:1 | 114:11 117:7 | 13:18,23 14:11 |
| 189:21 193:4 | 88:21 89:6 | 122:10 124:20 | 18:16,24 19:10 |
| **responsibilities** | 96:20 97:3 | 125:16 126:3 | 19:13 24:1 |
| 8:12 43:4 | 125:10,15 | 127:15 132:16 | 25:11 26:25 |
| **responsibility** | 134:1 | 133:4 134:15 | 27:19,25 28:5 |
| 58:5 108:9 | **reviewing**  5:20 | 135:20 147:18 | 28:8,13 30:22 |
| **responsible** | 35:8 58:5 | 151:8,24 153:8 | 33:4 45:16 |
| 20:2 22:18,19 | 61:20 63:16 | 155:14 159:7 | 81:13 93:3 |

**[roughly - see]**                                                      Page 39

166:16 192:20
**rounds**  12:5,7
**routine**  31:18
**rpr**  2:6
**rude**  167:7
**rule**  27:6 67:15
  99:25 100:1
  189:11
**rules**  27:4
  52:14,16 85:18
  85:19 90:13
  91:22,24 95:11
  98:1,2 116:8
  116:12,15,16
  129:3 135:8,25
  143:13,14
  144:6 158:25
  179:17 189:10
  191:6,7
**ruling**  118:1
**run**  45:12
  190:16
**running**  8:7
  13:25 190:15
**runs**  106:11
**rushing**  102:20

**s**

**s**  173:3,3
**safety**  36:24
  37:2
**salary**  87:14
**sales**  147:21
  148:2 153:19
  154:9

**salta**  169:3
**sandy**  16:8
**sara**  132:24
  133:6
**sat**  44:22
  115:18 170:22
**saturday**
  162:16,20
  163:15
**saturdays**
  163:13
**save**  95:3
  102:24
**saw**  35:8
  101:17 102:3
  103:13 186:22
**saying**  15:5
  71:4 86:13,25
  90:1 99:20
  109:13 110:17
  117:8 126:4
  130:17 134:3
  135:11 137:5
  141:10 144:8
  148:24 156:21
  159:18 160:11
  160:21 161:22
  166:20 170:10
  171:7 172:7
  177:9 179:22
  179:23,25
  180:1,4,13
  182:18,22
  183:11 184:8
  189:21 190:14

**says**  59:6 62:20
  71:9 73:11
  76:5 78:14
  100:6 121:24
  123:4 124:17
  129:6 133:11
  135:3,13
  138:18,22,25
  143:1 145:7
  150:11 162:7
  173:9 175:11
  178:3 179:13
  181:14 183:16
  184:9,10,18,19
  185:11,17
**scans**  30:15
**schedule**  14:2
  22:2,14,15
  23:14 26:1,4,5
  26:6,6,23,25
  27:17 30:9
  32:18 33:11
  36:7 73:13
  79:14,15,22
  80:7,9 83:3,6
  85:5 141:14,16
  141:18,19,20
  142:4 180:2
**scheduled**
  22:13 26:12
  27:2 30:11,13
  142:1
**scheduler**
  143:1,3

**schedules**
  78:23 80:5
  84:18
**scheduling**
  31:2
**school**  16:22
  154:21
**scream**  165:14
**screamed**  87:24
  161:9
**screaming**
  168:1 170:14
**screen**  162:13
**scribe**  56:12
**second**  15:23
  18:21 35:6
  45:7 89:1 99:4
  101:21 114:24
  136:1 137:3
  152:20
**see**  14:9 23:17
  24:13,14 25:11
  25:20,21 26:5
  26:11,14,16
  28:2,3,5,20,22
  28:25 29:1,2,3
  29:4 30:2
  31:13,13,16,16
  32:25 34:14
  40:13,15,24
  46:24 53:15,21
  61:9 71:9,9
  76:5 80:17
  82:24 83:14
  84:24 85:8,9

**[see - several]** Page 40

85:15 86:18
87:20 89:15
91:4 92:17
99:8,18 100:23
102:17 103:2
103:25 104:1,6
104:25 111:9
115:11 119:5
121:5 122:4,4
122:18 124:8
124:19,25
132:14 142:7
142:13,25
143:8 145:8
151:10 162:11
165:5 174:6
180:6 184:17
187:8,11,23
188:11,24
189:17,19,20
189:21 194:16
197:17 198:20
198:24 199:2
199:20
**seeing**  25:1
27:25 28:8,13
29:15 55:16,17
66:8 86:12
101:23 104:3
142:2,9,18
143:4 151:25
181:23 197:20
197:22
**seeking**  107:18
137:18

**seemed**  174:2
**seems**  34:15
**seen**  30:22,23
42:22,24 51:4
101:14 102:18
118:8 136:15
137:11 145:14
180:22,25
181:4
**sees**  25:16 92:5
95:6 143:16
**self**  8:19
**selina**  17:2
**sell**  148:6,9
149:5,6,11
150:13,16
153:9
**selling**  148:2
**semaglutide**
161:8,19
162:10 163:5,9
163:19,24
164:13 165:5
166:1,6,13,15
169:21 170:20
171:3,11
**semiprivate**
51:18
**send**  46:13,21
50:4 78:23
120:7,22
159:17 178:20
**sending**  145:17
**sense**  161:23

**sent**  39:1 60:22
64:5 112:7,14
122:3 129:18
138:18 139:22
160:6 161:17
161:18,19
162:6,10 163:5
163:9,18,20
169:22 178:1
179:11
**sentence**
134:24
**separate**  9:23
11:9,9,14,18
103:7
**separated**
22:21
**separately**  71:3
**september**  67:2
**service**  10:22
10:25 52:21,22
71:2 85:16
101:7 133:7
138:19,21
145:11 150:14
150:16 155:23
201:10
**serviced**  151:15
**servicer**  102:4
**services**  10:4
29:22 30:1
45:10,13 46:9
49:22 52:19,23
52:24 60:1,3
69:21 70:4,8

70:12,13,16,25
71:1,5,18,22
72:2,4,18
73:11,14 75:5
75:8 76:6,14
92:5 97:21
99:11,12 104:7
145:9 158:18
191:17 200:21
**servicing**  88:14
91:11,11,12,20
92:1 95:4
97:10 100:23
101:6 115:5
133:11 137:8
140:20 144:4
150:17 180:17
181:19
**session**  44:9
**sessions**  195:13
195:14
**set**  8:7 15:14
51:9 54:15
202:8
**sets**  168:25
**setting**  62:3
**settlement**  90:7
**seven**  6:19
168:18
**several**  20:16
28:1,9,10 41:2
104:22,24
115:18 169:7
182:3 187:19

**[severally - spa]**                                          Page 41

severally  1:19
severance
  160:12 171:18
  171:20 186:22
shadow  51:11
  51:12
share  10:22,25
  11:1,16 15:10
  15:12
shared  22:2
shares  15:11
she'd  34:14
  35:12 168:23
  188:3,4,9
  191:25
sheet  134:19
short  54:17
  106:3
shorter  14:14
show  12:23
  34:3 55:4,11
  84:1 86:16
  131:15 158:2
  158:11,12,17
  159:21 163:12
  179:1
showed  86:15
  126:15 159:22
showing  41:23
  87:11 198:10
shows  43:14
  151:18
side  17:21
  60:10,12,15
  89:17 106:18

sign  60:21
signature
  202:20
sim  122:13
  123:4 125:22
  138:18 139:22
  145:6,7,18
  146:1
simply  108:19
  169:22
simrath  16:10
  46:1 47:15
  48:2,4,18,21
  50:10 65:22
  96:22 117:4,8
  118:7,10,11
  122:6 129:23
  136:25 200:22
simrath's  47:20
single  176:3
  201:11
sit  6:7 22:8
  44:9,20 149:1
  152:5 171:5
  188:3,9
site  114:18
  139:2,5
sitting  96:12
  175:24 188:3
  189:14
situation  63:11
  65:2 76:9
  98:23 99:23
situations
  87:24

six  40:11 41:7
  187:21
size  59:11
skill  54:15
  168:25
skip  122:14
slight  165:3
slows  164:9
small  126:15
social  149:16
software  177:6
sold  165:10
sole  76:10
  169:3
solely  73:11
  75:8,8 76:6,7
  76:11
solid  5:19
solutions  10:15
somebody
  18:11,18 51:2
  51:5 53:22
  92:5 108:11
  112:4 119:13
  125:23 132:6
  149:9 150:17
  150:21 156:9
  156:19 181:22
  183:3 187:8
  189:5 192:16
  193:21
somebody's
  55:20
soon  171:22

sorry  31:21
  35:11,15 37:18
  40:22 47:19
  52:5 55:5 57:9
  57:23 61:17
  70:2 87:1 88:5
  93:23 98:9,20
  99:4 105:25
  111:24 112:3
  120:17 122:13
  136:14 138:20
  170:3 179:10
  181:12 185:2
  185:23 194:5
  195:13
sort  14:4 32:9
  49:16 87:9
  166:9 197:18
sound  47:7
  133:4 134:5
  137:13 155:14
  177:20
sounds  13:15
  50:10 100:15
  167:12 173:8
  176:17 186:20
southern  1:3
spa  1:12,14
  8:25 9:22 10:4
  10:5 11:11
  15:6,12,16
  17:24 20:21,25
  21:12,15,18
  22:5,7 33:25
  87:13,17,21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[spa - stop]**

88:4 105:14
106:2,5,7,10,11
106:19,21
111:8 112:20
112:21 147:5,9
147:18,20
148:10,15,19
148:20 149:2,7
149:15,15
150:1,5,12,18
151:15,17
152:9,10,13,17
152:25 153:5
153:14,25
154:1 155:6,8
156:2,10,25
161:8 166:6
172:21 199:12
201:8
**speak**  50:6
95:25 134:25
**speaker**  166:9
**speaking**
184:10 186:17
188:17
**speaks**  77:12
**specialized**
45:6
**specific**  12:23
21:25 51:22
75:13,14 117:7
136:22
**specifically**
100:18 109:15
179:16 201:3

**speculate**  158:7
183:25
**speculation**
67:11 68:2,4
102:8,15 158:5
158:14 178:19
**speculatively**
67:8
**spend**  13:11,13
27:12,15 45:2
51:10 52:10
150:12
**spending**  27:21
175:11
**spent**  45:3
152:23
**spider**  71:16
**spite**  173:3
**split**  23:19 25:7
81:16
**spoke**  95:24
96:1
**spoken**  141:23
**spouse**  174:22
**ss**  202:3
**staff**  15:11,11
15:13 33:14
45:19 82:6
83:13 112:24
114:15 120:2
126:8 141:2
151:22 161:9
162:2 198:3,6
200:17

**stamp**  126:4
**stamps**  121:19
**stand**  36:25
165:14 173:22
174:24,25
175:7,8
**standard**  31:18
187:3
**standardized**
43:17
**standards**
176:10
**standing**  159:7
161:21
**start**  13:18
15:18 23:9
29:6 31:6
41:10 65:17
85:25 138:17
161:18 192:18
198:14 200:19
**started**  13:19
13:21 28:4
29:7 35:7,8
65:12 87:10,10
87:22,23
107:21 168:1
190:13,13,15
192:17,22
**starting**  165:4
**state**  69:21
70:4 72:3,18
81:15 84:17
131:11 202:2

**stated**  191:16
**statement**
66:20 67:14
70:6 71:8,17
71:24 91:6
129:9 134:20
139:15 141:7,9
**statements**
178:14
**states**  1:1
**stating**  63:10
**station**  188:3,5
188:6
**stay**  21:23
**stenographer**
5:8
**stenographic**
202:11
**stenographic...**
2:5 202:9
**step**  49:2 56:14
56:15 57:2
61:13
**stick**  101:21
**sticks**  37:4
**stipulations**
145:10
**stomach**  164:4
164:9
**stood**  167:7
190:13
**stop**  21:14
134:15 157:22
159:18

stopped 87:18
stopping
  177:19
straightforward
  31:19 113:10
  114:13
straith 11:8
  14:7
stressful 99:23
strictly 136:5
strike 53:12
  91:1
stroke 71:16
strong 167:12
studies 61:11
study 126:11
stuff 12:8,14
  18:5 32:22
  50:20 55:14
  69:9 87:1,3
  91:5 96:20
  175:3 190:19
  190:21
subcutaneous
  164:2
submitted
  46:10 48:17,17
succeed 148:6
succinct 186:20
sufficient 62:13
  63:1 73:3
suite 2:1,18 3:4
suites 13:8
summarization
  64:19

summarizing
  125:3 130:11
  130:15
sunday 144:17
  144:22 146:8,9
  146:16,17
supervises 20:8
support 175:19
supposed 22:3
  22:4,6,25
  23:22 36:21
  37:12 44:12,17
  49:2 52:13
  55:25 56:2
  58:10,14 59:16
  65:9,25 67:12
  86:18 87:13,20
  89:5,5 104:18
  119:20,22,23
  120:9 149:11
  150:15 152:25
  153:1,2 181:14
  192:7
sure 5:18 8:1
  14:17 15:2,17
  15:19 23:8
  25:23 26:23
  29:10,19 37:4
  37:14 42:20
  43:16 44:17
  51:4 53:16
  57:4,11 59:10
  59:21,24 60:9
  64:10 65:6
  68:12 69:12

72:11,13 76:7
77:19,21 80:12
81:9 82:5
87:16 92:15,16
94:13 100:15
105:10 108:17
110:6 113:11
116:14 119:8
124:3,15 130:3
135:24 139:12
146:2 165:18
167:3 168:14
178:2 182:6
184:12 187:15
187:19 194:13
197:12 198:3
surgeon 10:17
  126:13,14
surgeries 12:7
  12:25 23:23,23
  24:22 32:16
  49:9,10 70:18
  71:23,23 82:12
  84:1,14 199:20
surgery 12:5
  13:1,25 14:9
  46:25 49:14
  53:11 71:15,15
  72:9 82:14
  84:2 105:4
surgical 1:11
  8:24 9:3,7 14:4
  16:8 20:17
  22:20 71:13

surprised
  87:25
swim 82:19,20
  82:23,23 83:10
  84:1,2,9
swimmer 82:17
swimming
  82:17 83:7
  84:14 141:25
  143:14,19
  155:19
sworn 5:6
symptoms
  129:14
syndrome
  130:5 131:1
system 47:17
  56:19,23 58:1
systems 57:5
  58:25 59:7

**t**

t 131:8
table 4:1
take 20:6 45:7
  49:2 53:25
  54:4,18,24
  64:22 66:15
  71:7 72:16
  75:18 81:7,13
  82:9 122:10
  128:8,12 138:8
  177:16,18
  178:4,18
  179:14 183:17
  183:20 199:19

**[takeaway - thing]** Page 44

| | | | |
|---|---|---|---|
| **takeaway** 122:14 126:5 | 186:14 197:6 197:13 | 123:21 125:16 125:17 139:22 | **testifying** 123:23 |
| **taken** 2:1 192:7 202:7,11 | **tanya** 15:19 16:7 | 147:8 148:21 159:4,15 | **testimony** 119:14 125:3 |
| **takes** 13:4 14:8 16:15 82:13 84:13 | **taught** 65:20 126:15 | 161:22 165:11 169:11 174:18 | 130:2 143:6 |
| **talk** 25:22 30:9 42:16 44:9 45:4,24 51:14 54:18 93:7,11 96:1 115:14 124:11 150:9 154:7,8,9 164:19,20 167:2 174:14 196:21 | **taxes** 94:1,5 **taylor** 2:15 **tech** 33:19 **technically** 65:25 **techs** 17:19 **telegraph** 84:12 **telehealth** 100:1 101:9,18 101:20 114:7 | 179:21 182:14 184:1 188:22 189:20 191:24 192:2 199:14 **ten** 10:10,19 **tenet** 9:18 **term** 7:16 51:4 76:18 139:4 164:6 **terminate** 33:20 | **tests** 61:13,24 64:2 **text** 76:25 77:2 108:17,20,21 108:22 109:1,7 109:10,14,19 110:14,19,22 114:8 118:9 137:25 138:1,5 160:17 162:21 162:22,23 177:3 |
| **talked** 38:15 150:8 170:16 170:18 176:23 182:3,3 186:24 | **televideoing** 143:15 **tell** 20:10 46:20 56:9 61:17 | **terminated** 19:7 33:15,18 33:19,22 34:2 34:8 110:15 140:16 147:13 148:13 | **texted** 109:19 109:21,23 110:7,17 118:11 |
| **talking** 12:20 36:22 42:18 51:18 65:2 66:21,21,22,24 71:4 87:7 91:25 103:7,22 113:15,21 132:10 136:3,5 136:12 144:14 146:15 149:3 153:19 161:11 162:17 165:1,2 168:15 172:14 179:4 180:12 | 74:25 100:17 124:10,22 130:17 140:6 142:15,20,22 143:7 146:5,7 152:5 154:22 162:7 171:5 175:25 176:4 182:2,4,4 183:24 189:23 **telling** 109:10 110:19 116:23 118:2 119:1 121:12 123:3 | **terminating** 146:20 147:2 **termination** 35:20 146:10 146:12 163:10 185:22,23 190:1 191:15 **terminology** 28:20 **testified** 5:8 **testify** 5:6 | **texting** 109:18 **texts** 109:3,9 110:1,3,5,10 177:6 197:17 **thank** 149:25 177:7 183:5 195:2 200:8 201:23,24 **thanks** 137:12 **thehlp.com** 3:7 **therapist** 150:3 **thing** 11:15 14:10 32:9 42:24 43:4 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

49:11 60:6
66:9 78:1
90:11 107:8
149:4 169:21
171:7 176:3
186:20 192:15
**things**   22:18,22
28:23 30:5
31:6 32:8
36:11,20 41:16
41:23 44:12,23
45:8 49:8,10
50:20,22,22,25
65:8 70:19
76:11 78:6
80:13 82:9
88:18 89:3
91:21 95:4,15
95:17,20 96:17
97:3,11 111:21
119:24 126:22
127:8,8 150:16
157:8,11
161:23 169:1
169:13,15
173:25 175:17
189:18,20
192:2 196:9
199:21
**think**   6:12
16:22 17:18
19:11 26:20
27:10 32:4
33:13 36:20
39:11 40:6

42:5,19 44:25
47:3 67:23
90:6 93:5 94:8
94:14 98:13
99:1,19 102:2
110:18 114:8
116:9 118:16
118:17 129:21
135:19 136:7
140:15 145:14
149:23 150:2
153:13 164:8
166:12 167:23
170:8 173:20
177:3 193:23
**thinking**
157:14,23
166:10 183:19
197:7
**third**   46:2,3
200:23
**thirdpartypay...**
145:13
**thought**   35:15
35:16,16,17
96:6,7 117:24
142:17 172:20
174:2,19
176:24 188:13
**thousand**   77:14
**three**   12:4,9,17
13:13,14,19,23
14:12,12 17:25
160:12 171:18
171:21 174:9

176:16 193:23
193:23 195:22
195:22
**thurner's**   130:4
130:23 131:1,5
131:8,9
**thursday**   24:10
25:1,3 30:11
30:21 155:11
**thursdays**
24:20,21
**time**   7:14 10:12
13:11 19:10,20
24:19 26:3,14
26:18 27:3,9
27:10,12,13,15
27:21 31:9
33:3 35:3 36:6
38:18 40:15,15
41:5,6 43:12
43:13 44:22
47:20 51:10
52:11 54:8
55:4,11 56:6
57:22 60:18,18
63:6 70:19,19
71:18,19 75:18
81:19,24 82:20
83:11 85:17
89:10 90:15
95:3 103:18,20
103:22 104:2
106:17 109:4
110:15 112:2
118:8 125:1

142:12 143:13
145:2 150:12
152:22,22,25
153:1,2 156:8
163:13 170:12
170:18,23
178:23 187:20
190:6 195:6,23
198:5,10,18
199:17,18
200:9 201:17
201:24
**timeframe**
12:19
**timeline**   113:11
**times**   12:4,9
13:20 20:16
23:9 41:22
66:13 97:23
104:10,22
141:24 158:3
174:8,9 182:3
194:21
**title**   34:17
47:20 54:12
111:24
**titles**   15:1,18
18:1
**today**   24:1,5
27:20,25 79:2
96:12 98:12
100:17 114:4
119:14 125:7
130:2,8 132:4
136:3 137:16

138:25 148:17
148:21 160:18
166:13 168:13
169:12 173:25
175:24 176:3
177:23 184:1
184:23 185:2
185:21 187:14
189:14,23
199:15
**today's** 28:5
177:16,25
178:3,17
179:13 182:13
183:17
**together** 42:25
72:25 81:18
109:6 112:4
198:6
**told** 35:13 68:9
69:3 78:24
91:19 95:14
97:8 98:19
99:1 100:20
107:19 110:24
111:6 112:11
118:10 142:11
144:6,18 148:1
148:17 150:15
157:25 170:4
170:22,24
175:14 179:9
179:10 182:7,8
185:11 190:6,7
190:8

**tomorrow**
144:9 185:8
**ton** 87:17 90:12
**took** 7:10 58:20
59:22 65:13
90:7,7
**top** 104:24
121:24 123:5
164:4 177:4
**topic** 198:8
**total** 70:16
71:22
**touch** 162:13
162:22 163:23
**towards** 188:20
**town** 110:25
134:5,23 135:4
135:10 136:13
**track** 38:11
148:15 168:5,8
**train** 51:13
**trained** 44:1
126:13 169:1
172:19
**training** 36:4
36:14 37:11
43:23 44:3,7,8
48:21,24 50:11
50:14 51:14,16
51:21,22 52:3
54:19 55:15,22
66:3,8 100:8
113:3 114:17
114:19,21,22
114:23 150:23

166:4 195:13
195:14 196:4
200:18
**trains** 43:25
**transcript** 5:20
202:11
**transcription**
202:10
**transition** 66:7
106:16
**transitioned**
46:7 47:15
106:15
**travel** 32:9
**treat** 28:20
102:21 172:25
**treated** 102:23
**treating** 102:20
117:25
**treatment**
31:19 61:11,12
70:14 71:14
**treatments**
61:22 63:21
71:15,24 90:12
**trenton** 11:7
**tried** 116:6
159:20,20
161:23 164:19
**trouble** 183:12
**true** 54:6 66:20
74:7,8,14,19
117:10 119:4
127:17,19
139:25 140:2

143:11 202:10
**trusted** 35:1
**truth** 5:6,7,7
62:13 63:1
68:20 73:3
125:16,17
**try** 5:19 19:21
21:16 39:12,25
40:9,11,11
41:7 49:18
56:2,10,11
57:11,13 59:19
65:7 82:23,25
95:2 102:24
116:2,2
**trying** 5:22
17:18 39:7
92:20 103:15
108:15,15
113:9 124:10
124:14 162:18
167:10
**tuesday** 22:3
24:15 25:1
30:10 31:22
**tuesdays** 24:19
24:21
**turn** 95:12
**turned** 87:25
**turnovers**
18:12
**twice** 196:15
**two** 6:8,14
10:12 11:9,9
11:16,18 12:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

12:9,17 13:14
14:12,16 15:5
15:11 16:22
17:8,16 18:20
19:8,19,23
24:15 25:17
38:5 39:5,17
83:25 84:3
87:24 90:2
96:1 106:14
111:17 153:7
192:21,22
193:1 196:24
196:25 197:1,5
**tyler** 184:18
**types** 10:25
29:25
**typical** 74:22
**typically** 19:19
24:7 73:12,16
74:9,10,15,19
75:9 81:20
82:20 83:11,18
83:23
**typing** 56:22

**u**

**u** 131:8 173:3,3
**uh** 40:20 132:2
132:2 133:15
133:15 172:11
172:11
**ultrasound**
17:19 33:19
**ultrasounds**
30:17 44:15

**um** 5:20 7:6
11:20 21:8
25:8,13 28:7
28:15 38:23
53:20 69:23
75:17,21 76:19
81:25 82:8,23
83:17,20 92:2
93:15 94:17
108:10 114:12
122:9,12,19
133:8 137:14
139:9 141:3
146:11 152:2
174:17 176:5
180:20 183:15
186:9 192:12
**unclear** 86:17
113:23 139:14
140:2,11
**uncomfortable**
180:11
**under** 27:4
62:16 73:11
75:5 76:11
77:3 80:23
92:1,6,7 98:4
104:15 105:1,5
105:11 115:6
120:16 131:6
135:14 136:16
138:22 139:10
139:18,24
140:1 141:14
143:9,12,17

145:11,11
149:5 156:15
157:11 161:24
161:25 178:11
178:15 181:1,4
181:10,15
182:25 183:3
184:13 190:12
190:24
**understand**
5:14 15:10
19:3 24:18
29:19 36:4,25
44:17 46:16
47:6 51:17
52:11 55:25
61:8 62:17
63:3 67:5,9
69:8 75:20,23
78:2 84:4
89:21 90:17
92:3 96:5 98:2
102:19 109:17
113:3,9 115:3
138:3 158:25
159:9 161:11
165:11 166:22
167:10 169:15
169:17 175:12
175:18 179:17
179:20 188:10
188:15 189:10
189:11,23
**understanding**
23:19 50:17

88:19,20 92:4
92:20 99:22
107:9,11
117:24 134:18
140:19 181:18
**understands**
50:17,19,20,24
95:2
**understood**
86:6 90:5
122:3 141:6
164:16 167:11
189:8
**underweight**
164:17,25
165:25 167:18
167:19 170:5
**uninsured**
72:16
**united** 1:1
**unnamed**
174:22
**unpleasant**
196:20
**unprofessional**
197:6
**upcoming**
154:8
**updated** 133:13
**ups** 31:17
**upset** 35:10
128:6 167:11
**use** 20:21 21:24
22:17 47:17
51:1 101:9

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

121:10 126:9
128:20,25
129:10 131:9
159:11 166:1
171:11 174:23
191:3 194:11
**used** 20:24
21:11,11 33:5
34:23 43:9,10
51:23 104:6
120:5,7 169:24
**uses** 143:22
**using** 13:4
21:14 33:4
122:15 126:5
129:7 131:8
159:16 166:13
167:17 171:13
171:14 201:19
**usually** 12:22
39:14,16 41:7
41:8 44:1
57:22 58:3,23
84:22 153:23

**v**

**vacation** 81:13
81:14 84:17
85:9 87:12
135:11
**vacationing**
81:18
**vacations** 32:16
84:15
**vague** 192:4

**vaguely** 117:17
118:3 155:15
**value** 73:14
**variations**
42:11
**varicose** 71:16
**varies** 27:23
45:17
**various** 51:17
151:2,4
**varithenas**
172:25
**vascular** 1:11
8:24 9:2,3,7,20
11:10 15:7
19:4 22:20
23:25 24:8
29:25 70:14
71:9,12,13,14
93:12 126:13
126:14 172:22
172:24 199:11
201:8
**vein** 1:11 8:24
9:2,2,7,20 15:6
22:20,24 23:25
24:8 29:25
30:3 31:19
44:14 70:14
71:9,12,13,14
71:16 89:13
90:1 93:11
149:10 199:10
201:7

**veins** 173:1
**venous** 126:9
126:10,10,12
127:15,22,23
128:3,4,18,19
129:14
**venting** 197:23
**verbally** 153:11
175:23 182:2
**verifying** 60:14
**versus** 64:19
145:11
**victims** 71:16
**video** 101:10
**view** 165:20
**vincent** 3:1
**virtually** 104:3
**visit** 56:5,6,6
126:11
**visits** 24:2,7
26:15 48:13,14
53:1 158:16
**vitals** 16:15
54:18
**vitamin** 90:12
**voice** 196:12
**vs** 1:7

**w**

**wait** 139:1,4
177:1 185:7,7
185:8,15
**waiting** 64:23
**walk** 53:18
56:19 106:3,3

**walked** 167:8
**walks** 56:7
**want** 5:15
14:17 15:4
17:10 25:22
31:16 38:18
39:10 41:9,10
50:4 59:10,24
81:4,6 86:7
107:17 138:4
142:25 143:23
151:13 160:20
162:22 171:19
171:24 178:10
179:18,18,21
180:10,10
181:1,3,3
183:12 185:19
187:17 191:3,5
191:6
**wanted** 18:20
19:4,5,6 21:24
29:9 31:16
43:15,16 50:6
131:14 137:4,5
141:14 142:4
158:20,25
180:14 187:4
189:4 193:19
198:20,23
**wanting** 133:16
**wants** 41:8
50:24 143:22
181:24 184:13

**warning**
153:12,17
**warren** 11:4
**watch** 36:6
143:20
**watching** 22:10
**way** 22:2 28:2,3
31:23 46:21
86:4 88:17
93:1 141:10,12
154:18 174:20
178:15 192:8
**wayne** 6:12
202:4,23
**we've** 9:1 16:7
143:1 168:12
173:16 175:22
182:3 200:6
**wednesday**
30:10
**wednesdays**
24:21 25:5
134:4,8,15,21
157:9
**week** 12:2,4,9
12:17 13:13,23
14:11,12 25:12
25:17 82:24
83:23,24,25
84:3
**weekend**
122:14 146:17
146:17,19
**weeks** 19:9
160:12 163:11

166:17,18
171:18,21
176:16 187:21
192:21,22
193:24
**weight** 10:7
163:25 164:5
165:6,8,11
**went** 19:2,17
44:22 64:12
72:6 86:14
107:23 108:1
114:16 124:23
149:23 154:14
154:15 171:6
**when's** 170:18
**where'd** 98:7
**whoa** 167:9
**wildly** 192:4
**wing** 6:17
**wise** 94:8
**withdrew** 7:12
**witness** 4:3 5:5
170:14
**wonder** 189:6
**wondering**
51:5 69:15
**word** 28:10
118:5,6 121:16
123:21 143:22
151:8
**words** 35:11
117:23 130:15
167:21 173:14
174:23 175:1

186:15
**work** 11:3 16:3
17:19 20:7
21:21 23:12
24:25 32:10,11
36:24 37:2
40:8 45:1 47:6
48:11 52:8
53:13 57:21
86:7 87:21
89:8 156:10
163:15,16
170:25 171:21
172:3,13 183:2
184:2 185:20
185:25 197:25
**workday** 23:7
**worked** 48:5
66:4 89:10
90:15 94:12
126:14 141:15
163:11
**working** 11:23
22:16 36:9
39:7 42:10
43:6 89:16,17
90:8 149:7
155:6,8 156:25
158:20 161:24
168:16 186:18
193:16 198:21
199:2,3,5
**works** 11:4,5,7
14:6 17:9 18:3

**world** 16:1
45:11 46:14
150:24
**worry** 116:24
**wound** 30:4,4
30:18 57:7,8
59:11 101:15
**wounds** 59:9
**wrap** 81:4
**write** 40:7
55:25 56:10
61:12 111:10
111:12 129:13
129:14 134:25
136:9 173:2
175:6 184:14
**writes** 40:5
134:14 140:16
163:4,6,10,11
176:13 177:3
177:14 179:5,6
181:8,11,12
**writing** 35:20
37:7 43:18
44:3,4 61:1
71:2 80:11,14
86:22 88:9
108:14,16,19
112:23 114:14
116:18,22
147:1,4 153:8
153:11 170:10
170:21 171:2
180:4 182:1
184:1 189:17

**[writing - zimmerman]** Page 50

191:13
**written** 44:6
58:16 88:6
91:6 96:23
123:4,6 178:25
185:3,10 191:7
**wrong** 35:12
74:13 96:5,7
96:11 124:25
160:8 170:8
**wrote** 86:25,25
117:3 134:9
144:3 179:2
181:13 184:2
**www.aapa.org**
145:13
**wyandotte**
11:24

**x**

**x** 27:9 44:15

**y**

**yahoo** 129:23
134:3 140:17
**yahoo.com**
120:22 121:2,7
121:11 122:1
**yahoo.com.**
120:13,21
121:4
**yeah** 7:13,15
8:21 9:5,12
11:14,22 12:10
13:14,16,25
14:5,14 16:8

17:16 18:12,12
18:23 19:8,21
19:21,24 21:1
21:3,10 22:15
24:17 26:16
28:7,21,23
29:3,17 30:12
32:10,19 33:2
33:5,24 34:16
37:4,16 38:6
39:12 42:19
43:11,19 44:13
47:2,3,9 49:5
51:7 54:21
55:6,6 57:1,25
59:24 65:18
66:18 67:9
70:24 71:6
72:15,21 78:12
80:8 81:19
82:19 83:5,10
84:5 85:5
86:21,24 89:17
90:11,16 92:19
94:3,12 95:18
99:17 102:24
104:13,16,24
109:12,12,21
115:17 118:19
118:24 121:3
125:4 130:16
136:2 138:13
141:17 143:2
145:4 146:6
150:11 151:12

154:24 158:6
160:4 162:21
163:2 164:19
167:20 168:12
171:13 172:17
174:7 177:2
185:11 187:8
195:6
**year** 6:24 7:4,5
9:12 18:17,25
29:7,15 31:7
40:10 41:5,6
42:17 81:14
87:6 90:23
93:2,4,5,6,22
93:24 94:1,5,7
94:11,11 104:6
109:4 111:2
170:19,20
**yearend** 94:6
**years** 6:19,19
12:1 13:19
16:22 19:22
28:1,9,12,13
30:23 41:2
168:18,23
193:19
**yelled** 167:8
**yelling** 161:21
**york** 81:21

**z**

**zero** 93:6 160:5
**zimmerman**
1:5 3:11 5:13
21:5 23:1,4,6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Michigan Court Rules

Chapter 2: Civil Procedure

Subchapter 2.300 Discovery Rule 2.306

(f) Certification and Transcription; Filing; Copies.

(1) If transcription is requested by a party, the person conducting the examination or the stenographer must certify on the deposition that the witness was duly sworn and that the deposition is a true record of the testimony given by the witness. A deposition transcribed and certified in accordance with sub-rule (F) need not be submitted to the witness for examination and signature.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.