UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULIA ZIMMERMAN,

      Plaintiff,

v.

ELIZABETH A. PENSLER, D.O., PLLC, *et al.*,

      Defendants.

_____/

No. 23-11634

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [38]**

Plaintiff Julia Zimmerman initially brought three claims against her former employer, Elizabeth A. Pensler, D.O., PLLC; Elizabeth Med Spa, PLLC; Derek L. Hill, D.O., PLLC; Elizabeth A. Pensler, D.O.; and Derek L. Hill, D.O. (collectively, "Defendants"), but only her retaliation claim under the False Claims Act ("FCA") survived Defendants' motion to dismiss. Defendants now move for summary judgment on that claim. (ECF No. 38.) Plaintiff opposes the motion. (ECF No. 44.) Defendants have replied. (ECF No. 48.) Plaintiff has also filed a sur-reply and Defendants have responded. (ECF Nos. 50, 54.) Under Eastern District of Michigan Local Rule 7.1(f)(2), the motion will be decided without oral argument. For the reasons below, the Court DENIES IN PART AND GRANTS IN PART the motion.

## I.    Background

Plaintiff is a physician assistant who started her employment with Defendants in October 2022. At the time, she had fourteen years of experience working as a physician assistant. (ECF No. 44-2.) Plaintiff's job duties included reviewing patients' medical

1

histories, consulting with and examining patients, providing treatments, conducting procedures, diagnosing patients' conditions, and ordering diagnostic tests.

Defendants are medical providers who bill insurance providers for their services, including state and federal Medicare and Medicaid programs. Generally, under Centers for Medicare & Medicaid ("CMS") guidelines, services solely provided by physician assistants are typically reimbursed at a reduced rate of 85% of the CMS fee schedule amount for the value of the services but there is an exception to this general rule for services performed by a physician assistant that are provided "incident-to" the services of a physician. Under the Medicare Benefit Policy Manual, billing for incident-to services at the full rate is only permissible if the physician performs the initial service, creates the care plan, is on-site for any subsequent visits, and participates in any visits during which changes are made to the patient's care plan.

According to Plaintiff, shortly after becoming employed by Defendants, she observed and began reporting what she deems fraudulent billing practices. In particular, she was concerned that Defendants were billing for incident-to services even though the CMS criteria were not being met. (*See* ECF No. 44-3, PageID.2371-72.)

On January 21, 2023, Plaintiff emailed Dr. Pensler and the lead biller, Simrath Davison, about a recent case and stated that the staff "should not be using diagnoses if the diagnosis doesn't actually exist as a finding" as doing so could "open us up for issues if we were audited for billing, or potentially in litigation." (ECF No. 44-10.) Plaintiff included in her email "some CMS accepted diagnoses for our most common dopplers." (*Id.*) Plaintiff testified that in late January or February 2023, she had a conversation with Dr. Pensler and the practice manager, Pavlina Goodman, about her concerns. (ECF No. 44-

2

3, PageID.2371.) A few weeks later, Plaintiff spoke with Dr. Pensler and Goodman to reiterate her concern that they were not meeting criteria for CMS guidelines. (*Id.* at PageID.2377.) Plaintiff sent Dr. Pensler and Dr. Hill a printout from the American Academy of Physician Assistants ("AAPA") explaining the CMS requirements that she believed were not being met. (*Id.* at PageID.2372.)

On March 1, 2023, Plaintiff sent an email to Davison stating that because she saw a patient for her first visit, it was important that it would be billed appropriately. (ECF No. 44-13.) Despite this email, Davison represented that Dr. Pensler was both the billing and servicing provider. (*See* ECF No. 44-9, PageID.2664.) On March 8, 2023, Plaintiff sent another email, this time to Dr. Pensler, Davison, and Goodman, asking them to confirm that she would be recorded as the servicing and billing provider for patients that were only seen by her. (ECF No. 44-14.) Goodman responded that Plaintiff would be recorded as the billing provider "on Wednesdays and when the Doctors are out of town."

According to Plaintiff, during a meeting with Dr. Pensler and Dr. Hill that took place later that month, she was told that "they did not feel like it as a big deal that [they] weren't actually doing incident-to" and instructed not to list herself as the servicing provider. (ECF No. 44-3, PageID.2373.) They told Plaintiff that they would lose money to bill under the physician assistant rate and to stop worrying about it. (*Id.* at PageID.2377.) On March 16, 2023, Plaintiff sent Dr. Pensler and Goodman a follow-up email stating the "when the patient is seen by the PA, the visit must either be billed in the PA's name . . . or if billed under the physician would fall under 'incident to' billing. Incident-to billing can be cumbersome, as the physician must be physically present in the building, see new patients, and see every patient that has a change of treatment plan." (ECF No. 44-15.)

The email including a link to a summary explaining "Coding and Billing for NP and PA Providers in Your Medical Practice," which referenced CMS guidelines.

On April 13, 2023, Plaintiff sent a follow-up email stating she "continue[d] to be concerned about the process of billing in the physician's name regardless of insurance carrier or servicing provider, and my personal professional liability." (ECF No. 44-16, PageID.2737.) She further stated, "As we aren't able to meet the incident to criteria, I'd like to continue to discuss what we should do when a patient is seen by me." (*Id.*) The next day, Dr. Pensler texted Goodman stating that she was going to fire Plaintiff because it was "a bad fit." (ECF No. 44-17.) She planned to give Plaintiff three weeks severance but was concerned about her remaining in the office "monitoring."

On May 8, 2023, Plaintiff sent another email indicating that she had not received a response to her previous email and that "[m]oving forward, in order to ensure that I'm in compliance with proper billing and to be able to continue with my position, I will be modifying [the listed servicing provider] when appropriate." (ECF No. 44-16, PageID.2736.) That day, Dr. Hill sent a text message to his colleagues stating, "[i]n light of today's email, we're going to have to take procedures away from [Plaintiff] when [Dr. Pensler] is not in the building. We can't afford to take the 20% loss on procedure[s] when she does them." (ECF No. 44-19.) Dr. Pensler agreed and stated, "She has to go." Defendants decided to fire Plaintiff the next day and "give Daryl a raise." Dr. Pensler informed him of the raise immediately because "[i]t'll be a little less fishy if it's not the same day."

On May 9, 2023, Defendants terminated Plaintiff's employment. Dr. Hill, Dr. Pensler, and Goodman met with her. Plaintiff testified that they told her she was being

fired because she had changed the serving and billing provider to herself in a medical chart, which would affect their reimbursement. (ECF No. 44-3, PageID.2383.)

## II.    Legal Standard

Summary judgment under Federal Rule of Civil Procedure 56(a) is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing the record, "'the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). Furthermore, the "'substantive law will identify which facts are material,' and 'summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 327 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden "of establishing the 'absence of evidence to support the nonmoving party's case.'" *Spurlock v. Whitley*, 79 F. App'x 837, 839 (6th Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once the moving party has met its burden, the nonmoving party 'must present affirmative evidence on critical issues sufficient to allow a jury to return a verdict in its favor.'" *Id.* at 839 (quoting *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403 (6th Cir. 1992)).

## III.   Analysis

The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Section 3730(h) of the statute prohibits retaliation against employees

5

who expose such fraud. When there is no direct evidence of retaliation, FCA retaliation claims are evaluated under the *McDonnell-Douglas* burden-shifting framework. *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). To establish a prima facie case, Plaintiff must prove that: 1) she engaged in protected activity, 2) Defendants knew she engaged in protected activity, and 3) Defendants discharged or otherwise discriminated against her as a result of the protected activity. *See United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008). If Plaintiff succeeds in establishing a prima facie case, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for its actions. *See Scott*, 234 F. App'x at 346. If Defendants articulate such a reason, the burden shifts back to Plaintiff to show that the proffered reason was not the true reason for her termination but was pretext for retaliation. *See id.* Plaintiff may meet her burden of demonstrating pretext by showing that the proffered reason 1) had no basis in fact, 2) was not the actual reason for the termination, or 3) was insufficient to warrant the challenged conduct. *See Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 U.S. Dist. LEXIS 21682, at *28 (E.D. Mich. Feb. 24, 2015) (citation omitted).

Defendants argue that Plaintiff cannot prove any of the elements of her FCA retaliation claim and that her termination was based on legitimate, non-retaliatory grounds. Plaintiff argues that she can establish a prima facie retaliation case and that the nonretaliatory reasons articulated by Defendants are pretextual.

### A. Prima Facie Case

#### 1. Protected Activity

With regard to the first element, the FCA protects "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or

more violations of this subchapter." § 3730(h)(1). An internal report to a supervisor may constitute an effort under the statute. *See Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398-99 (6th Cir. 2015). To be protected, however, internal reports must "specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct." *Mikhaeil*, 2015 U.S. Dist. LEXIS 21682, at *20 (internal quotation marks and citation omitted). Moreover, the allegations of fraud must have been made in good faith and must be objectively reasonable. *See Jones-McNamara*, 630 F. App'x at 399-400.

Defendants characterize Plaintiff's actions as complaints raising internal quality or regulatory concerns rather than efforts to stop fraud against the government. Several of Plaintiff's emails, however, referenced CMS guidelines. And Plaintiff has testified that during her conversations with Dr. Pensler and Goodman, she raised her concern about not meeting the criteria for CMS guidelines. (ECF No. 44-3, PageID.2377.) Thus, a reasonable jury could conclude that Plaintiff made reports regarding alleged fraudulent claims for federal funds.

Defendants also argue that Plaintiff's actions did not stem from an objectively reasonable belief that there was fraud being committed against the government. Defendants emphasize that during the underlying time period, there were certain regulations in place due to the COVID-19 pandemic permitting direct supervision via real-time audio and video technology. Ultimately, however, "an employee need not complete an investigation into potential fraud or uncover an actual FCA violation to undertake protected activity." *See Jones-McNamara*, 630 F. App'x at 399. Defendants emphasize that Plaintiff was not aware of the revised CMS guidelines, but there is also no evidence

7

that they had informed Plaintiff of them. In sum, there is enough evidence to raise a genuine issue of material fact regarding whether Plaintiff made the reports in good faith and whether her reports were objectively reasonable.

### 2. Notice

Similar to their argument regarding the lack of protected activity, Defendants argue that Plaintiff never communicated her concerns in a manner that could be interpreted as complaints regarding fraud on the government. Defendants state that the only written complaint they received discussed Plaintiff's own "personal liability" and did not identify any false claims, fraudulent conduct, or billing practices that would support a FCA violation. But, as discussed above, even those emails referenced CMS guidelines. And Plaintiff has testified that she also complained verbally about not meeting CMS guidelines. Thus, there is enough evidence to raise a genuine issue of material fact regarding the notice element.

### 3. Causation

Defendants argue that temporal proximity alone cannot establish the causation element of Plaintiff's FCA retaliation claim. But the Sixth Circuit has held "that the required causal connection between the protected activity and the adverse action can be established solely by temporal proximity." *See Maxwell v. FCA United States LLC*, No. 22-3286, 2023 U.S. App. LEXIS 6775, at *9 (6th Cir. Mar. 21, 2023) (citing *Render v. FCA US, LLC*, 53 F.4th 905, 921 (6th Cir. 2022)). Here, there was only one day between the last of Plaintiff's emails on May 8, 2023, and her termination on May 9, 2023. And in fact, there is additional evidence from which an inference of causation can be drawn. In text messages, Defendants explicitly stated they were moving forward with firing Plaintiff in

8

light of her email and that they could not afford to list her as the serving provider. Plaintiff also testified that during her termination meeting, Defendants told her they were firing her for this reason. In sum, Plaintiff has presented enough evidence to establish a prima facie case of FCA retaliation.

### B.      Pretext

Defendants argue that even if Plaintiff could establish a prima facie case of retaliation, there were legitimate, non-retaliatory reasons for her termination, particularly her performance issues. Plaintiff argues that the reasons articulated by Defendants had no basis in fact and did not actually motivate the termination.

Despite the testimony regarding Plaintiff's alleged performance deficiencies, there is no record of any disciplinary actions taken against Plaintiff due to those deficiencies. Moreover, Defendants stated in their text messages that Plaintiff "has to go" due to her email indicating she would be listing herself as the servicing provider. Plaintiff's testimony about what she was told during the termination meeting is also relevant to the issue of pretext. For these reasons, there is a genuine question of material fact regarding whether the proffered reasons were pretext for unlawful retaliation. Accordingly, Plaintiff's FCA retaliation claim survives Defendants' motion for summary judgment.

### C.      Named Parties

Defendants argue that Plaintiff failed to name the proper defendant and that her actual employer was Ferndale Management, LLC. Defendants also argue that Plaintiff improperly seeks to hold two individuals, Dr. Pensler and Dr. Hill, personally liable.

While Ferndale Management is the entity that issued Plaintiff's paychecks, it does not appear to have played any other role in Plaintiff's employment or termination. And

"'the current version of the statute also covers independent contractors and other *employment-liked relationships.*'" *Ickes v. NexCare Health Sys., LLC*, 178 F. Supp. 3d 578, 591 (E.D. Mich. 2016) (quoting *Tibor v. Mich. Orthopaedic Inst.*, 72 F. Supp. 3d 750, 759 (E.D. Mich. 2014)). There is enough evidence in the record to support the finding of an employment-like relationship between Plaintiff and the named parties. With regard to Dr. Pensler and Dr. Hill in particular, not only were they Plaintiff's supervisors, but they also had the ability to fire her and direct the terms of her employment. Thus, the Court declines to dismiss any of the defendants.

### D.    Damages

Under § 3730(h)(2), relief from retaliatory actions "shall include reinstatement . . . [,] 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." Defendants make two specific arguments regarding damages.

Defendants first argue that when calculating back pay, interim earnings should be deducted before applying the statutory multiplier. (*See* ECF No. 38, PageID.634-36 (relying in part on *Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 891-92 (8th Cir. 2000)). Plaintiff does not dispute this point. (ECF No. 44, PageID.2340.) Thus, this issue is moot.

Defendants also argue that punitive damages are not recoverable under the FCA's anti-retaliation provision. Plaintiff does not cite any case that has found otherwise. Instead, Plaintiff asks the Court to hold off on deciding this issue, noting that the Sixth Circuit has not opined on it and that one of the cases relied upon by Defendants, *Grant*

*ex rel. United States v. Zorn*, 107 F.4th 782 (8th Cir. 2024), was on appeal. The Supreme Court, however, has since denied the petition for writ of certiorari filed in that case. Moreover, it appears that there is a consensus among the courts that have considered the issue that punitive damages are not available under § 3730(h). *See, e.g.*, *Zorn*, 107 F.4th at 796; *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 536 (10th Cir. 2000); *United States ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1095 (C.D. Cal. 2001); *see also Gierer v. Rehab Med., Inc.*, No. 4:14-CV-1382 CAS, 2015 U.S. Dist. LEXIS 169993, at *3-4 (E.D. Mo. Dec. 21, 2015) (listing cases). The Court agrees. Thus, Plaintiff is not entitled to punitive damages as a matter of law.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is DENIED IN PART AND GRANTED IN PART. The motion is granted as to Plaintiff's request for punitive damages only but denied in all other respects.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 30, 2026

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 30, 2026, by electronic and/or ordinary mail.

s/Marlena A. Williams
Case Manager

11